UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HENRY SCHEIN, INC., COVETRUS, INC., BENJAMIN SHAW, and CHRISTINE T. KOMOLA,<br><br>Defendants. | Case No.: ____<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>JURY TRIAL DEMANDED |

Plaintiff City of Hollywood Police Officers' Retirement System ("Plaintiff") alleges the following upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included review and analysis of: (a) public filings with the United States Securities and Exchange Commission ("SEC") made by Henry Schein, Inc. ("Henry Schein"), Covetrus, Inc. ("Covetrus" or the "Company"), and related parties; (b) press releases and other publications disseminated by Henry Schein, Covetrus, and related parties; (c) shareholder communications, conference calls and postings on Henry Schein's and Covetrus' websites concerning the company's respective public statements; (d) news articles concerning Henry Schein, Covetrus, and related parties; and (e) additional publicly available information concerning Henry Schein, Covetrus, related parties, and/or Defendants (as defined below).

**NATURE OF THE ACTION**

1.      This is a federal securities class action against Henry Schein, Covetrus, and certain of Covetrus' executive officers for violations of the federal securities laws.  Plaintiff brings this action under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired Covetrus common stock from February 8, 2019 through August 12, 2019, inclusive (the "Class Period") and were damaged thereby.

2.      Covetrus was formed through a spin-off and merger of the Animal Health Business of Henry Schein with Vets First Choice ("VFC"), a privately-held company, to create what the Company described to investors as the "only global animal health technology and services company."

3.      Henry Schein announced the spin-merger on April 23, 2018.  On February 8, 2019, Covetrus shares began trading on the NASDAQ Global Market ("NASDAQ").

4.      In the Offering Documents (defined below) for the spin-merger and continuing throughout the Class Period, Defendants made a series of false and misleading statements and omissions concerning the Company's infrastructure and capabilities, as well as the true costs of becoming independent from Henry Schein.   For example, the Offering Documents represented that one of the Company's "key strengths" was its "inventory management and supply chain services and technology that help improve practice efficiency and economics," and one of the "key benefits" of the merger was the creation of a "global, technology-enabled Animal Health Business with a comprehensive service and technology platform and supply chain infrastructure supporting the companion, equine, and large animal veterinary markets."   After the spin-off,

Defendants assured investors that the integration of the legacy Henry Schein Animal Health Business and VFC was "on track" to hit financial targets.

5.      Defendants' statements were materially false and misleading.   Specifically, Defendants' representations to investors: (i) overstated Covetrus' capabilities with regard to inventory management and supply chain services; (ii) understated the costs of the integration of Henry Schein's Animal Health Business and VFC, including the timing and nature of those costs; (iii) understated Covetrus' separation costs from Henry Schein; and (iv) understated the impact on earnings from online competition and alternative distribution channels as well as the impact of the loss of a large customer in North America just prior to the Company's separation from Henry Schein.

6.      On August 13, 2019, before the market opened, Covetrus shocked investors by reporting a net loss of $0.09 per share for the second quarter of 2019 when the market had been expecting net income of $0.17 per share.  Covetrus also slashed its 2019 EBITDA guidance from its recent stated estimates in February and May as much as $250 million, to disclose EBITDA guidance of just $200 million.  In doing so, Covetrus admitted that the Company would have to spend tens of millions of dollars more in infrastructure spending and redundant costs.  The Company also admitted previously undisclosed difficulties integrating the platforms and disclosed increased spending to eliminate obligations to Henry Schein as part of the spin-off. Defendants acknowledged, contrary to their statements at the time of the spin-off and, only six months *after* the merger, that they were finally "at a point where we have detailed plans and understanding of the level of infrastructure investment we need to make and how these costs break out."  Finally, Covetrus also disclosed on August 13, 2019, that the "loss of a customer weighed heavily on organic growth in Q2 by 3%."

3

7.      In response to these disclosures, the Company's stock price plummeted 40%, declining $9.30 per share, from $23.19 per share on August 12, 2019, to close at $13.89 per share on August 13, 2019.  The following day, August 14, 2019, Covetrus shares dropped another 11%, to close at $12.35 per share.

8.      Plaintiff and the other Class members have suffered significant damages due to Defendants' false and misleading statements and omissions.

