**FILED**
**CLERK**

5/12/2020 12:49 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
. . . . . . . . . . . . . . . . . . . . . . . . . . .
City of Hollywood Police     .  Docket #CV-19-5530 (GRB)(RLM)
Officers Retirement System,  .
                             .
       Plaintiff,            .
                             .  United States Courthouse
          V.                 .  Central Islip, New York
                             .  April 30, 2020
Henry Schein, Inc., et al.,  .  11:00 a.m.
                             .
       Defendants.           .
. . . . . . . . . . . . . . . . . . . . . . . . . . .
```

**TRANSCRIPT OF TELEPHONIC PRETRIAL MOTION HEARING**
**BEFORE THE HONORABLE GARY R. BROWN**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

For The Plaintiff:                Brandon Marsh, Esq.
                                  Saxena White, PA
                                  12750 High Bluff Drive-Ste 475
                                  San Diego, CA 92130

                                  David Kaplan, Esq.
                                  Saxena White, PA
                                  12750 High Bluff Drive-Ste 475
                                  San Diego, CA 92130

For The Defendants:               Jordan D. Hershman, Esq.
                                  Morgan Lewis & Brockius, LLP
(Covetrus, Inc.)                  One Federal Street
                                  Boston, MA 02110

                                  Jason D. Frank, Esq.
                                  Morgan Lewis & Brockius, LLP
                                  One Federal Street
                                  Boston, MA 02110

2

                              Emily E. Renshaw, Esq.
                              Morgan Lewis & Brockius, LLP
                              One Federal Street
                              Boston, MA 02110

                              Richard A. Rosen, Esq.
(Henry Schein, Inc.)          Paul Weiss Rifkind Wharton
                              & Garrison
                              1285 Ave. Of the Americas
                              New York, NY 10019

                              Nicholas A. Casielli, Esq.
                              Paul Weiss Rifkind Wharton
                              & Garrison
                              1285 Ave. Of the Americas
                              New York, NY 10019

Audio Operator:

Transcribing Firm:            Writer's Cramp, Inc.
                              1027 Betty Lane
                              Ewing, NJ 08628
                              609-588-8043

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

(Proceeding in progress)

THE CLERK:  -- 19-5530, City of Hollywood Police Officers Retirement System vs. Henry Schein.  Counsel please state your appearance for the record?  Plaintiff goes first.

MR. MARSH:  This is Brandon Marsh from Saxena White, for lead plaintiffs in this action and I'm joined here by my partner David Kaplan also from Saxena White.

MR. HERSHMAN:  This is Jordan Hershman of Morgan Lewis.  And I'm joined by my partners Jason Frank and Emily Renshaw as well for the Covetrus defendants.

MR. ROSEN:  Good afternoon, Your Honor.  Richard Rosen from Paul Weiss Rifkind for the Henry Schein defendants and I'm joined by my associate Nicholas Casielli.

THE COURT:  Is that everyone?  Is that everybody?

MR. MARSH:  We believe so.

MR. ROSEN:  We believe so, Judge.

THE COURT:  Okay.  Good.  All right.  So we're here for a pre-motion conference.  The motion to dismiss, I believe, by defendants so would defense counsel like to lead off?

MR. HERSHMAN:  Sure.  Your Honor, this is Jordan Hershman of Morgan Lewis and to give you some background on the case, this is a case that is governed by the Private Securities Litigation Reform Act of 1995.  Congress enacted that PSLRA to discourage the filing of what it called,

4

{quote}, "baseless and extortionate securities losses."  And frankly, this is exactly the kind of suit that it was designed to prevent.  This case asserts claims that are often referred to as claims of {quote}, "fraud by hindsight" {close quote} with -- which the Second Circuit has expressively, and repeatedly, held aren't actionable as a matter of law.  Now, in a case that's governed by the PSLRA there can't be any discovery in the case until after there is a ruling on the motion to dismiss and if a case doesn't survive a motion to dismiss, there's no discovery at all until the time that there's a ruling on a motion to dismiss.

Now, what I'm going to move on to now is giving you the basic background facts that led to the filing of suit.  The complaint arises out of a merger in February 2019 of a company called Vets First Choice and the Henry Schein Animal Health business, which was a division of Henry Schein.  And that merger formed a company called Covetrus.  We represent Covetrus and the Covetrus defendants.

Now, like any merger, when you combined two distinct businesses that presents opportunities but it also presents challenges.  And the defendants were candidly -- they candidly, and extensively, warned investors before the merger, at the time of the merger, afterwards about the many risks that could prevent the combined entity from realizing its growth aspirations and the success of the integration.

