# EXHIBIT A

2021 WL 1226627, Fed. Sec. L. Rep. P 101,076

2021 WL 1226627
United States District Court, S.D. New York.

IN RE: DIEBOLD NIXDORF,
INC., SECURITIES LITIGATION

19-CV-6180 (LAP)
|
Signed 03/30/2021

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

 **\*1** Before the Court is the Rule 12(b)(6) motion to dismiss filed by Diebold Nixdorf, Inc. ("DN" or "the Company"), its former CEO Andreas W. Mattes ("Mattes"), its former CFO Christopher A. Chapman ("Chapman"), and its former COO Jürgen Wunram ("Wunram"). [1] Lead Plaintiff Indiana Laborers Pension and Welfare Funds ("Plaintiff")--on behalf of a putative class of purchasers of DN's securities-- opposes the motion. [2] For the reasons below, the motion is GRANTED, and the Consolidated Class Action Complaint ("CCAC") is DISMISSED without prejudice.

1     (See Defendants' Motion to Dismiss, dated Mar. 10, 2020 [dkt. no. 79]; see also Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Class Action Complaint ("Defs. Br."), dated Mar. 10, 2020 [dkt. no. 80]; Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Class Action Complaint, dated May 15, 2020 [dkt. no. 83]; Declaration of Jeffrey T. Scott ("Scott Decl."), dated Mar. 10, 2020 [dkt. no. 81].) Collectively, the Court will call DN, Mattes, Chapman, and Wunram "Defendants." When referring only to Mattes, Chapman, and Wunram, the Court will use "Individual Defendants."

2     (See Opposition to Defendants' Motion to Dismiss the Complaint ("Pl. Br."), dated Apr. 24, 2020 [dkt. no. 82].)

## I. Background

DN "is an international financial and retail technology company that focuses on the sale, manufacture, installation, and service of self-service transaction systems (such as ATMs and currency processing systems), point-of-sale terminals, physical security products, and software and related services." [3] The present action relates, in significant part, to the Company's ongoing efforts to transform itself into a "services-led, software enabled company" and to divert resources away from its less profitable hardware segments. (CCAC ¶ 4.)

3     (Consolidated Complaint for Violations of the Federal Securities Laws ("CCAC"), dated Jan. 10, 2020 [dkt. no. 73], ¶ 2.) For citations to the CCAC, all emphases included therein are omitted unless otherwise specified.

### a. The 2016 Merger with Wincor Nixdorf AG

On November 23, 2015, Diebold, Inc. ("Diebold") entered into a merger agreement with one of its primary competitors: Germany's Wincor Nixdorf AG ("Wincor"). (Id. ¶ 5.) Mattes described the Diebold-Wincor merger ("the Merger") as a deal that would leave the resulting company "well positioned for growth in high-value services and software ... across a broader customer base." (Id. ¶ 6.) The Merger closed in August 2016, and the combined entity became DN. (Id. ¶¶ 5, 14.) Diebold paid $1.8 billion in consideration to acquire a majority of Wincor's shares, and Diebold took on more than $2 billion in debt to finance the acquisition. (Id. ¶ 9.)

Leading up to the Merger's closing, Mattes touted what he felt would be a smooth fusion of the two companies:

- Mattes stated that Diebold and Wincor had undertaken "a very lengthy diligence process" before agreeing to merge and the companies would "fit extremely well together ... nearly like two pieces of a jigsaw puzzle." (Id. ¶ 7.)

 **\*2** - When responding to a question regarding the pre-merger integration process, Mattes noted that there were "solid teams on both sides" who would make sure that "when we hit the day X+1 we know exactly who is going to do what, who's going to take care of which account, what's the product road map, where are the low hanging fruits and how can we reach these synergies sooner and faster." (Id. ¶ 8.)

- Mattes told investors that "teams from both companies have been diligently developing integration plans and we

2021 WL 1226627, Fed. Sec. L. Rep. P 101,076

are confident that we will hit the ground running." (Id. ¶ 13.)

At base, Mattes expressed confidence that the Merger would proceed smoothly and generate the promised synergies for investors. [4]

[4] Chapman expressed similar optimism, stating that "[t]he bug[s] and the kinks in the system, we worked through those in Q1 [2016]." (CCAC ¶ 14.)

### b. Class Period Events

The designated Class Period runs from February 14, 2017 to August 1, 2018. (Id. ¶ 1.) The Court has separated the misstatements alleged during the Class Period into loose, chronological groups. Although the allegations are voluminous, Plaintiff's contentions boil down to one theme: Defendants painted an unjustifiably positive picture of the Diebold-Wincor integration.

### 1. Q4 and FY 2016 Earnings and 2017 Investor Day

On February 14, 2017, DN issued a press release discussing its financial results for Q4 2016, which was the Company's first full quarter following the Merger. (Id. ¶ 48.) The results were optimistic, which Mattes attributed "to our collaborative teamwork during the first full quarter for our newly combined company." (Id.) He further opined that DN was entering 2017 "leveraging a stronger, fully aligned global sales force and a solid solutions portfolio with ample opportunity to succeed in the dynamic financial and retail markets." (Id.)

That same day, Mattes and Chapman hosted a conference call to discuss DN's earnings, and both discussed the steps that the Company was taking on integration. (Id. ¶ 49.) Mattes maintained that DN "continued to make progress" and explained that the Company's initial sales integration issues were "all ... in the rear-view mirror" because, "for the first time, the sales team is fully aligned around our goals, quotas, and account plans." (Id. ¶¶ 50, 52 (brackets omitted).) Chapman echoed that sentiment, stating that teams across the Company were "working very diligently on integration activities and driving cost synergies," which would "flow more substantially through the P&L as we progress in the year." (Id. ¶ 51.) Both expressed confidence that DN was on

track to "deliver cost synergies of $40 million in 2017." (Id. ¶ 53.)

On February 24, 2017, the Company filed its 2016 Form 10-K, which was signed by Mattes, Chapman, and Wunram. (Id. ¶ 54.) The 10-K whistled the same tune regarding DN's financial prospects. Notably, the 10-K stated that DN was "executing a multi-year integration program designed to optimize the assets, business practices, and IT systems of [DN]," which would provide "an opportunity to realize approximately $160 million of cost synergies over three years." (Id. (brackets omitted).) The 10-K also highlighted the goodwill acquired in the Merger, which it described as being "primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources." (Id. ¶ 55.) Finally, Mattes and Chapman completed certifications, as required by the Sarbanes-Oxley Act ("SOX"), regarding DN's financial statements and internal controls. (Id. ¶ 56.)