I.      **JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Henry Schein, which effectuated the spin-off, merger, and creation of Covetrus, maintains its principal executive office in this Judicial District in Melville, New York, and many of the acts charged herein, including the dissemination of materially false and/or misleading information, including in the Registration Statement and thereafter, occurred in substantial part in this Judicial District.

II.     **CLASS ACTION ALLEGATIONS**

12.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Covetrus common stock from February 8, 2019 through August

12, 2019, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Covetrus or Schein, and the directors, officers and employees of Covetrus, Schein, or their respective  subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

13.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Throughout the Class Period, Covetrus' common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "CVET."  Millions of Covetrus shares were traded publicly during the Class Period on the NASDAQ.  As of August 9, 2019, Covetrus had approximately 112 million shares of common stock outstanding.   Record owners and the other members of the Class may be identified from records maintained by Covetrus and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

14.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

15.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

16.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Covetrus;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Covetrus;

e)      whether the market price of Covetrus common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

17.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### III.    **PARTIES**

18.    Plaintiff City of Hollywood Police Officers' Retirement System purchased and acquired Covetrus common stock during the Class Period as set forth in the accompanying certification, and suffered damages as a result of the federal securities law violations alleged herein.

19.    Defendant Henry Schein is incorporated in Delaware and maintains its principal executive offices in Melville, New York.   Henry Schein effectuated the Spin-Off (defined below).   Prior to and at the time of the Spin-Off, Henry Schein was in direct control of the operation and management of the Henry Schein Animal Health Business as its parent organization.   Several officers and directors of Covetrus are current and former officers and directors of Henry Schein and therefore, Henry Schein had the requisite power to directly or indirectly control or influence Covetrus.

20.    Defendant Covetrus is incorporated in Delaware, and the Company's principal executive offices are located in Portland, Maine.   Covetrus common stock trades on the NASDAQ under the symbol "CVET."

21.    Defendant Benjamin Shaw ("Shaw") has served as the Company's Chief Executive Officer and President since February 2019.   Shaw, with his consent, is designated as a director of Covetrus in the Offering Documents.

22.    Defendant Christine T. Komola ("Komola") has served as the Company's Chief Financial Officer and Executive Vice President since February 2019.

23.    Defendants Shaw and Komola are referred to as the "Individual Defendants."

24.    Henry Schein, Covetrus and the Individual Defendants are referred to as the "Defendants."

25.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Covetrus, were privy to confidential, proprietary and material adverse non-public information concerning Covetrus, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Covetrus' business.

27.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Covetrus' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Covetrus common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Covetrus' publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

30.     Covetrus is a global, technology-enabled Animal Health Business that touts a comprehensive service and technology platform and supply chain infrastructure for the veterinary markets.  Covetrus was formed when Henry Schein, a large publicly traded health care company, spun-off its Animal Health Business and combined it with VFC, a private technology company focused on veterinary markets.  The transaction was financially lucrative for Henry Schein as it allowed the company to divest its legacy Animal Health Business while paying itself a massive dividend and unloading substantial liabilities.

31.     To effectuate the transaction, Henry Schein incorporated HS Spinco ("Spinco") in Delaware in April 2018.  On December 26, 2018, Henry Schein caused Spinco to file with the SEC a Registration Statement on Form S-4 for shares of Spinco common stock to be distributed to stockholders of Henry Schein pursuant to the spin-off and issued to VFC stockholders pursuant to the merger, which was amended on January 8 and January 15, 2019 (as amended, the "Registration Statement").   Thereafter, Spinco was renamed Covetrus, Inc.  On February 7, 2019, Covetrus filed a prospectus with the SEC ("Prospectus" and together with the Registration Statement, the "Offering Documents").  Also on February 7, 2019, Henry Schein distributed as a dividend, on a pro rata basis of 0.4 shares of Covetrus per share of Henry Schein, approximately 60 million shares of Covetrus common stock to Henry Schein shareholders of record as of January 17, 2019 ("Spin-Off").   In addition, approximately 40 million shares of Covetrus common stock were issued to VFC stockholders.

32.     As part of the Spin-Off, Covetrus took on $1.2 billion in new long-term debt.  Of this $1.2 billion in debt, Covetrus used $1.12 billion to pay Henry Schein, including $755 million used to fund a special cash dividend paid to Henry Schein and $365 million used to settle long-term intercompany debt between Henry Schein and its Animal Health Business.  Previously, Henry Schein's Animal Health Business only had $23 million in long-term debt.