5

And by way of example, in the prospectus and registration statement that was dated February 7th, which is just when it begins, Covetrus warned and I'm quoting, "Our success in realizing these growth opportunities and an operational synergies," meaning the synergies that grow out of this -- this integration, this combination, this merger, {quote} "and the timing of the realization depends on the successful integration of the Henry Schein Animal Health business and the business of Vets First Choice.  Even if we are able to integrate the businesses successfully, this integration may not result in the realization of the revenue growth and operational synergies that we currently expect within the anticipated timeframe or at all.  Moreover, we may incur substantial expenses in connection with the integration of the two businesses.  Said expenses are difficult to estimate accurately and may exceed current estimates.  Accordingly, the benefits from the transaction may be offset by costs or delays incurred in integrating the businesses."  Now, they went on to provide other warnings along the same -- in the same regard.  Investors were told, {quote} "There is a significant degree of difficulties and management distraction inherent in the process of integrating."  They warned, {quote} "Covetrus cannot assure investors."  It would, {quote} "successfully or cost effectively integrate the businesses" and {quote} "the failure to do so could have a real adverse effect on our

6

business, financial condition, results of operations and cash flows."

Now, those were all warnings among many others that we will be discussing in our briefing that Covetrus provided to the investors before any of these investors bought any stock. Now, it's clear that the market heard these risks, loud and clear and we know this, because the complaint incorporates by reference, and cites to, an analyst report by Raymond James and that's dated February 27th, 2019. So that's 20 days later. Twenty days into this putative class period, they put out an analyst report. It's cited in paragraph 42 of the complaint. It has a section in it called investment risks. And in that section, it has a heading called {quote} "integration." And in that section the analyst states. Now based upon the warnings and the extensive disclosures that the defendants made, they state, "Integration of the Vets First Choice and Henry Schein Animal Health businesses brings inherent risks to operation. We view the integration of the two businesses as a material risk." {close quote} So obviously, it is clear that the market has heard loud and clear. Integration process is going to take some time and that there are no guarantees that it's going to be successful. There are many ways that it could potentially be unsuccessful.

It could happen that the synergies that they hope will be realized aren't realized in the timeframe that they hope, or

at all.  It could be that they encounter expenses that are higher than people expect.  They could result in the -- the process of integrating not being as successful as people hope. Investors were told that in plain English.  And it's clear from the Raymond James report and from other market statements that the market heard it loud and clear, investors knew this.

Now, not long after that, unfortunately, some of those risks, disclosed risks, materialized.  So on August 13th, 2019 just months later, Covetrus announced that its financial results for its first full quarter of existence and they revised downwards, their guidance for the future.  And they attributed the performance they disclosed that day in part to expenses related to the ongoing integration of the Henry Schein Animal Health business and Vets First Choice.

Now -- and not long after that this lawsuit was filed alleging that our clients all engaged in securities fraud. They did not.  Now, the fundamental point here is that the materialization of previously disclosed risk is not securities fraud, as the cases have made clear for a long time and I'm quoting a case called the RAB from 1993.  The market has risks and the securities laws do not serve as investment insurance.

And the Supreme Court has underscored at this point in the Durick case, saying the securities laws exist, {quote} "Not to provide investors with broad insurance against market losses, but to protect against those economic losses that

misrepresentations actually cause." And here, we do not have any actionable misrepresentations. Rather, we have a series of statements that are not actionable as a matter of law under a long line of cases that we'll be talking about in our briefing.

Now just this month, a very similar case was decided by Judge Abrams in the Southern District. That case was called the Adient, we call it to the court's attention. We'll be -- citing to it and discussing it in detail in our briefing but their Judge Abrams dismissed, with prejudice, claims very similar to those here growing out of a spinoff transaction, a merger transaction, where there are -- plaintiff made very similar claims to those that are made here.

And the court ended up saying that the plaintiffs are simply "quote} "Challenging statements of goals and beliefs." (Close quote} That the defendants had made while {quote} "explicitly recognizing the challenges they faced to achieve their goals." {close quote} That is exactly what is going on in this case. Also in the Adient case, separately, the court held that the plaintiff had {quote} "failed to sufficiently plead that any defendant acted with the requisite scienter or intent to deceive."

Now, that is also true here, and I -- and it's worth stressing that under the PSLRA, the statute that governs this case, there is a heightened pleading standard for scienter,

higher than the Rule 9(b) standard that applies in this case. And in our briefing, we'll also be talking in detail about the legal standard, how it applies in the Second Circuit and how this case doesn't come close to meeting the very high pleading standard for scienter that is set forth in the PSLRA.

So there are, and our briefing is going to discuss, numerous, independent, dispositive reasons supporting the dismissal of the complaint here, with prejudice. And I'll just cite some of them here, which we'll obviously talk about in much more detail in our briefing. But the vast majority of the statements that are at issue in this case, are forward looking statements that are immune liability under the so called safe (indiscern.- audio difficulty) forward-looking statements provision that is included within the PSLRA.