**\*3** Four days later, the Company issued a press release introducing its "DN2020" program, i.e., its integration plan. (Id. ¶ 57.) That same day, Mattes, Chapman, and Wunram hosted an Investor Day Conference, at which they explained DN2020 to attendees. (Id. ¶ 58.) They asserted that DN was already realizing benefits from the Merger and, indeed, that the "smooth integration of legacy organizations" was paving the way for up to $200 million in net savings. (Id. (brackets omitted).) Given the measures DN had implemented so far, Wunram wondered whether the Company's targets were "aspirational enough." (Id. ¶ 63.) Mattes closed the conference by saying the Company's integration targets "are a commitment that we will achieve." (Id. ¶ 66.)

While their tone was generally optimistic, Mattes, Chapman, and Wunram also noted that the Merger's success was not a sure thing. For example, Mattes said:

> [When] we announced this and during the process and as you have experienced just like we did, doing a deal in Germany is not a trivial task and you have to go through quite a process to get it done. People were pointing out a lot of things that were going wrong; appreciate all the input.

> We lightheartedly depicted them here as alligators, so without going into everyone [sic] of those alligators, the main message is we went into this thing eyes wide opened and we've been wrestling down alligators one at a time, still a few more to go, but we feel very confident about how we're going to do this.

(Id. ¶ 59.) Mattes also emphasized that "60% of all the M&A deals that are being done fall short of the expectations" and stressed that DN was "spending a lot of time and energy on the integration" of Diebold and Wincor. (Id. ¶ 60.) Similarly, Wunram noted that management was "not naive" and was "aware of the risks" regarding the integration. (Id. ¶ 63.)

In early March 2017, Diebold issued its preliminary and final proxy statements. (Id. ¶¶ 67-68.) Those statements reiterated the Company's optimism when it came to DN's integration efforts. Both statements noted that DN had "continue[d] to make progress on [the] integration" and that the "sales team [wa]s fully aligned." (Id.)

### 2. Q1 2017 Earnings and JP Morgan Conference

On May 4, 2017, the Company issued a press release announcing its Q1 2017 earnings. (Id. ¶ 71.) The Company lowered its full-year 2017 revenue guidance to $5 billion (from $5-$5.1 billion) and its net loss estimation to between $50 million and $75 million (from $30-$55 million). (Id.) Mattes reported, however, that "[t]he transition to [DN was] complete" and that the combined entity was prepared to "begin [its] long-term transformation with the DN2020 program." (Id. ¶ 71.)

Later that day, Mattes and Chapman hosted DN's Q1 2017 earnings call. (Id. ¶ 72.) Mattes discussed the Company's progress on integration, noting that DN was "off to a good start" and that he was "encouraged by the early progress." (Id. ¶¶ 72, 78.) He emphasized that DN's "ability to coordinate numerous intersecting activities" gave him confidence that the Company "should be able to exceed ... cost synergy targets for the year." (Id.) Mattes also acknowledged, however, that Q4 2016's results were "weak," noting that DN did not "have a common management tool" and that there were "home-grown issues in Europe." (Id. ¶ 79.)

On the same day, DN filed its Q1 2017 10-Q, which touted DN2020's strategic benefits for the Company's financial, operational, and sales "excellence." (Id. ¶¶ 74-75.) The 10-Q also highlighted various "business drivers of the Company's future performance," which included the "integration of legacy salesforce, business processes, procurement, and internal IT systems; and realization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies." (Id. ¶ 76.) Like DN's 2016 10-K, Mattes and Chapman completed SOX-mandated certifications regarding DN's financial reporting and internal controls. (Id. ¶ 77.)

**\*4** Several weeks later, on May 22, 2017, Mattes discussed DN2020's progress with investors and analysts in a presentation at the JPMorgan Tech, Media, and Telecom Conference. (Id. ¶ 80.) Mattes, in a variation of his comments on the FY 2016 earnings call, noted that everyone was "singing off the same hymn sheet." (Id.) He also indicated that DN "track[ed] all of the[ ] synergies," that he was "very encouraged of where we stand," and that the Company thought it would "have pressure to increase the synergy realization numbers upwards in this calendar year." (Id. ¶ 81.)

### 3. Q2 2017 Earnings

Yet, on July 5, 2017--approximately two weeks before announcing its Q2 2017 results--DN issued a press release lowering its full-year revenue guidance, this time to $4.7–4.8 billion (from $5 billion). (Id. ¶ 85.) The Company cited "a longer customer decision-making process and order-to-revenue cycle" for why it lowered its forecast. (Id.) On the heels of the news, DN's shares fell 23% to $21.60 per share. (Id. ¶ 86.)

Two weeks later, on July 19, 2017, DN issued a press release announcing its Q2 2017 results. (Id. ¶ 88.) That release reiterated the Company's decision to lower its revenue guidance and indicated that DN was on track to post a net loss of between $110 million and $125 million for the year. (Id.) Notwithstanding that outlook, Mattes opined that, "[a]s we near the first anniversary of the combination of our two companies, I am more confident than ever that we are uniquely positioned to deliver innovative solutions to our customers and long-term value to our stakeholders." (Id.)

Consistent with its quarterly routine, Mattes and Chapman led DN's earnings call the same day. (<u>Id.</u> ¶ 89.) Mattes addressed the downward revisions to DN's revenue guidance, indicating that some drivers were (1) slower than expected sales volume for certain product lines and (2) a "complex timing challenge" related to its service business. (<u>Id.</u>) On the integration front, however, Mattes stated that "we have completed[,] or are in the process of completing, several actions which should benefit our P&L by the end of the year," and he suggested that the "DN2020 initiatives continue to point to significant scale benefits for the new company" to the tune of expected "net savings of $240 million by the end of 2020." (<u>Id.</u> ¶ 90.) Chapman similarly suggested that the integration and related cost savings were progressing well. (<u>Id.</u> ¶ 91.)

One week later, DN filed its Q2 2017 10-Q, which reiterated the results from its press release and earnings call. (<u>Id.</u> ¶¶ 92-94.) The 10-Q maintained that through DN2020, <u>i.e.</u>, the Company's "multi-year integration and transformation program," DN hoped to deliver "operating profit of $240 [million] by the year 2020." (<u>Id.</u> ¶ 92.) Like all quarterly filings, Mattes and Chapman also completed SOX certifications regarding DN's financial reporting and internal controls. (<u>Id.</u> ¶ 95.)