33.     Also pursuant to the Spin-Off, Covetrus agreed to Transition Services Agreements ("TSAs") with Henry Schein, whereby Covetrus would pay Henry Schein for various administrative services while the newly formed Company established its "own" organizational structure capable of handling these services.

34.     Covetrus common stock began trading on the NASDAQ under the symbol "CVET" on February 8, 2019, at an opening price of $42.96 per share.

**B.**      **Defendants' Materially False and Misleading Statements**

35.     Defendants touted Covetrus as a way to combine a technology-enabled animal health business (*i.e.*, VFC) with a comprehensive service and technology platform and supply chain infrastructure (*i.e.*, Henry Schein's Animal Health Business) to support the companion, equine and large animal veterinary markets.  However, from the start, and unbeknownst to investors, Covetrus lacked the infrastructure necessary and overstated Covetrus' capabilities with regard to inventory management and supply chain services.  Further, the cost of setting up the proper infrastructure and systems proved to be materially more expensive than what the Company had represented to investors.

36.     During the Class Period, Covetrus fundamentally misrepresented the Company's business outlook, particularly related to the newly combined companies' infrastructure and capabilities as well as the true costs of becoming independent from Henry Schein.  In addition, Covetrus made false and misleading statements about the financial health of the Company, including unsupported financial guidance, and falsely assured investors of the success and progress of the integration.

### *The Offering Documents*

37.     The Offering Documents represented that one of the Company's "key strengths" was its "inventory management and supply chain services and technology that help improve practice efficiency and economics."   The Offering Documents further represented that one of the "key benefits" of the merger was "the complementary fit of Vets First Choice and the Henry Schein Animal Health Business, and the strategic benefits of a global, technology-enabled Animal Health Business with a comprehensive service and technology platform and supply chain infrastructure supporting the companion, equine, and large animal veterinary markets."

38.     Additionally, the Offering Documents stated that Covetrus is "well suited to compete in this market" based on, among other things, the Company's "global scale, comprehensive and integrated capabilities and expertise."

### Capital Markets Day Statements

39.     On February 4, 2019, Covetrus held its 2019 Capital Markets Day with analysts to discuss the formation of the new company.  During the presentation, the Company's Chief Executive Officer, Benjamin Shaw, represented that Covetrus has the "ability to strengthen the veterinary client patient relationship as we fully integrate a full suite of client communication tools across both companies in an easy-to-use application for both the clinic and the practice" as a "one-stop-shop" for practitioners.  Further, Shaw represented Covetrus' platform will "improve functionality, save time in the practice, but also create better integration on the platform.  We're going to have more natural integration with prescription, appointment and inventory management capabilities" and "can drive really significant new health and financial outcomes for our customers and do it across all geographies."

40.     In addition, Shaw represented that Covetrus has "significant supply chain infrastructure on a global basis [to] support pretty much the entire active ecosystem in our space and a complete stack, a complete range of services, the ability to bring – to meet the total needs of our customers across practice management, prescription management, appointment management, inventory management and other added value services."

41.     During the same presentation, the Company's Chief Financial Officer, Defendant Christine Komola, represented that the Company's "adjusted EBITDA base" would be $225 million, stating: "[t]he net result… is about $225 million of an adjusted EBITDA base. That's what we would expect you all to work off of. That's the baseline to take away from today and

build the models that you are all feverishly building probably as we speak. You're watching me, probably building your models, right?  So these are the things that you actually should take away and work forward from."  Komola told investors that the $225 million figure was based on 2018 EBIDTA of $250 million, taking into account $25 million in company investments for 2019, stating: "and we're estimating right now for being a public company supporting this amazing organization, it's about $25 million."  Komola added that "[w]e plan for double-digit growth off of the adjusted $225 million EDITDA, and feel confident in our ability to execute against that."

42.     Komola also represented that the Company's "core business is strong." As to the TSAs, Komola represented that Covetrus is "really making sure that we get this TSA process underway in which we can actually transition off the TSAs."  Komola also represented that the TSAs would be "limited in duration."

43.     Commenting on the loss of a key customer, VCA, Inc. ("VCA"), which dropped Henry Schein as its primary supplier in January 2019, Covetrus' Senior Vice President and President, North America, stated that the loss "was not surprising at all" and added that "we are going to maintain a relationship with VCA" and "[w]e'll be in a position to still serve VCA" Komola additionally stated "just to reinforce, the reality is it was a low margin account and it was sales, yes. But margin, it won't impact things significantly."