So one of the things that's in the PSLRA is a provision that encourages companies to provide forward looking statements, to talk openly with the marketplace about their beliefs. And the provision makes clear that whereas here, those forward looking statements are accompanied by meaningful cautionary language, of the sort I just read to the court and there's much, much more of it in the documents that we're going to be referring to in our briefing, those statements under the first prong of the PSLRA are immune from liability as a matter of law under the very statute under which the

plaintiffs bring suit.  So that is dispositive issue as to the vast majority of the alleged misrepresentation here.

Now in addition, many of the challenge statements are referred to as so called puffery statements.  They are statements that are -- that are too vague and indefinite to be actionable under Second Circuit Law as a matter of law.  And particularly, and there's -- there are many of these and we will talk about them in our briefing but the heart of this case involves statements about integration about two businesses integrating.  And courts have widely recognized that statements about a businesses merger {quote} "integration" {close quote} are not actionable.

And I'm quoting now a Southern District Case called Razorfish, {quote} "Integration is far too loose and uncertain a term on which to premise a claim for securities fraud."  Now more recently, Second Circuit Court of Appeals in the IBEW case, which we'll be discussing in our briefing, affirm the dismissal of securities fraud claims that are similar, stating, {quote} "statements that quote, the integration of ABN AMRO is off to a promising start" {close quote} and {quote} "our positive view has been confirmed are in actionable puffery."

There are -- that -- that's a Second Circuit Court of Appeals case we'll be citing to several other cases in the Second Circuit and elsewhere that holds that statements of the

sort that are placed at issue in this complaint are simply not actionable as a matter of law.  Now, as I said, in addition, and wholly apart from the fact that the statements themselves are not actionable, even if the plaintiff had pled any actionable misrepresentation or omission of material facts, and they haven't, they have not come close to meeting that strict pleading standard for scienter set forth under PSLRA, which provides a separate and independent ground for dismissal.

The last one that I will tick off here, without taking too much of the court's time in this pre-motion conference, is -- we'll also be talking about loss causation as well under the DURA Case.  And we think that there are arguments that are under loss causation that also again, independently dispositive here.

So in short, Your Honor, every securities class action begins with a motion to dismiss under the PSLRA.  We -- we are ready to -- we've discussed with the other side a briefing schedule for putting in our motion to dismiss and we are frankly confident that in this circumstance here -- this is exactly the kind of case that the PSLRA and Congress had in mind when it enacted the PSLRA and wanted this sort of an acid test at the beginning of every single private securities class action, every one requires the acid test of this motion to dismiss before even any discovery can be taken, unlike most of

any other area of the law that I could think of is automatic stay of discovery.  Just because of the fact there had been so many filings of cases without really a true legitimate basis.

So we have the acid test of this motion to dismiss.  We are confident that we have a number of arguments that we'll be laying on our briefs that -- that as in the recent Adient case that Judge Abrams had support the dismissal with prejudice of all claims in this case.  Thank you, Your Honor, for -- for your indulgence.

THE COURT:  Excellent.  Okay.  Let me hear from you arbitrary, please.

MR. ROSEN:  Okay.  Judge, I'm sorry.  This is Richard Rosen.  I represent the other defendants and we have a separate motion.

THE COURT:  Oh!  I apologize.

MR. ROSEN:  No, no, no.  If I'm -- so this is Richard Rosen from Paul Weiss.  And I represent Henry Schein.

THE COURT:  All right.  And Mr. Rosen, you might want to -- Mr. Rosen, you might want to address a question. I'm just going to address at your colleague, but you can answer too.  I was wondering if the recent Top Ship case in the Second Circuit has anything to do with this?

MR. ROSEN:  I confess, Judge, that doesn't ring a bell but –

THE COURT:  Okay.  April 9th –

MR. ROSEN:  -- we -- we can --

THE COURT:  -- April 9th was a decision -- Second Circuit decision Top Ship, I think, it was called.  Mine was a related case, which is why I know about it.  That may have something -- some bearing on this, but anyway please go ahead.

MR. ROSEN:  We would obviously have to take a -- have to take a look, but I apologize.  I know this area of the law pretty well, but it's a case that's escaped my attention.

THE COURT:  Well then I feel very privileged that I know and you don't.

MR. ROSEN:  Right.  So I represent the other defendants in the case, which is Henry Schein, Inc. and its Chief Financial Officer Steven Paladino.  And I'd like, without overlapping with anything my colleague Mr. Hershman said, I'd like to briefly explain the basis on which we have a -- our own motion to dismiss.