### 4. Q3 2017 Earnings & Mattes' Exit

On October 31, 2017, DN issued a press release announcing its Q3 2017 results and again lowering the Company's 2017 revenue target to $4.6 billion (down from $4.7-$4.8 billion) and its net loss expectation to between $130 million and $140 million (down from $110-$125 million). (<u>Id.</u> ¶ 99.) Even so, Mattes maintained his positivity regarding the Company's integration efforts, stating that "[w]e are encouraged to see our integration and transformation achievements begin to translate into meaningful cost synergies." (<u>Id.</u>)

On the Company's same-day earnings call, Mattes reiterated that DN's "integration and transformation achievements" had "translate[d] into meaningful cost synergies during the third quarter" and that the Company was "achieving the integration milestones, which we established." (<u>Id.</u> ¶ 100.) Wunram echoed Mattes' outlook, reaffirming that the "DN2020 program will expect to deliver $240 million operating profit impact through 2020" and that DN's "achievements and outlook on the integration of DN2020 cost savings remain positive." (<u>Id.</u> ¶ 101.)

**\*5** Consistent with its Q2 2017 timing, DN filed its Q3 2017 10-Q one week after its press release. (<u>Id.</u> ¶ 102.) The 10-Q, which contained similarly worded disclosures as past quarterly reports, disclosed financial results consistent with those announced in the press release and earnings call. (<u>Id.</u> ¶¶ 102-104.) And, as always, Mattes and Chapman completed SOX certifications regarding DN's financial reporting and internal controls. (<u>Id.</u> ¶ 105.)

DN issued an ad hoc press release on December 13, 2017 announcing that Mattes was stepping down as CEO, effective immediately. (<u>Id.</u> ¶ 108.) In the interim, Chapman and Wunram would take over the helm as Co-CEOs. (<u>Id.</u>) Plaintiff alleges, based on confirmation from a "Company spokesman," that Mattes was asked to step down by DN's Board of Directors due to the Company's "poor financial performance following the [M]erger." (<u>Id.</u>)

### 5. Q4 and FY 2017 Earnings

As should now be familiar, on February 13, 2018, DN issued a press release regarding its Q4 and FY 2017 earnings. (<u>Id.</u> ¶ 109.) DN reported revenue of $4.6 billion, which was in line with the amended forecast it announced in Q3 2017, but it also reported a net loss of $205 million, which exceeded prior projections. (<u>Id.</u>) Nevertheless, Wunram announced that "[w]e are pleased with the pace of our integration efforts, which are enabling the company to streamline costs, increase productivity and strengthen our competitiveness." (<u>Id.</u>)

On the same day, Wunram and Chapman hosted DN's quarterly earnings call to explain the Company's full-year 2017 results. (<u>Id.</u> ¶ 110.) On the call, Wunram reported that DN had made "significant progress in 2017" regarding its integration initiatives, stating that DN had already "reduced headcount by 1,300 full-time positions, with a net impact closer to 1,000 employees." (<u>Id.</u>) He went on to inform that, "[t]hrough our execution of the DN2020 program, the company realized over $100 million of savings as the result of our integration and operational excellence programs during 2017 and we expect to realize at least another $50 million of savings in 2018." (<u>Id.</u>) Chapman also commented on DN's supply chain, suggesting that DN had "recently experienced a few growing pains and associated minor supply chain delays that will impact [its] systems revenue" but otherwise spoke positively about the integration. (<u>Id.</u> ¶ 111.)

Case 2:19-cv-05530-ARL Document 57-1 Filed 07/20/21 Page 6 of 16 PageID #: 2813

On February 28, 2018, one week after DN announced the hiring of Gerrard Schmid ("Schmid") as its new President and CEO, the Company filed its 2017 10-K. (Id. ¶¶ 112-113.) That report offered familiar disclosures regarding the effects of the Merger, the related goodwill, and certain business drivers for the combined entity. (Id. ¶¶ 113-115.) And like all the Company's 10-Qs and 10-Ks, Wunram and Chapman completed SOX certifications regarding DN's financial reporting and internal controls. (Id. ¶¶ 116-117.)

About one month later, DN announced that Wunram was leaving the Company voluntarily as of May 31, 2018. (Id. ¶ 121.) Reportedly, Wunram decided it was time to leave "based on the advanced integration of Diebold and the former Wincor Nixdorf" and Schmid's appointment as CEO. (Id.)

### 6. 2018 Events Leading to Stock Price Fall

From there, things at DN began to trend downward. On May 2, 2018, DN issued a press release announcing disappointing Q1 2018 results and revising its projected full-year net loss upwards by $30 million. (Id. ¶ 122.) On the quarterly earnings call, new CEO Schmid admitted that DN's operations were overly "complex" and that the Company had "a number of inconsistent processes in different regions ... which [we]re exacerbated by a complex IT environment." (Id.) When responding to an analyst question about the IT environment, Schmid replied that "[t]here [we]re simply too many manual workarounds needed to run the business," which "ha[d] negative implications for our pre-sales activities, resource planning and supply chain." (Id. ¶ 123.) Schmid elaborated that, "from my vantage point, the combination of [Diebold and Wincor] in late 2016 was probably one of the core drivers for the additional complexity in our IT environment." (Id.) In response to a different question, Schmid indicated that DN's "current operating model still reflects some elements of legacy norms from the historical 2 entities." (Id. ¶ 124.) The market responded to Schmid's more cautious outlook: DN shares fell by 16% to $12.90 per share. (Id. ¶ 125.)

**\*6** The following quarter offered little relief. On August 1, 2018, DN announced that it suffered a $131 million loss during Q2 2018, $90 million of which was due to a goodwill impairment related to the Merger. (Id. ¶ 127.) The Company also lowered both its top and bottom-line projections significantly. (Id.) On the related earnings call, Schmid again expressed caution, stating that "it is clear that more action is needed to fundamentally change the way we

operate" given that a "high degree of complexity ... permeates our business." (Id. ¶ 128.) Schmid indicated that the Company was "focused on several actions to simplify our operations and rationalize our cost structure," including "stabilizing the supply chain, strengthening our IT environment and investing in new more cost-effective product platforms." (Id.) When answering an analyst's question, Schmid did not mince words, responding that the "fundamental reason" for DN's poor earnings was "the complexity of our operating model." (Id. ¶ 130.) Again, the market responded: DN shares plummeted 38% to $7.05 per share. (Id. ¶ 132.)

### c. Post-Class Period Events & This Action

From there, things went from bad to worse. The day after announcing its Q2 2018 earnings, DN abandoned DN2020 in favor of a new integration plan called "DN Now." (Id. ¶ 134.) After the Company filed its Q2 2018 10-Q on August 6, JP Morgan downgraded its recommendation on DN's stock, and DN's share price fell another 10% to $6.30 per share. (Id. ¶¶ 136-137.) Chapman left DN "to pursue other opportunities" in October 2018, and by December 2018 the Company's share price had fallen to below $3 per share. (Id. ¶¶ 143-144.) Compounding those issues, on March 1, 2019, DN disclosed several material weaknesses in its internal control environment. (Id. ¶¶ 145-146.)