### Henry Schein's Statements at Industry Conferences

44.     On March 3, 2019, Henry Schein's Chief Financial Officer and Executive Vice President, Steven Paladino ("Paladino") participated at an industry conference where he represented that the TSAs with Covetrus are "as long as…21 months" and "some things will sunset earlier than that.  Some things will sunset in 3 or 4 months and other things will sunset much longer than that."  Paladino further represented that "there's a lot of activity that the Henry

13

Schein teams need to do to properly service Covetrus.  And we want to make sure Covetrus is serviced well."

45.    On March 13, 2019, Paladino participated at another industry conference where he represented that "that the merger of the 2 companies will create shareholder value and that there's over $100 million of EBITDA synergies that are expected by the end of year 3.  So that's a pretty significant number and can't be achieved unless the 2 companies were brought together."

46.    With respect to the TSAs, Paladino represented that "Henry Schein and Covetrus have something like 80-plus TSAs for 80 different services that Henry Schein will continue to provide Covetrus until they're able to provide those services on their own.  So they run anywhere from a few months to maybe 21 months in duration from closing."  Paladino further represented that reason why the duration of the TSAs go "from a few months to 21 months" is "[s]o both parties can be prepared for when the service agreements end" and "Henry Schein can take that time to plan and reduce the stranded costs that it has, and that's our goal, at the time that the services end to virtually eliminate the stranded costs."

### *Statements Regarding First Quarter Financial Results*

47.    On May 15, 2019, the Company issued a press release announcing financial results for the first quarter ended March 30, 2019.  In the press release, Covetrus provided 2019 adjusted EBITDA guidance of up to $250 million, compared to $223 million in 2018, for growth of up to 12%, and that the guidance incorporated $25 million in planned corporate overhead investment and funding new investments "including a year-over-year increase of $5 million in software and prescription management R&D investments, many of which are a one-time increase in expenditures."

14

48.     In the press release, Komola stated that Covetrus' "fiscal 2019 guidance reflects our early integration efforts and additional investments in innovation to accelerate our strategic priorities and capitalize on the momentum we have across our business" as the Company has "made notable progress across multiple fronts since the merger closed and ha[s] been pleased by the pace of growth following our commercial launch as one integrated global team in March, reinforcing our conviction in our differentiated value proposition we bring to market and our ability to deliver double digit adjusted EBITDA growth long-term."

49.     Also on May 15, 2019, the Company conducted an earnings call where Shaw represented that Covetrus is "very pleased with how the integration year-to-date has progressed and how we're tracking toward strategic objectives" after launching "an aligned…powerful platform that provides differentiated compelling capabilities for our customers."  Shaw additionally stated that Covetrus was "proud of the work by our teams and our friends at Henry Schein that led to a very smooth transition and carve-out process."  Furthermore, Shaw represented that Covetrus was "very well positioned as a standalone company" and "off to a fast start towards executing against both our short-term priorities and our long-term strategies" as the "results in the first quarter of 2019 and the first few weeks post-closing through March demonstrate great attitude, great energy among our team, good discipline in managing customer service levels, insightful planning for the transition out from the transition service agreements and great early work to deliver an integrated set of commercial and operating capabilities."

50.     In addition, Shaw represented during the May 15, 2019 earnings call that Covetrus "experienced a surge of new high-quality lead and enrollments following our U.S. national meeting in March where we introduced, trained and launched the platform for the first time to our new more than 500 combined North America account managers."  Shaw assured

investors that Covetrus' "sales pipeline of qualified opportunities is strong with April growth meaningfully ahead of the pace seen in the first quarter.  In addition, to this strong pipeline, we also have won multiple new corporate accounts that will enroll during the balance of the second quarter."   In regard to the Company's "planned transformation and integration," Komola represented that the Company "took critical steps in the first quarter to push forward with the value capture opportunities… and believe we are on track for the delivery of our year one target that is part of our three-year adjusted EBITDA goals."

51.    Shaw also represented that Covetrus is "on track" in establishing a "new and necessary corporate infrastructure across multiple geographies to operate as a stand-alone company" and the Company is "ready to exit our transition service agreements on a timeline previously agreed with Henry Schein."