So as you heard, Henry Schein spun off its Animal Health business in February 2019, which then merged with Vets First Choice to form this new public company Covetrus, which commenced operations later that month.  The focus of the complaint, as you'll see and almost all of the factual allegations, focused on the period after Covetrus began operating as an independent public company and it culminated in a disappointing financial performance in the second quarter of 2019, disclosed to the public in August of that year.

14

My clients are not alleged to have controlled Covetrus and the plaintiffs' pre-motion letter that Your Honor has, has clarified that they're suing Henry Schein and Paladino only for a handful of statements.  Every statement that the plaintiffs attribut to Henry Schein was made before the merger had closed, that is before the company even began operations. And the few statements that the plaintiffs attributed to Mr. Paladino were made within the first quarter of the new company's operations, literally within weeks of the company beginning its career as an independent company.

So our motion is somewhat more narrowly focused because we have fewer statements to deal with.  Our first point is that the amended complaint actually doesn't even allege adequately, that any of the handful of statements my client's made were false.  And I'll just take an example.  The statements made by Henry Schein in the January 2019 registration statement, which was necessary in order to accomplish the spin-off of the Animal Health business, described the proposed transaction, described the general nature of the businesses that were going to be combined and described why Henry Schein was doing this transaction and why he thought it was a good idea.

And there are many of the same risk disclosures to which Mr. Hershman alluded.  Plaintiffs allege, as you'll doubtless come to know in more detail, that the process of integrating

these two companies was flawed, and the companies turned out not to be well-integrated or that there were missteps along the way.  But at the time my client's spoke, the companies hadn't even merged yet.  The integration process hadn't even started.

And since the plaintiffs don't allege that the description of what the two businesses are that were going to be integrated, they don't allege those statements were false, our view is they haven't alleged falsity at all.  We also believe that we have compelling arguments that the statements from our clients are forward-looking projections accompanied by risk disclosures that many of the other statements are, as Mr. Hershman characterized them, puffery.  You know, a statement for example, that "we believe these two companies are well-suited to compete."  That's a statement that's so vague and not subject, if you will, to objective verification and it's just an opinion.

So we would submit that that's not actionable either. And finally, we have to point that these statements weren't made with fraudulent intent and less I trespass more on your generosity of time, I'll just make one last observation.

THE COURT:  Take your time.

MR. ROSEN:  Plaintiffs highlight a statement made by Mr. Paladino, who, as I said was on the Covetrus Board, as well as being C.F.O. of Henry Schein in March 2019, only weeks

after the company had begun to operate.  And Mr. Paladino says that he is projecting, it's his view that the company could realize $100 million in synergies by the end of year three. That is, he is making a projection about what one of the benefits of the merger that you won't know about until March 2022.  So we won't know for two more years whether that projection turns out to be true.

And I would submit, judge, that it's ridiculous to suggest that a projection of something that's three years in the future could not have been made without any reasonable basis.  And so we look forward to the opportunity as well to brief these issues thoroughly and to have an opportunity for oral arguments.  So thank you for your time.

THE COURT:  Excellent.  Let me hear from plaintiffs please.

MR. MARSH:  Yes, Your Honor, thank you very much. This is Brandon Marsh for the plaintiff.  It probably comes as no surprise that we disagree with many of the extreme statements made by counsel today.  This is a very straightforward case of securities fraud and it's notable before I delve into the elements of the claim and the particular arguments defendants are making, it's notable that defendants actually don't dispute that their statements were false and misleading, nor can they at this stage where the plaintiff's allegations are accepted as true.

Instead, they seek refuge in doctrines of purported safe harbors about forward-looking statements. But this is not a forward-looking statement case and it's also notable that in defendant -- the Covetrus defendants statements that they did not cite a single false statement that they are alleged to have made. Because if we actually look at these false statements we see, and I'd like to explain, that they represent past and present fact. They represent the integration as completed.

And one thing that I think is important for context in this case, while defendants seem to maintain that they misled no one and no one was misled, they did nothing wrong, the fact is that when the truth came out about this fraud on August 13th, 2019, analysts almost uniformly questioned the credibility of the management here. They specifically stated that management's question -- "there are now serious questions around the merger and management's credibility, and management's credibility was damaged from the start of the merger," that's in paragraphs 103 and 173 of the complaint.

The stock immediately fell nearly 50% on the highest trading volume since the company had started regular trading. And in a remarkable turn of events, the company not only fired defendants Shaw and Komola, the Chief Executive Officer and Chief Financial Officer responsible for the vast majority of the alleged misstatements here, but also embarked on a mission

of, in their own words, {quote} "rebuilding trust with investors and the analyst community." Rebuilding trust. They have characterized this as their, {quote} "critical mission." Those are the words of the new C.E.O. who came in to clean up after the fraud.