In response to these events, DN shareholders filed several lawsuits against the Company and its senior officers, which were ultimately consolidated. (See Opinion and Order, dated Oct. 30, 2019 [dkt. no. 51], at 1-2.) After some jockeying among several of DN's institutional investors, the Court selected Indiana Laborers Pension and Welfare Funds as Lead Plaintiff. (See id. at 2.) Shortly thereafter, an amended consolidated class action complaint was filed, asserting claims against DN, Mattes, Chapman, and Wunram. (See CCAC ¶¶ 185-201.)

Specifically, Plaintiff presses claims for (1) securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) "control person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (See CCAC ¶¶ 185-201.) Those claims posit that Defendants made a variety of misleading statements that masked the true extent of the Company's difficulties related to the integration of Diebold and Wincor. The instant motion to dismiss followed.

Case 2:19-cv-05530-ARL    Document 57-1    Filed 07/20/21    Page 7 of 16 PageID #:
2814

## II. Legal Standards

### a. 🏳 Fed. R. Civ. P. 12(b)(6), 🏳 Fed. R. Civ. P. 9(b), & the Private Securities Litigation Reform Act ("PSLRA")

To survive a 🏳 Rule 12(b)(6) motion to dismiss, Plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." 🏳 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🏳 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 🏳 Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019). Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 🏳 Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020). It is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted). "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 🏳⚠ Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." 🏳 Iqbal, 556 U.S. at 679.

**\*7** "A claim under Section 10(b) ... sounds in fraud and must [also] meet the pleading requirements of 🏳 Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA." Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607 (S.D.N.Y. 2015) (citation omitted). Under 🏳 Rule 9(b) and the PSLRA, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." 🏳 ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); accord 15 U.S.C. § 78u–4(b)(1)(B).

### b. Section 10(b) & Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." 🏳 Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014). The first and second are particularly relevant to this litigation.

### 1. Material Misrepresentations or Omissions

"To support a claim of securities fraud, the stated or omitted fact must be material." 🏳 Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp., 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020). "An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." 🏳 Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (quotation marks omitted). "In judging whether an alleged omission was material in light of the information already disclosed to investors, the [C]ourt considers whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available." Chapman v. Mueller Water Prods., Inc., 466 F. Supp. 3d 382, 396–97 (S.D.N.Y. 2020) (cleaned up).

"Certain categories of statements are immaterial as a matter of law, such as 'puffery,' opinions, and forward-looking statements accompanied by adequate cautionary language." Barilli v. Sky Solar Holdings, Ltd., 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019). "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them," 🏳 In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (cleaned up), such "as a company's statements of hope, opinion, or belief about its future performance," Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc., 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019), aff'd, 826 F. App'x 111 (2d

Cir. 2020). Likewise, "a sincere statement of pure opinion is not an untrue statement of material fact, regardless [of] whether an investor can ultimately prove the belief wrong." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186 (2015) (quotation marks omitted). In that vein, "the Court of Appeals has repeatedly held to be nonactionable expressions of corporate optimism." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004).

In addition to materiality, "[a]n alleged statement or omission must also be false or misleading." Constr. Laborers, 433 F. Supp. 3d at 531. "The test for whether a statement is materially misleading ... is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." Vivendi, 838 F.3d at 250 (quotation marks omitted). In other words, whether a statement is "misleading," is "evaluated not only by literal truth, but by context and manner of presentation." Singh, 918 F.3d at 63 (cleaned up). Critically, a statement must be contemporaneously false: "A statement believed to be true when made, but later shown to be false, is insufficient." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). To establish the falsity of an opinion, a plaintiff must plead that (1) "the speaker did not hold the belief she professed," (2) any "supporting fact[s] she supplied" with her opinion "were untrue," or (3) the speaker omitted facts whose omission makes the statement misleading to a reasonable investor. [5]

5    Omnicare, 575 U.S. at 186; see also Tongue v. Sanofi, 816 F.3d 199, 209-10 (2d Cir. 2016) (applying Omnicare to claims brought under Section 10(b) and Rule 10b-5).

**\*8** Moreover, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015). Section "10(b) and Rule 10b–5(b) do not," however, "create an affirmative duty to disclose any and all material information": "Disclosure is required ... only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (cleaned up). "This inquiry, unlike other duty-to-disclose scenarios, merges with the question of whether the omitted fact is material." Constr. Laborers, 433 F. Supp. 3d at 531.

### 2. Scienter

Claims under Section 10(b) and Rule 10b-5 must allege "that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quotation marks omitted). The PSLRA mandates that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Under that standard, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. That necessary inference of scienter, taking "into account plausible opposing inferences," "must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." Id. at 323-24.

For an individual, "the scienter requirement is met where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (quotation marks omitted). "Where motive is not apparent[,] the strength of the circumstantial allegations must be correspondingly greater." Schiro v. Cemex, S.A.B. de C.V., 396 F. Supp. 3d 283, 300 (S.D.N.Y. 2019). For corporations, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008).

### c. Section 20(a)

Section 20(a) of the Exchange Act provides for what is commonly known as "control person" liability:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ....

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108.

## III. Discussion

### a. Section 10(b) & Rule 10b-5 Claim

Defendants have moved to dismiss Plaintiff's Section 10(b) claim on two grounds. First, Defendants contend that the CCAC fails to allege any actionable material misrepresentations or omissions. (See Defs. Br. at 12-23.) Second, Defendants aver that the CCAC fails to allege facts supporting a strong inference that Defendants acted with scienter. (See id. at 23-30.) The Court agrees with both arguments.

### 1. Material Misrepresentations or Omissions

**\*9** Plaintiff points to a myriad of statements made by Defendants during the Class Period. (See CCAC ¶¶ 48-147.) Those statements can be sorted into two buckets. First, most of the statements relate to expressions of optimism regarding DN2020 and the integration of Diebold and Wincor, which the Court will call the "Integration Statements." And second, Plaintiff identifies specific representations related to (1) DN's goodwill [6] impairment charges; (2) the Company's disclosures under Item 303 of Regulation S-K; and (3) the Individual Defendants' SOX certifications. The Court will address each family of statements separately.

[6] "Goodwill," as that term is used in the context of business combinations such as the Merger, has a specialized meaning. Business combination transactions are frequently accounted for using the "purchase method." See United States v. Winstar Corp., 518 U.S. 839, 848-49 (1996). Under that approach, the "difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill." In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 484 (S.D.N.Y. 2005) (emphasis omitted).