### *Industry Conference Statements*

52.    On May 29, 2019, the Company participated at an industry conference where Shaw represented that "post-closing, what we've achieved has been an integration of that value proposition" by bringing together a software sales organization, a prescription management sales organization, and a legacy distribution sales organization "into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities."   Shaw also represented that Covetrus is a "combined organization" that "is able to leverage all of the unique assets" and "leverage our PIMS practice management software position."   As a result of Covetrus' integrated capability, Shaw assured investors that the "power of the integrated capability set of the company… manifested itself in a very big pipeline, really strong engagement activity,  and we see that coming into Q2.  So we mentioned that April was our first full month really as an integrated sales organization."   Shaw represented that despite Covetrus

being "a very complex organization that includes the carve out of financial systems and payroll services and licensure and accreditation and just a massive amount of disruption, the organization, we didn't miss a beat on the first hour of the first day" as the Company is "able to take a structured, methodical approach to what is the next best opportunity to integrate these businesses into more of an integrated ecosystem."

53.     Regarding the status of the integration, Shaw represented that Covetrus was able to integrate the "several dozen" Henry Schein legacy businesses to present a "single face" to the customer "around software… and analytics around inventory management," stating:

> I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses, right? There are several dozen different operating businesses. And so post closing, what we've achieved has been an integration of that value proposition. We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management. And it's the integration and kind of power of that connected ecosystem that we're delivering to customers. So we're not managing the business day 1 or day 2 as standalone legacy businesses. I think that's a very important observation around sort of the structural changes we've been able to achieve in this.

54.     The above statements in paragraphs 37-53 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Defendants failed to disclose that: (i) the Company required tens of millions of dollars in additional infrastructure investments that were needed to sure up its inventory management and supply chain services; (ii) Defendants did not have proper visibility into the Company's infrastructure needs;  (iii) Defendants understated the significant infrastructure expense and duplicative costs related to TSAs with Henry Schein; (iv) and online competition as well as the loss of VCA "weighed heavily" on the Company's organic growth in North America;

and (v) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

### C.   The Truth Is Revealed

55.     On August 13, 2019, Covetrus shocked investors when it reported a loss for the second quarter of 2019 (its first full quarter as a public company) of $0.09 per share versus estimated earnings of $0.17 per share.   Additionally, the Company slashed its 2019 EBITDA guidance to $200 million, $50 million or 20% lower than its previously issued guidance just months prior of up to $250 million.   Rather than growth of 12% over 2018, the new EBITDA guidance would be a decline of 10%.

56.     In explaining the loss and the revised guidance, Shaw admitted that the Company had "significantly accelerated investments tied" to its "separation from Henry Schein and the build-out of infrastructure that supports completion of the carve-out."   Shaw also revealed "additional infrastructure expense and duplicative cost" related to legacy TSAs with Henry Schein as exiting the TSAs forced the Company to pay twice for the same services in the near term.

57.     Komola acknowledged that the Company would now be spending $40 million in 2019 on investments, much higher than the $25 million the Company previously guided. Further, rather than "one-time" in nature, the Company would be spending $10 million to $15 million in recurring operating expenses.   Komola further disclosed that Covetrus' second quarter results included "$4 million of operating expenses, $2 million of which are recurring, tied to our infrastructure investments, which were expenses previously not contemplated in our prior outlook."   Covetrus also stated its financial results were "impacted by challenges in North

America" and that the "loss of a [large North American] customer weighed heavily on organic growth in Q2 by 3%."

58.     Defendants also acknowledged that their previous statements concerning infrastructure were wrong, revealing that now, six months *after* the merger, they were finally "at a point where we have detailed plans and understanding of the level of infrastructure investment we need to make and how these costs break out ... So we just have a lot greater visibility and more detailed plans now that we're in an implementation mode, and I think that gives us a lot more confidence than where we were in January." Consequently, Shaw stated that it was "prudent to reset our near-term growth outlook in the second half of this year based on the recent trends."

59.     On the same day, Stifel issued an analyst report that noted that "the magnitude of CVET's 2019 guidance revision was clearly surprising" after providing guidance of up to $250 million in May 2019.   Also, on August 13, Credit Suisse issued a report noting that the Company's EBITDA growth of a negative 10% year-over-year was "a far cry from initial +DD growth aspirations."