And so we think it is -- that this is important context for understanding the severity of how defendants misled the market with their statements about the integration of these two companies that never happens. As defendants mentioned, this is a case about a merger of two companies. The integration of these companies into Covetrus concerned both the integration of the company's different softwares and their sales teams. For example, Henry Schein has software called Practice Management softwares that assisted veterinarians on a day-to-day basis with managing their offices.

The other company Vets First Choice sold a software called the Prescription Management software, which helps the veterinarian increase their revenues by having a customer to order more prescriptions for their pets. The integration of these softwares, as well as the integration of the sale teams that were coming from both VFC and the Henry Schein company, as the linchpin of the company's financial health on which investors and analysts were keenly focused. Indeed defendants spent nearly a year preparing for this merger finalization in February 2019, drubbing up interest in this new company by

saying that this integration was happening and it was important for the company's finances.

Indeed, on February 4th, 2019, at a Capital Markets Day, a key day where essentially the defendants are announcing the formation of this new company and spurring interest in investors to buy and do it, a securities analyst asked Defendant Shaw, Covetrus' C.E.O., "What separated Covetrus from the competition?"  In response, Defendant Shaw didn't speculate about the future as defendants now contend in litigation.  He said that that "V.F.C.'s Prescription Management software had already been hardwired into Henry Schein's pre-existing Practice Management software."  That's at paragraph 124 of the complaint.

And we have ample allegations, including through the corroborating testimonials of 11 different former employees, that these statements, and they were repeated over and over again, were false when made.  For example, at paragraph 68, I think several different confidential witnesses explain how these statements were blatantly false that the software integration had been achieved.  I'd also refer the court to paragraphs 58 through 67 generally, where we have many further statements about how these purported software integrations had not taken place.

Now, it's important to know that investors and analysts credited these representations because the two companies had

collaborated for nearly a year on the merger before the company's stock began trading.  So when they said they were fully integrated, it made sense.  People believed it.  But it just wasn't true, as we've now explained it, and as the company has admitted in August 2019.  And I'd like to stress some of the statements --

THE COURT:  So you're suggesting -- hold on counsel. You're suggesting to me that they said the integration already happened when they actually went forward with it, it hadn't happened and when they tried it didn't go so well.  Is that the idea?

MR. MARSH:  Approximately, that's almost exactly right, I'd say.  At the beginning of the class period.  Now in -- on February 4th, at the Capital Markets Day and also in the registration statements, they explicitly represent integration as having been completed and they repeat this throughout the class period.  They say it's done.  They say we are -- they say we are now -- our revenues are rising.  They said they were ahead of pace.  They said that they have improved top line performance already.  They say these things -- these financial results are improving now because we have already successfully integrated not only the software --

THE COURT:  But counsel, let me ask you a question there.  Hold on.  I'm sorry.  I -- this interests me because work I've done in the distant past.  Wouldn't there be a

problem with sort of gun jumping violation if that were the case?  Now, is that possible that they were already reaping the benefits of the merger before the merger happened?

MR. MARSH:  Well, I'm not saying that they were reaping the benefits of the merger, they simply represented that as soon as that -- I think there are two concrete representations of integration that the court -- that are sort of easily digestible.  One is this integration of software.  So it's certainly possible that they were developing software such that when the company did merge in February, they could integrate the softwares and that's what they said happened.  They said that they were hardwired together.

I mean, that's that's Defendant Shaw' own language, but it just wasn't true.  And the other integration that they talked about was slightly different, Your Honor.  They didn't say they were -- the other integration was of the sales teams.  And this was a point that Defendant Shaw specifically stressed in May.  And I'd like to quote what he said.  He said, in March, "We brought our three various sales organizations together into" -- I'm leaving out a couple of words, but this is the quote, "together into a now tightly integrated stood up aligned group, that's now representing the total scope of our capabilities."  So they represented it as of March, so early in the class period, their sales organizations had come together.  Now, why is this important?  Well, first of all,

it's absolutely false as we allege at paragraph 57, 71 and I'd also point the court to 72, 3 and 4, as well as, paragraph 63 is also relevant. These statements about salesforce integration as of March were key because they pitched this company to investors as creating value through increased revenues, how? By cross selling the products, by cross selling through the software integration and by using Henry Schein's extensive salesforce to pitch the prescription management software from Vets First Choice.

So the integration of the sales teams was key. They said it had occurred but as we have amply alleged, it simply did not occur. And that is one of the reasons why they reported such disastrous financial results in August that required essentially a complete reset of the company and dropped the company's stock 50% because the integration hadn't happened. And so again, I think the key point I'm trying to make in response to defendants argument is that there -- the vast majority of the statements here are statements of present facts that were blatantly false and historical fact that were false.