### i. The Integration Statements

Although themselves quite voluminous, the Integration Statements can be further separated into two general silos: (1) statements of corporate optimism regarding the benefits of the Merger, DN2020, or the progress of the integration of Diebold and Wincor; and (2) any remaining statements regarding the then-present status of the Company's integration efforts. For the reasons below, neither silo is actionable.

The vast majority of the Integration Statements are expressions of corporate optimism. Consider the following representative examples:

- Defendants spoke repeatedly about the Company's "aligned" sales force, goals, and quotas. Defendants also said that "everyone" was using the "same goal sheet" or "singing off the same hymn sheet." [7]

- Defendants referenced the Company's "progress" regarding DN2020 or the integration of Diebold and Wincor." [8]

- Defendants used the term "excellence" to describe DN2020's components related to finance, operations, and sales. [9]

- Defendants expressed "confidence" in their ability to integrate Diebold and Wincor. [10]

- Defendants stated that IT integration would be a "major enabler" for recognizing Merger-related "synergies." [11]

- Defendants cited the "collaborative" nature of the business and the "teamwork" being leveraged to integrate Diebold and Wincor. [12]

These general and vague statements of corporate optimism are "precisely the type of puffery that [the Second Circuit] and other circuits have consistently held to be [no]nactionable." [13] Additionally, many of those statements "may also be properly characterized as opinion[s]," which are similarly nonactionable. Adient, 2020 WL 1644018, at *19 n.14.

[7]     (See, e.g., CCAC ¶ 48 ("We enter the year leveraging a stronger, fully aligned global sales force ...."); id. ¶ 50 ("For the first time, the sales team is fully aligned around our goals, quotas, and account plans."); id. ¶ 52 ("Everybody is aligned.... [W]e've got everybody on the same goal sheet. We now have the full domination agreement between the two Companies, and all the quotas are aligned."); id. ¶ 61 ("[S]ince January, everybody is on the same goal sheets."); id. ¶ 67 ("Our sales team is fully aligned around our goals, quotas and account plans."); id. ¶ 68 (same); id. ¶ 80 ("[E]verybody is singing off the same hymn sheet.").)

[8]     (See, e.g., id. ¶ 50 (Mattes stated that DN "continue[d] to make progress" on integration); id. ¶ 53 ("So we have seen very good progress, we have gotten organized, and the foundation work is in place."); id. ¶ 67 ("We continue to make progress on our integration ...."); id. ¶ 68 (same); id. ¶ 72 ("I'm pleased to report that we're off to a good start.... I'm encouraged by the early progress and our ability to coordinate numerous intersecting activities."); id. ¶ 78 ("With respect to our DN2020 transformation program, the company is off to a good start .... I'm encouraged by the early progress and our ability to coordinate numerous intersecting activities."); id. ¶ 90 ("We are well on our way to reducing redundant stocking locations globally.... We have also made good progress on integrating the field service organization, which includes unifying the legacy IT systems and logistics support."); id. ¶ 109 ("[W]e are pleased with the pace of our integration efforts, which are enabling the company to streamline

costs, increase productivity and strengthen our competitiveness."); id. ¶ 110 ("We made significant progress in 2017.").)

[9]     (See, e.g., id. ¶ 60 ("[W]e're spending a lot of time and energy on the integration but that [b]y the same token, making sure that we drive operational excellence." (quotation marks omitted)); id. ¶ 75 (discussing the Company's pursuits of "finance excellence," "operational excellence," and "sales excellence"); id. ¶ 92 (same); id. ¶ 102 (same); id. ¶ 113 (same).)

[10]     (See, e.g., id. ¶ 59 ("[W]e went into this thing eyes wide opened and we've been wrestling down alligators one at a time, still a few more to go, but we feel very confident about how we're going to do this."); id. ¶ 88 ("As we near the first anniversary of the combination of our two companies, I am more confident than ever that we are uniquely positioned to deliver innovative solutions to our customers and long-term value to our stakeholders.").)

[11]     (See, e.g., id. ¶ 63 ("I think the main part of synergy capture will be in 2017 and 2018, and this goes along also with IT integration. I will talk in a minute about IT integration. On the one hand side, IT is a major enabler for getting value out of the synergies."); id. ¶ 65 ("IT will be a big enabler for synergy capture.").)

[12]     (See, e.g., id. ¶ 48 ("I'm pleased with our strong free cash flow performance during the period, which is a testament to our collaborative teamwork during the first full quarter for our newly combined company.").)

[13]     In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 170 (2d Cir. 2021); see also, e.g., ⚑ In re Synchrony Fin. Sec. Litig., 450 F. Supp. 3d 127, 156 (D. Conn. 2020) ("[N]o reasonable investor would be misled by Defendants' statements about their 'completely aligned' interests with retail partners, because these are 'vague ... generic statements [that] do not invite reasonable reliance.'"), aff'd in relevant part, rev'd in part on other grounds, and remanded, 988 F.3d 157 (2d Cir. 2021); In re Adient plc Sec. Litig., No. 18-CV-9116 (RA), 2020 WL 1644018, at *19 n.14 (S.D.N.Y. Apr. 2, 2020) ("Statements about Adient's progress with

respect to certain goals, including it being 'on track,' also constitute [no]actionable puffery."); Okla. L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson, No. 18-CV-3021 (JMF), 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) ("It is well established that such general statements about ... corporate 'excellence' and progress, are nonactionable puffery."); Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc., 422 F. Supp. 3d 821, 846 (S.D.N.Y. 2019) (finding that statements that a merger integration was " 'quick,' 'very smooth' and [showing] 'great progress' [we]re so vague and ill-suited to concrete measurement that they constitute puffery"); In re Aratana Therapeutics Inc. Sec. Litig., 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (holding that statements that the company had "made remarkable progress towards our stated goal of advancing our expanding pipeline towards commercialization," was "confident about and prepared for what lays ahead," was " 'proud' to be 'on track to have these products reach the market in 2016,' " and was "confident in these products and our overall commercialization strategy," were nonactionable puffery (citations omitted)); Schaffer v. Horizon Pharma PLC, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) ("[S]tatements by Defendants extolling their 'unique commercial business model,' noting that the company was 'on track,' and highlighting that prescription growth was 'exceeding [their] expectations' are not actionable under the securities laws." (citations omitted)).