60.     In reaction to these disclosures, Covetrus' stock price declined $9.30 per share, or 40% on August 13, 2019, and another $1.54, or 11%, on August 14, 2019.

61.     On August 16, 2019, Credit Suisse cut its price target on Covetrus to a "Street-low" stating that VFC's platform offerings won't be enough to offset near-term pressures from online competitors and that Covetrus continues to point to lackluster animal health demand, "a dynamic that is a disconnect from other constituents and our survey work, suggesting it may be ceding share to other distributors and alternative channels."

## V.  **UNDISCLOSED ADVERSE FACTS**

62.     The market for Covetrus common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, Covetrus shares traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.  Plaintiff and the other members of the Class purchased or otherwise acquired Covetrus common stock relying upon the integrity of the market price of the Company's stock and market information relating to Covetrus, and have been damaged thereby.

63.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.

## VI.  **LOSS CAUSATION**

64.     During the Class Period, as detailed herein, the Defendants made a series of false and misleading statements and omissions that artificially inflated the prices of Covetrus common stock and operated as a fraud or deceit on Class Period purchasers of Covetrus common stock by failing to disclose to investors material adverse facts.  When the Defendants' misrepresentations and fraudulent conduct were disclosed, the price of Covetrus common stock fell precipitously as the prior inflation came out of the prices of the Company's securities.  As a result of their purchases of Covetrus common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

65.     Because Defendants' failed to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status.   Therefore, Defendants presented a misleading picture of Covetrus' business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Covetrus to conceal the truth.

66.     The decline in the price of Covetrus common stock after the truth came to light was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of Covetrus common stock decline negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Covetrus common stock and the subsequent decline in the value of Covetrus common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.   SCIENTER ALLEGATIONS

67.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

68.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Covetrus, their control over, receipt and/or modification of Covetrus' allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Covetrus, participated in the fraudulent scheme alleged herein.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

69.     At all relevant times, the market for Covetrus common stock was an efficient market for the following reasons, among others:

a)     Covetrus common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

b)     As a regulated issuer, Covetrus filed periodic public reports with the SEC and the NASDAQ;

c)     Covetrus common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d)     Covetrus regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for Covetrus common stock promptly digested current information regarding Covetrus from all publicly available sources and reflected such information in Covetrus' stock price. Under these circumstances, all purchasers of Covetrus common stock during the Class Period suffered similar injury through their purchase of Covetrus common stock at artificially inflated prices and a presumption of reliance applies.

71.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Covetrus' business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## IX.   NO SAFE HARBOR

72.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Covetrus who knew that the statement was false when made.

23

## X.   CLAIMS AGAINST DEFENDANTS

### COUNT I

#### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
#### Against all Defendants

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

75.    During the Class Period, Henry Schein, Covetrus, and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Covetrus common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Covetrus common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Covetrus common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.   The Individual Defendants are also sued herein as controlling persons of Covetrus, as alleged herein.

77.    Henry Schein, Covetrus, and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal

adverse material information about the business, business practices, performance, operations and future prospects of Covetrus as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Covetrus' value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Covetrus and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Covetrus' common stock during the Class Period.

78.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Covetrus' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

80.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Covetrus common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Covetrus shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class purchased or acquired Covetrus common stock during the Class Period at artificially inflated high prices and were damaged thereby.

81.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Covetrus, which were not disclosed by the Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Covetrus common stock during the Class Period, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

82.     By virtue of the foregoing, Henry Schein, Covetrus, and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants and Henry Schein

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     The Individual Defendants were and acted as controlling persons of Covetrus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

87.    Henry Schein effectuated the Spin-Off and was a control person of the Company. Prior to and at the time of the Spin-Off, Henry Schein was in direct control of the operation and management of the Henry Schein Animal Health Business as its parent organization. Furthermore, several officers and directors of Covetrus are current and former officers and directors of Henry Schein. Henry Schein had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I with respect to the false and misleading Offering Documents and statements issued by Henry Schein and its executives. By virtue of Henry Schein's controlling position, Henry Schein is liable pursuant to Section 20(a) of the Exchange Act.

88.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

89.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

## XII.     JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2019

Respectfully Submitted,

*/s/ Steven B. Singer*
Steven B. Singer
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Joseph E. White, III
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

**Counsel for Plaintiff**

**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

**Additional Counsel for Plaintiff**