And they even went so far as to say that the supply chain system from Henry Schein – now this is another key element, they pitched this company to investors by saying "we are going to leverage Vets First Choice off of the Henry Schein supply system." This was a massive concern for investors because the

Henry Schein supply chain of distribution system was responsible for about 95% of the company's revenues. And if they were going to leverage the company off of the supply chain they repeatedly promoted this supply chain system as wonderful. This is both from the Henry Schein defendants and from the Covetrus defendants. But in truth, this system, as we've amply alleged, was dilapidated and causing reduced sales. Indeed, even before Covetrus was formed, the company lost access to whole categories of sale that Henry Schein had had and investors didn't know about this. They didn't tell anyone. But this was another reason why revenues were declining from the very start, from the very get-go of this company being public. And I point the court to, for example, the allegations at paragraphs 83 and 84 of the complaint where we talk about these lost revenue streams that predated the company and it was even worse than that because the sales representatives had been told. And again, we've alleged all of this in the complaint in those paragraphs. Because they don't represent the argument, "You're going to lose these revenues. So why don't you basically sell extra, extra products to your clients now before you lose them when Covetrus is formed." One of the confidential witnesses analogized this to if a person is going to buy her favorite lipstick and she knows it's going to be out of stock and they're not going to sell it anymore, so you're going to buy,

you know, extra of them.  And that's what clients did and that's another reason why sales were declining from the start, that defendants concealed these facts from investors.  And there are just so many statements, Your Honor, that I don't think I need to go into detail, but there are so many statements about how the company claimed a deep integration on day one, that they said that they didn't miss a beat on the first hour of the first day.  These are not forward-looking statements as defendants claim, they simply aren't.  And I would just point the court in addition to what -- when we talk about the financial statements, it's true.  This complaint does feature guidance, earnings guidance to some extent. Statements about, you know, we're going to have double digit revenue growth or a big, big growth in 2019.  Well, what they actually said also was that in the second quarter, they were already achieving those goals.  On May 15th, Defendant Komola came out and said that they had taken critical steps forward here in the first quarter and they were on pace.

Analysts understood this and asked them about the purported revenue lifts that had already been achieved in April and May before these May 15th statements.  And in response, the defendants claim that it, you know, that they had integrated and that there were all these reasons for why the revenues were up.  Well, they weren't.

In fact, as we allege there were internal meetings in late April and early May in which it was discussed that the revenue was down across the board and that management was present at these meetings.  I point the court to paragraph 78 of the complaint.  Now these were facts about across the board sales declines that defendants completely misrepresented by claiming sales were increased.  And then in August, just a few months later, they revealed the truth.

And in fact, Defendant Shaw use the exact same language as he's saying sales were down across the board.  In May, they promoted a successful distribution business in North America that was exceeding expectations and then in August, they disclosed the exact opposite.  And so the primary reason for their disastrous results was reduced revenues and the lack of success in North America.  So this is an unusually strong case of statements of present and historical facts that were blatantly misrepresented, completely misrepresented the truth inside the company.  And if I can just say a few words on scienter as well.  Well, first of all --

THE COURT:  Before you do that, counsel, may I ask one other question.  It's -- I know that you said you wanted to react to some of the more, what can recall, I think, extreme statements by defense counsel.  Is there any place that they're right?  Is there any way we can reduce or simplify any of this?

MR. MARSH:  Well, in that regard, Your Honor, I honestly I don't see anything in their letter or in their statements today that I would agree with.  I would say that one thing that is pertinent to the court's analysis is that, you know, they're really making their main argument that there are no actionable false or misleading statements or omission. I would just like to emphasize that it's the plaintiffs burden at this stage is merely to allege one or more false or misleading statements or omissions.  And so, it's our position, as we expressed in the letter, that in such a clear case of fraud as this one, there's not even a need for full briefing because clearly, the complaint alleges one or more.

And again, I just want to be very clear.  I would point the court to paragraphs 115 to 151 of the complaint because there seems to be some confusion particularly on -- in the Henry Schein letter about what statements were false or not. But those are the paragraphs where we allege the false misleading statements and we comply with all the pertinent pleading requirements by stating exactly when the statement was made, who made it, in what context and the reasons why they were false.  This complies with all the pertinent pleading requirements.

And in terms of alleging the information on which our allegations are based, I point the court to paragraphs 30 to 114 generally, which contain the particularized facts,

undergirding the reasons why these statements are false.  So I almost have to apologize that I simply can't find anything thus far with that defendants has said that I agree with.  There are other, you know -- and one of the things too that they mentioned was recent case law that's pertinent and there were some strident statements about integration statements aren't actionable.  Well, that's just -- it's just not true.  And in analysis of the case laws, it doesn't support that view.