**\*10** Plaintiff hopes to avoid that conclusion by suggesting that those puffery and opinion statements are actionable because they "are couched between statements of fact and offered for context." (Pl. Br. at 15.) Specifically, Plaintiff posits that Defendants failed to "tell the whole truth" because they did not disclose the full extent of the Company's struggles to integrate Diebold and Wincor, which led to an "illusion that the cost savings and merger integration targets were proceeding and faced no undisclosed challenges to the 'bottom line' or 'P&L' throughout the Class Period." (Id. at 15-16.) Moreover, Plaintiff suggests that even if many of the Integration Statements are puffery, Defendants can still "be held liable for misrepresentations of existing facts." (Id. at 17 (quotation marks omitted).) The Court disagrees.

As an initial matter, Plaintiff's claim regarding the "half-truth" nature of the puffery Integration Statements "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 97–98 (2d Cir. 2016). Furthermore, even setting that aside, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." Dalberth v. Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014). Rather, DN was only obligated to disclose additional facts if doing so was necessary to make the Integration Statements "not misleading." Matrixx, 563 U.S. at 44. Whether the Integration Statements were misleading absent the additional facts requires considering whether, in light of Defendants' other relevant disclosures, those statements "would have misled a reasonable investor." Vivendi, 838 F.3d at 250. They would not.

Although Defendants may have expressed a rosy outlook regarding the Merger, the CCAC shows that they also offered cautionary statements to temper their optimism. Consider the following examples. In DN's 2016 10-K, Defendants disclosed that "[t]he Company [wa]s executing a multi-year integration program" that was aimed at providing "an opportunity to realize approximately $160 [million] of cost synergies over three years." (CCAC ¶ 54 (some emphasis omitted).) Likewise, at the Company's 2017 Investor Day, Mattes stated that "doing a deal in Germany is not a trivial task and you have to go through quite a process to get it done," and he emphasized that "60% of all the M&A deals that are being done fall short of the expectations." (Id. ¶¶ 59-60.) Mattes also used a visual aid depicting potential problems as "alligators" and stated that "we've been wrestling down alligators one at a time" and that there were "still a few more to go." (Id. ¶ 59.) Additionally, throughout the Class Period, DN repeatedly lowered its revenue and net loss targets and provided explanations for doing so. (Id. ¶¶ 71, 85, 99, 122, 127.) Finally, Defendants made several other cautionary statements regarding DN2020's ongoing work on the Company's quarterly earnings calls, even though those statements are omitted from the CCAC. [14] Plaintiff's suggestion that the Company's Merger-related reporting was all roses is divorced from its own pleadings and Defendants' other public statements. [15]

[14]    (See, e.g., Ex. 11 to Scott Decl., dated July 19, 2017 [dkt. no. 81-12], at 7 (Q2 2017 earnings

call transcript) ("I think it's very fair to say that we underestimated the amount of distractions tied to the integration, the amount of change that we introduced to the organization, and also the size of the hole that we dug ourselves as we exited 2016 and came into 2017 ...."); Ex. 13 to Scott Decl., dated Oct. 31, 2017 [dkt. no. 81-14], at 3 (Q3 2017 earnings call transcript) ("Our leadership team is actively managing the complexities related to the transaction and we are achieving the integration milestones which we established.... [But] significant transformational work remains ...."); id. at 5 (quoting Wunram as saying, "Every integration has its own unique challenges, and ours was no different.... While there is still work ahead of us, the company has already made many of the difficult and complex changes to adjust the cost baseline, which is necessary in integration of our size.").)

It is proper for the Court to take judicial notice of these earnings call transcripts--which are quoted and referred to by the CCAC--and "to consider them in adjudicating the Motion to Dismiss, examining the documents only to determine what statements they contain rather than to prove the truth of the documents' contents." Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp., 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018).

15    For the same reason that the Court finds that the Integration Statements are not misleading, the Court also finds that further disclosure of the Company's integration difficulties would not have "significantly altered the total mix of information already made available." Chapman, 466 F. Supp. 3d at 397 (cleaned up).

 **\*11** Plaintiff's claims regarding falsity and "half-truths" run into another problem: They fail to plead with particularity that Defendants knew that their statements were misleading when they were made. See Lululemon, 14 F. Supp. 3d at 571. To establish contemporaneous falsity, Plaintiff relies principally on (1) DN's abandoning of the DN2020 integration plan and (2) Schmid's 2018 statements regarding, among other things, DN's organizational complexity, supply chain maladies, and IT systems. (See Pl. Br. at 10-13.) Those statements do not move the needle.

DN's change in business strategy does not, without more, render its past disclosures regarding DN2020 misleading.

A company may shift gears for any number of reasons, most of which have nothing to do with fraud. As for Schmid's comments, those statements simply cannot do the work that Plaintiff requires of them. Schmid repeatedly used phrases such as "I think" or "from my vantage point" or "to me," [16] which signal an expression of opinion, not fact. See Omnicare, 575 U.S. at 183 ("[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."). That Individual Defendants may have held different opinions from Schmid regarding the Company's integration efforts does not mean that their opinions were false or misleading. Critically, Plaintiff points to no data-- such as documents, reports, analyses, etc.--suggesting that Defendants' statements regarding DN's integration efforts were false or misleading when made, let alone that Defendants knew of such data but made their representations anyway.

16    (See, e.g., CCAC ¶ 123 ("I think at the--from my vantage point, the combination of the 2 organizations in late 2016 was probably one of the core drivers for the additional complexity in our IT environment. I do think it's important that as part of my strategic agenda, I look to explore ways to further standardize and harmonize that platform."); id. ¶ 128 ("It has become quite clear to me that complexity is driving higher costs in the business..... At the end of the day, the complexity of our operating model effectively has services actions distributed globally across multiple operating units, which, quite frankly, I think, is the fundamental reason for--the reason why we are--where we are today.").)

For the reasons explained above, Plaintiff has failed to plead that the Integration Statements constitute "material misrepresentation[s] or omission[s]." Halliburton, 573 U.S. at 267. Accordingly, those statements, at least as currently pleaded, are not actionable under Section 10(b) and Rule 10b-5. [17]

17    Given these conclusions, the Court need not address the parties' arguments regarding whether the PSLRA's safe harbor for forward-looking statements applies to any of the alleged

misrepresentations. (See Defs. Br. at 15-17; Pl. Br. at 13-15.)

### ii. The Other Statements

Undeterred, Plaintiff asserts that statements related to DN's goodwill impairment charges, the Company's Item 303 disclosures, and Individual Defendants' SOX certifications are actionable. (See Pl. Br. at 19-21.) Not so.