For instance, in our in our letter --

THE COURT:  All right.  Counsel, let me just take another step here.  Because it may prove my point a little bit.  When I asked you the question, anything you agree with, you give me a very good answer.  But it was not what I was looking for.  So let me rephrase the question a little bit.  Having now looked through at your own case, the lens of potential motions that are coming, are there any claims that you might look at and say, you know, judge, you know, claim two as against defendants three, you know what, they're right there is a problem there.  We should withdraw that so you don't have to spend time on things like that, we can move the case faster.  I guess that's what I was looking for.

MR. MARSH:  Well, I don't think so, Your Honor.  We alleged two claims.  These are, so to speak, the standard claims in securities litigation 10(b) and 20(a) under the

Exchange Act of 1934.  And we exercised a good amount of discretion in selecting both the defendants and the statements that that were the most misleading for investors.  If one of the courts -- maybe what the court is kind of getting at is what do we think are our strongest statements?  I would say generally, that the strongest statements are those regarding the purported integration and that it was already complete.  You know, one of the words they use was achieved.  They said it had been achieved.  They said it was deep, you know, this category of statements, which I must stress, began even before the stock was traded.  These statements were present in the registration statements and on February 4th, 2019 at the Capital Markets Day where they promoted the stock.  You know, this category of statements, I frankly, I can't envision a good argument the defendants have against these statements.

Is that all, I don't know if that was very helpful.  I hope -- I aimed to be responsive.

THE COURT:  It helps a little.  All right.  I -- let me say this, counsel's done a fine job today.  We're working on the difficult conditions.  The record should reflect this being done at the -- during -- the advent of the pandemic.  We're all working from temporary chambers in different unfortunate circumstances and I hope everyone's well.

And counsel certainly you've given me enough here to say, we've got to brief this motion.  So I'm not going to decide

this from the hip.  So let me ask, Mr. Rosen, the other defendants, how long it was going to take you to draft your papers and serve them, remembering please that even during a pandemic, we're going to adhere to the all-important bundling rule.  Recognize (indiscern.) with defendants --

MR. ROSEN:  Judge, this is Richard Rosen from Paul Weiss and in anticipation of that question, the parties, you know, who are working harmoniously together have a proposed briefing schedule for you.  We would propose that the defendants filed their motion to dismiss on June 12th, that plaintiff's respond on July 24 and that we file our reply papers on September 4.

THE COURT:  That's very nice because we get to spend the whole summer together.  So I'll look for your motion papers in September, is that fair?

MR. ROSEN:  You mean you want -- you want them delivered bundled to chambers at that time?

THE COURT:  Yes, if --

MR. ROSEN:  Yeah.

THE COURT:  -- assuming we're up and running with physical bundling, when I say that you're going to file the motion with the court in September, fair?

MR. ROSEN:  Yes.

THE COURT:  Okay.  Good.

MR. MARSH: A quick (indiscern.) clear, Your Honor. I just want to be clear that because Richard -- the way Richard said it that none of the papers are going to be filed, they might just deliver it to your chambers, but they're not filed until the whole package of moving brief, opposition brief, reply brief and then the whole package will be filed together at once in September.

THE COURT: Correct. As a single enchilada of sort, yes?

MR. MARSH: Yes, understood.

THE COURT: Okay. All right. Good. That said, again, counsel done a great job. Anything else we need to do today?

MR. HERSHMAN: I'm just going to say, Your Honor, I -- you know, I had some -- some real good comebacks that I was going to give you on some of the things you just heard but we'll wait until the briefing for that, Your Honor.

THE COURT: I think -- I think you should. Look, here is the thing, sometimes I can simplify things. There might be this particular claim we can sort of knock off but this, it sounds like we're going to have to go through everything anyway. So why don't you have at it, you know, Save all your vigor for the paper you'll file.

MR. HERSHMAN: Okay.

THE COURT:  And a further oral argument, I'll call you in for that.  But I don't know if I will look at the papers first.

MR. HERSHMAN:  Well, I'll just say this, Your Honor. I'll just say that that many of the statements on which the plaintiff just stressed, are being pulled out of context and distorted and you will expect that in the briefing we will put them back into context and show how it is that, you know, frankly, attacks on statements about an integration being already 100% completed before the merger even happened yet.

THE COURT:  All right.

MR. HERSHMAN:  And when there are documents that are filed that have warnings in them that are saying, quite specifically that the integration process plays out over obviously as the market notes an extended period of time and gives rise to all kinds of risks regarding how it's going to go over time.  It obviously, the plaintiff's statements, the way that they're putting it before you are pulling things out of context and it'll come down to a statement by statement analysis of statements in context and an analysis of all of the rules respecting scienter as well and we'll address all that in our briefing.

THE COURT:  All right.  And what I'll say is given what I've heard so far, when you say you'd answer everything

thoroughly and so forth, put it back in context, I would expect nothing less.