First, Plaintiff suggests that "at least by December 2017, ... Defendants knew or should have known that the merger synergies had adversely affected the Company's merger-related goodwill." (Id. at 19-20.) To support that contention, however, Plaintiff points only to (1) Schmid's August 1, 2018 statement explaining why the Company was reporting an impairment to goodwill associated with it Q2 2018 results, (see CCAC ¶ 131); and (2) a March 1, 2019 disclosure that deficiencies in the Company's internal control environment had resulted in misstatements to, inter alia, goodwill impairment, (see id. ¶ 145). But "after-the-fact allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (quotation marks omitted). Importantly, Plaintiff alleges no concrete facts, known in December 2017, suggesting that generally accepted accounting principles ("GAAP") "so clearly required" DN to impair its Merger-related goodwill such that the Company's "failure to take such a charge was fraudulent." [18]

[18]    In re Loral Space & Commc'ns Ltd. Sec. Litig., No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004). That failure is compounded because GAAP requires "that the value of goodwill should be tested for impairment at least annually." City of Omaha v. CBS Corp., No. 08 Civ. 10816 (PKC), 2010 WL 1029290, at *3 (S.D.N.Y. Mar. 16, 2010).

**\*12** Next, Plaintiff avers that it has pleaded actionable omissions related to the Company's required disclosures under Item 303 [19] because Defendants did not "disclose the full extent of the Company's integration problems." (CCAC ¶ 83; see also id. ¶ 119; Pl. Br. at 20-21.) That contention fails for the same reason that Plaintiff's claims related to the Integration Statements do: Defendants were not obligated to

disclose every fact that an investor might want to know about DN's integration. See Dalberth, 766 F.3d at 183. Here, there is no dispute that the Company "provided disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced." Ong v. Chipotle Mexican Grill, Inc., No. 16 Civ. 141 (KPF), 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017). Plaintiff simply maintains that Defendants should have disclosed more. However, as explained more fully above, Defendants' failure to paint the fullest picture possible is not actionable, especially considering the array of other information that was disclosed to the market. (See CCAC ¶¶ 71, 85, 99, 122, 127.)

[19]    Rule 303 requires disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." Stratte-McClure, 776 F.3d at 101.

Finally, Plaintiff suggests that Individual Defendants' allegedly misleading SOX certifications are actionable because the Company failed to disclose that its existing internal controls were deficient and needed to be "enhanced," which contributed to DN's "business and operations [being] materially impaired as a result of the merger." (Id. ¶ 69(f)-(g); see also id. ¶¶ 56, 77, 82(f)-(g), 97(f)-(g), 105, 106(e)-(f), 117, 118(f)-(g), 145-146.) SOX certifications are "statement[s] of opinion," which "contain an important qualification that the certifying officer's statements are true based on his or her knowledge." In re AmTrust Fin. Servs., Inc. Sec. Litig., No. 17-CV-1545 (LAK), 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019) (brackets omitted). Yet, Plaintiff offers nothing beyond conjecture to suggest that Individual Defendants knew--at the time they signed their certifications--of any misrepresentations in DN's financial statements or deficiencies in the Company's internal controls. Defendants' post-Class Period identification of control deficiencies and misstatements, without more, does not show otherwise. [20]

[20]    See Francisco v. Abengoa, S.A., 481 F. Supp. 3d 179, 210 (S.D.N.Y. 2020) ("The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made.").

In sum, Plaintiff's allegations related to DN's goodwill impairment charges, the Company's Item 303 disclosures, and

the Individual Defendants' SOX certifications fare no better than Plaintiff's claims premised on the Integration Statements.

### iii. <u>Conclusion</u>

DN undertook a merger that proved to be more complex, and less lucrative, than its senior executives initially thought it would be. But Plaintiff cannot leverage Defendants' general expressions of corporate optimism about that merger, although perhaps misguided, to bootstrap a Section 10(b) or Rule 10b-5 claim. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994). Hindsight, although 20/20, cannot be used to prove securities fraud. See, e.g., Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). Plaintiff's Section 10(b) and Rule 10b-5 claims must be dismissed.

### 2. <u>Scienter</u>

Defendants also move to dismiss Plaintiff's Section 10(b) and Rule 10b-5 claims because Plaintiff has failed to plead scienter. (See Defs. Br. at 23-30.) Recall that Plaintiff may show scienter in one of two ways: (1) evidence that Individual Defendants had "a motive and opportunity to commit the fraud" or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." Blanford, 794 F.3d at 306 (quotation marks omitted). Plaintiff's allegations fall short under either theory, especially since, when evaluating scienter, "the [C]ourt must take into account plausible opposing inferences." Tellabs, 551 U.S. at 323.

**\*13** In terms of motive and opportunity, Plaintiff alleges that Individual Defendants "were motivated to make the alleged false and misleading statements in order to preserve their executive positions and personally collect millions of dollars in compensation and bonuses." (CCAC ¶ 158.) That contention fails because it is not "concrete" or "personal" to the Individual Defendants. Teamsters, 531 F.3d at 196. Indeed, the Court of Appeals has "made clear" that "an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient [to show scienter] because such a desire can be imputed to all corporate officers." Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001).

Instead, Plaintiff focuses its arguments on the Individual Defendants' purported recklessness, (see Pl. Br at 23-30), which the Court of Appeals defines as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308 (quotation marks omitted). To satisfy that standard, Plaintiff points to five families of facts it avers circumstantially evidence scienter: (1) Individual Defendants' central role in the integration, (see Pl. Br at 23-25); (2) Individual Defendants' departures from DN, (see id. at 25-26); (3) certain post-Class Period events at the Company, (see id. at 26-27); (4) Individual Defendants' SOX certifications, (see id. at 28); and (5) Individual Defendants' knowledge of "core operations," (see id. at 27-28). None of those allegations gives rise to the required strong inference of scienter.

Plaintiff relies primarily on Individual Defendants' senior management roles to evidence scienter, pointing to their "responsib[ity] for the companies' successful integration" and their "comprehensive understanding of the integration activities and how those activities would affect the Company's financial and operational results." (Id. at 23.) Yet, "Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). To that end, "[w]here scienter is based on a defendant's knowledge of and/or access to certain facts, Second Circuit cases uniformly rely on allegations that [1] <u>specific</u> contradictory information was available to the defendants [2] <u>at the same time</u> they made their misleading statements." Adient, 2020 WL 1644018, at *27.