MR. HERSHMAN:  Thank you.

MR. ROSEN:  Judge -- Judge, I do actually --

THE COURT:  Yeah.

MR. ROSEN:  -- have one other question which if my memory serves, your individual rules of practice don't have page limits on briefs of this sort.  I think you can trust that all of us who've been doing this kind of work for a long time, we'll make our brief as succinct as we possibly can so that we don't overburden you and your clerks, but I'm I correct in understanding --

THE COURT:  I might, I mean --

MR. ROSEN:  -- this has no absolute page limit?

THE COURT:  I might have a page limit.  I thought I had 25 pages but I could be wrong.  I'm inheriting lots of things.  Let me ask you this, do we think we can do it in 25 pages?

MR. HERSHMAN:  We cannot, Your Honor.  I mean, we absolutely can't.  I would -- I, you know, we're -- we are moving on behalf of many different people together.  Each of them would have their own individual basis for pages as well. So I can't give you the exact number right now.  But it, you know, generally, oftentimes, the briefing here is, you know, can be like, you know, for three different people together, it

can be quite, you know, substantial but we'll be as succinct as we can be.

THE COURT:  Well, I might want a little bit more than that.  When you say you absolutely can't, we know we can't do it within 25 pages.  Let me put the question in a different way.  How many pages can you do it in?

MR. HERSHMAN:  I would say --

MR. ROSEN:  Your Honor --

MR. HERSHMAN:  Your Honor, I would -- speaking for the Covetrus defendants, I, you know, we often come in at, you know, at 60 pages or under for this many defendants.

MR. ROSEN:  Your Honor, for the Henry Schein defendants, I believe we can do it in -- in, say, 35 or less.  And I would strive to do it under 35.  Because my own experience is shorter is better.

MR. MARSH:  Your Honor --

THE COURT:  Go ahead.  Go ahead.  Let me hear from another attorney.

MR. MARSH:  Sorry.  This is Brandon Marsh for the plaintiff again.  It's customary in this -- in this field of law for briefs.  I mean, I think we can easily do this in 25 pages per brief, particularly given the defendants seem to be asserting that they want to file two separate briefs.

I'd also point out that given that the class period is only some, what is it, seven or eight months long, you know

there, this is not an unwieldy case that the complaint is only about a 100 pages, which is actually pretty concise for this field and so in our view, we don't see the need to overburden the court with excessive paper. And, you know, personally, we think 25 is sufficient.

THE COURT: All right. You know,, let me say this. I've heard from everybody and I will say that I adhere most strongly to counsel's statement that shorter is better. So let's keep it to 35. And we'll call it a day there. All right?

MR. HERSHMAN: Your Honor, may we at least -- we have -- we are the principal defendants, Your Honor. Can we at least get it to 40 pages, it's really going to be tough for us and each one of our parties has an -- independent separate right to put in a separate brief so we're putting in a streamlined presentation on behalf of all of them.

So I would -- I would really ask Your Honor for at least 40 pages for our -- I mean, we -- as you heard before, the vast majority of these challenge statements are that we need to be defending on a statement by statement basis.

THE COURT: Counsel?

MR. HERSHMAN: Yes, Your Honor.

THE COURT: Let me just say -- it may be (indiscern.) come to the fore with the pandemic and so forth. You just got me -- to go to 40 pages, but that's it. All

right?

MR. HERSHMAN:  All right, Your Honor.

MR. ROSEN:  Thank you, Your Honor.

MR. MARSH:  Thank you, Judge.

THE COURT:  All right.

MR. HERSHMAN:  Your Honor, one final question.  I'm sorry.  Can we presume that the reply briefs will be shorter or the 40-page limit also apply to defendants?

THE COURT:  We would want (indiscern.).  Everybody gets 40 pages, that's it.  We've had enough of this.  Oh! God, we're going to fight about everything in this case.  40 pages for everybody, that's it.  All right?

MR. ROSEN:  No, I'm sorry, Judge, I'm not -- I want to make sure I understand what you're saying.  You're saying each?

THE COURT:  Each brief, 40 pages.

MR. ROSEN:  Got it.

THE COURT:  I have three attorneys.  I don't want to see more than a 120 pages from the three of you, so 40 page for each, got it?

MR. HERSHMAN:  Yes, sir.

THE COURT:  All right.  Anything else?  Stay safe, wash your hands.  Have a good day.

MR. HERSHMAN:  Thank you, Judge.

THE COURT:  All right.

36

MR. ROSEN:  Thank you, Your Honor.

(Court adjourned)


CERTIFICATION
I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____            _____
Signature of Transcriber                      Date

5/11/20