On that front, Plaintiff points only to certain "tools" that Individual Defendants used to track Merger-related synergies. (See Pl. Br. at 23-24.) Generally, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. Crucially, however, Plaintiff specifies <u>no information in those tools</u> that runs counter to Individual Defendants' statements at the time they were made. To the contrary, Plaintiff relies only on Schmid's later opinions regarding the complexity of DN's organizational structure and IT environment and posits that it is "not plausible that [the Individual] Defendants ... were unaware" of those "facts" at the time. (Pl. Br. at 24-25.) That simply is not enough. [21]

A plaintiff can also show recklessness sufficient to infer scienter where it "allege[s] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Novak, 216 F.3d at 308. That is inapposite here, because Plaintiff's entire scienter theory is predicated on the fact that Individual Defendants were actively tracking and reviewing the progress of DN2020 and the integration. (See Pl. Br. at 23-24.)

**\*14** Next, Plaintiff invokes Mattes', Chapman's, and Wunram's departures from the Company. (See Pl. Br. at 25-26.) "Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter," Woolgar v. Kingstone Cos., Inc., 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020), because "there are any number of reasons that an executive might resign, most of which are not related to fraud," Das v. Rio Tinto PLC, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018). Additional factual allegations linking the termination or resignation to the alleged fraud are necessary. See Woolgar, 477 F. Supp. 3d at 240. Plaintiff attempts to tie the departures to fraud by suggesting that the departures were due to DN's poor post-Merger results including "tens of millions of dollars in operational inefficiencies, cost overruns, and debilitating supply chain problems." (Pl. Br. at 25.) But disappointing earnings do not a fraud make-- companies fail to execute on their operational objectives all the time for a variety of non-fraud-related reasons. Although Plaintiff suggests that the Individual Defendants' leaving DN somehow were "red flags," (id. at 26), Plaintiff offers nothing beyond innuendo to permit the Court to discern anything out- of-the-ordinary about those departures. See Adient, 2020 WL 1644018, at \*29.

Plaintiff next suggests that certain "post-Class Period events and statements support an inference of scienter." (Pl. Br. at 26 (quotation marks omitted).) Plaintiff points to two: (1) "DN's abandonment of the DN2020 integration program" in favor of "the new 'DN Now' program" and (2) "[t]he Company's need to take the massive [M]erger-related goodwill impairments." (Id.) Neither provides Plaintiff any help. As explained above, a change in business strategy does not itself show that the old approach was plagued by fraud. Although Individual Defendants may have expressed undue optimism about DN2020's progress, that hardly rises to an "extreme departure from the standards of ordinary care."

Kalnit, 264 F.3d at 142. As for the goodwill impairment, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Novak, 216 F.3d at 309. Yet, Plaintiff offers "no allegations that there were any internal reports"--or any other documents, analyses, or data for that matter--"that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it ... rose to the level of fraud." Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp., 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016).

Next, Plaintiff marshals Individual Defendants' SOX certifications associated with DN's 2016 10-K, each of its 2017 10-Qs, and its 2017 10-K. (See Pl. Br. at 28 (citing CCAC ¶¶ 56, 77, 95, 105, 117, 161.) As a general matter, however, SOX certifications "add nothing substantial to the scienter calculus" because permitting those "certifications to create an inference of scienter in every case where there was an accounting error ... would eviscerate the pleading requirements for scienter set forth in the PSLRA." Int'l Ass'n of Heat, 205 F. Supp. 3d at 536. To that end, courts in this circuit have found that a plaintiff "cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."[22] Here, no such allegations were made: Plaintiff relies only on facts occurring after Individual Defendants signed their certifications, namely the post-Class Period disclosures of material weaknesses in DN's internal controls and the Company's August 2018 impairment of goodwill. That dog won't hunt.

22  Plumbers, 89 F. Supp. 3d at 615 (emphasis added); cf. Reilly v. U.S. Physical Therapy, Inc., No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at \*19 (S.D.N.Y. July 23, 2018) ("SOX certifications may be probative of scienter if the complaint alleges glaring accounting irregularities or other red flags, of which the certifying defendant had reason to know." (quotation marks omitted)).

**\*15** Finally, Plaintiff contends that the "core operations doctrine"[23] supports an inference of scienter because Individual Defendants' responsibilities related to the merger undoubtedly concerned DN's core operations. (See Pl. Br. at 27-28.) Even assuming that is true, it is of no moment.

As Plaintiff implicitly recognizes, (see id. at 27 n.15), "the core operations theory"--at best--"constitutes supplemental support for alleging scienter but does not independently establish scienter."[24] In other words, the core operations doctrine can only be a buoy, not a life raft. And, as described above, Plaintiff's other allegations of scienter do not measure up.

23  "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (quotation marks omitted).

24  Lipow, 131 F. Supp. 3d at 163 (quotation marks omitted). Indeed, "since the enactment of the PSLRA, the Second Circuit has expressed doubt as to whether the core operation[s] doctrine has survived." In re Pretium Res. Inc. Sec. Litig., 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017).

Plaintiff cries foul with this method of analysis, averring that its allegations must be considered collectively. (See Pl. Br. at 22.) Plaintiff is correct that "the [C]ourt's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, 551 U.S. at 326. But the Supreme Court's command does not permit Plaintiff "to combine inadequate allegations of motive with inadequate allegations of recklessness ... to demonstrate scienter." Kalnit, 264 F.3d at 141. That makes sense as a matter of elementary arithmetic. After all, "zero plus zero" (plus zero plus zero plus zero) "cannot equal one." Reilly, 2018 WL 3559089, at *19.

In short, Plaintiff's allegations regarding scienter do not support a "powerful or cogent" inference that Individual Defendants harbored thoughts of fraud. Tellabs, 551 U.S. at 323. As a result, there is no intent that can be imputed to the Company. See Teamsters, 531 F.3d at 195. Consequently, Plaintiff's Section 10(b) and Rule 10b-5 claims must be dismissed on the basis of lack of scienter, too.

### b. Section 20(a) Claim

Plaintiff also asserts that Mattes, Chapman, and Wunram are liable as controlling persons, because all three "controlled" DN within the meaning of Section 20(a) of the Exchange Act. (See Pl. Br. at 30; CCAC ¶ 198.) But because Plaintiff has "failed to plead a primary violation" of the Exchange Act by DN, Plaintiff's "Section 20(a) claim necessarily fails." Chapman, 466 F. Supp. 3d at 414.

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss [dkt. no. 79] is GRANTED, and the CCAC is DISMISSED without prejudice. Should the class wish to re-plead, Plaintiff may file an amended complaint within thirty days.[25] "Plaintiff[ ] will not be given unlimited bites at the apple, however, as [it is] now on notice of the deficiencies in [its] pleadings." Francisco, 481 F. Supp. 3d at 216. The Clerk of the Court shall close the open motion.

25  "[U]pon granting a motion to dismiss, the usual practice in this Circuit is to permit amendment of the complaint." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (quotation marks omitted).

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1226627, Fed. Sec. L. Rep. P 101,076

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.