# EXHIBIT B

In re Nokia Corporation Securities Litigation, Slip Copy (2021)

2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

2021 WL 1199030
United States District Court, S.D. New York.

IN RE NOKIA CORPORATION
SECURITIES LITIGATION

Master File No. 19-cv-3509
|
No. 19-cv-3982
|
Signed 03/29/2021

**Attorneys and Law Firms**

Lawrence D. Rohlfing, Law Offices of Lawrence D. Rohlfing, Santa Fe Springs, CA, for Plaintiff.

US Attorney CV, Katherine L. Parker, US Attorneys Office, San Diego, CA, Michael Marriott, Social Security Administration, San Francisco, CA, for Defendant.

**OPINION & ORDER CLASS ACTION**

ANDREW L. CARTER, JR., United States District Judge

**\*1** Lead Plaintiff Clyde W. Waite ("Mr. Waite" or "Plaintiff") brings this putative class action against Nokia Corporation ("Nokia" or the "Company") and Rajeev Suri, former CEO of Nokia (collectively, "Defendants"), alleging that Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10(b)-5.

Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.

**BACKGROUND**

**I. Factual Background**

The following facts are taken from the allegations contained in the Second Consolidated Amended Complaint ("SCAC"), ECF No. 47, which are presumed to be true for purposes of this motion to dismiss. The Court also considers facts drawn from news releases, financial reports, and transcripts of earnings calls which Plaintiff quotes from extensively in the SCAC and are thus incorporated into the Complaint by reference. *See* ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

**A. The Parties**

Defendant Nokia is a network and technology company incorporated in Finland with its principal executive offices in Espoo, Finland. SCAC ¶ 15.

Defendant Rajeev Suri, served as Nokia's President and Chief Executive Officer ("CEO") throughout the period of April 27, 2017 until October 23, 2019 (the alleged "Class Period"). *Id.* ¶¶ 1, 16.

Plaintiff Clyde W. Waite seeks to represent all purchasers of Nokia American Depository Shares ("ADSs")[1] during the Class Period, and who were damaged thereby. *See id.* ¶¶ 14, 144.

[1]     "An ADS represents ownership in a security issued by a foreign company in foreign markets. Generally, a depositary institution, typically a U.S. bank, has custody of the foreign security, and issues the ADS certificate to an investor in the United States." SCAC ¶ 1 n.1 (citations omitted).

**B. The Acquisition of Alcatel-Lucent**

On April 15, 2015, Nokia announced plans to purchase Alcatel-Lucent ("Alcatel"). *Id.* ¶ 17. According to Nokia at the time, "the combined company will be in a position to accelerate development of future technologies including 5G." Press Release, Nokia, Nokia and Alcatel-Lucent to Combine to Create an Innovation Leader in Next Generation Technology and Services for an IP Connected World (Apr. 15, 2015). Indeed, Plaintiff alleges that the Nokia-Alcatel transaction was "intended to enable the Company to compete in 5G." SCAC ¶ 18.[2] While Nokia had been "historically focused on wireless service," 5G would require a "combination of wireless capabilities with physical networking capabilities and infrastructure that Nokia did not have." *Id.* ¶ 19. Alcatel had the capabilities and infrastructure that Nokia was lacking. *Id.* Thus, this acquisition "gave the Company the combination of wireless and networking assets and expertise essential to compete in the race to 5G," *id.*, making the "rapid integration of Alcatel [ ] the single most

important operational priority carried out by the Company during (and in the lead-up to) the Class Period, *id.* ¶ 20.

2  5G is "the next generation of wireless cellular network technology, capable of significant greater data speeds than earlier wireless networks." *Id.* ¶ 18.

 **\*2** According to Plaintiff, this acquisition raised "significant concerns" about the Company's ability to integrate Alcatel into Nokia's operations. *Id.* ¶ 21. These concerns were heightened due to the companies' past failures in "successfully and timely" integrating acquisitions and joint ventures. *Id.* [3] However, Defendant Suri was "determined" to avoid these same problems. *Id.* ¶ 22. He "acknowledged these concerns directly" at Nokia's Annual General Meeting on May 5, 2015:

> Those of you who have been following the transaction news have, I am sure, seen people raise concerns about execution risk. Given the issues associated with similar transactions in the past, that is a very fair concern. But, I do believe that this time can be different.

*Id.* The difference would largely be a result of Defendant Suri's management methodology known as the "Nokia Business System" ("NBS"). *Id.* ¶ 23. This system included "focused M&A and integration practices." *Id.* In line with NBS, on April 17, 2015 Nokia announced the creation of an Integration Steering Board that would "provide the structure, processes and working team needed to set up the required plans for the combined company." *Id.* ¶ 24. The head of the Integration Steering Board was to report directly to Defendant Suri. *Id.* An "Integration and Transformation Board" ("Integration Board"), an exclusive team dedicated to the Alcatel integration and led by senior executives reporting directly to Defendant Suri, was also created. *Id.* ¶ 26.

3  The market was "particularly wary" of compliance issues at Alcatel because they had been involved "in an international bribery scheme leading to one of the largest criminal settlements in history with the U.S. Department of Justice ("DOJ") for violations of the Foreign Corrupt Practices Act

("FCPA"). Indeed, Alcatel's deferred prosecution agreement with DOJ came to an end ... just two months before Nokia announced the Alcatel transaction." SCAC ¶ 6.

Plaintiff alleges that Defendant Suri required the Integration Board to carry out the Alcatel integration in "an exceptionally rapid time-frame." *Id.* ¶ 27. The Company also established compensation incentives for Defendant Suri and members of Nokia's Group Leadership Team, which included the Company's most senior executives (including the CEO, Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and Chief Legal Officer ("CLO"), among others). *Id.* ¶ 28. The compensation incentives were in the form of restricted stock units that were "tied specifically to the success of the Alcatel integration." *Id.* ¶ 29; *see also id.* ("tied expressly to targets related to the smooth and speedy integration of Alcatel"). Defendant Suri received 208,700 restricted shares, worth € 986,942 when granted, while the rest of the Group Leadership Team received a total of 1,015,100 restricted shares, valued at €4,800,408 when granted. *Id.* These shares were set to vest in three equal tranches on October 1st of 2017, 2018 and 2019. *Id.*

On January 14, 2016, Nokia announced that Nokia and Alcatel had begun operations as a single company. *Id.* ¶ 30. At the same time, Defendant Suri as well as other Nokia senior executives joined the Alcatel board of directors. *Id.* Nokia and Alcatel also adopted a Master Services Agreement and Framework Agreement (together, the "MSA") which "established Nokia's complete control over Alcatel, its operations, and, most importantly, its compliance processes." *Id.* ¶ 31. On November 2, 2016, Nokia announced that it had completed the Alcatel transaction. *Id.* ¶ 32. A couple of weeks later at its Capital Markets Day conference for investors and analysts, Defendant Suri explained the role that NBS had played in the integration and noted that he was "a permanent attendee" of the Integration Board sessions. *Id.* ¶¶ 33-34. At a conference call with securities analysts on February 2, 2017, Defendant Suri stated that they had "completed the integration projects related to Alcatel-Lucent *with the exception of a small handful of long-tail efforts*." *Id.* ¶ 35 (emphasis added). [4]

4  Plaintiff used a significant amount of added emphasis throughout the SCAC. This emphasis has been removed. The Court has added emphasis (in italics) to particular quotes.

In re Nokia Corporation Securities Litigation, Slip Copy (2021)
2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

## C. Defendants' Statements About the Alcatel Integration and 5G-Readiness During the Class Period

### 1. 2017

 **\*3**  On the first day of the Class Period, April 27, 2017, the Company held their Q1 2017 earnings call wherein Defendant Suri stated that "Nokia's first quarter results showed ... that we are *effectively moving beyond the* integration effort for 2016 to making 2017 a year of execution and performance." *Id.* ¶ 40 (emphasis added). Later on he stated that they were pleased with their performance in Q1 but that they were "not complacent" and knew they had "some challenges in select business groups." *Id.* Defendant Suri emphasized that they were "very focused on addressing those issues" and expressed that he was "confident that [they could] get those businesses back on track." *Id.* "With the integration of Alcatel-Lucent behind us, we are committed to building on that platform and to making 2017 a year of execution and performance." *Id.*

At the beginning of the call, Matt Shimao, Head of Investor Relations, stated that "[d]uring this call, we'll be making forward-looking statements regarding the future business and financial performance of Nokia...." Saltzstein Decl. Ex. 7 at 4.[5] He emphasized that:

> These statements are predictions that involve risks and uncertainties. Actual results may therefore differ materially from the results we currently expect... We have identified such risks in more detail on Pages 67 through 85 of our 2016 Annual Report on Form 20-F, our interim report for Q1 2017 issued today as well as our other filings with the [SEC].

*Id.* The 2016 Annual Report on Form 20-F ("2016 20-F") listed several risk factors including:

> **We have identified material weaknesses in our internal control over financial reporting following the Acquisition of Alcatel Lucent which, if not remediated, could have a material adverse effect on us.**

*Our integration activities in connection with the Acquisition of Alcatel Lucent are ongoing.* In connection with the preparation of our consolidated financial statements for the year ended December 31, 2016, our management identified two material weaknesses in the effectiveness of our internal control over financial reporting related to (1) the accounting for income taxes at a former Alcatel Lucent entity in the United States and (2) the accounting and control functions at a former Alcatel Lucent subsidiary in China.

As permitted by applicable regulations and accounting rules, *Nokia's internal controls effectiveness assessment in 2016 did not include Alcatel Lucent's legacy operations.* Our operating subsidiaries or our joint ventures' failure, or a failure to integrate the Alcatel Lucent legacy operations into our internal controls framework, could adversely affect the accuracy and timeliness of our financial reporting, which could result, for instance, in loss of confidence in us or in the accuracy and completeness of our financial reports, or otherwise in the imposition of fines or other regulatory measures, which could have a material adverse effect on us. *Moreover, we may identify further control deficiencies that are material weaknesses in the future.*

Ex. 1 at 76 (emphasis added). The 2016 20-F also disclosed historic compliance issues at Alcatel and warned that Nokia "may also be subject to claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition." *Id.* at 79. The 2016 20-F further warned that "failure to integrate Alcatel Lucent or to achieve the expected synergies or other benefits ... could materially and adversely affect our business, financial condition and results of operations." *Id.* at 67. They emphasized that "[d]espite our progress in the integration, there can be no assurance that the overall integration of Alcatel Lucent will be successful or yield expected benefits and results," and that discovery of compliance issues remained a potential challenge they could encounter. *Id.* at 67-68.[6]

[5]  All references to "Ex.___" refer to the exhibits attached to the Saltzstein Declaration submitted in support of Defendants' motion to dismiss.

[6]  The earnings report issued that same day identified similar risks. *See* Ex. 3 at 15, 73.

**\*4** On July 27, 2017, Nokia held their Q2 2017 earnings call where Defendant Suri discussed the "increased pressure" on Nokia to accelerate their 5G roadmaps, Ex. 8 at 5, which "create[d] *some near term risk*, as it makes the timing of certain project completions and acceptance [ ] more uncertain than is typical for us." SCAC ¶ 44 (emphasis added). However, he also noted that they had "successfully worked through such issues before" and expressed confidence that they would "do so again." *Id.* "We have strong customer relationships, deep R&D capacity and thanks to our robust balance sheet, the ability to further invest as needed. While we are still evaluating the full impact of these developments, I want to be clear this is not a time to back off from product leadership." *Id.* Kristian Pullola, Nokia's CFO, reiterated Defendant Suri's remarks:

> [A]s Rajeev discussed in his remarks, we have today provided some new commentary on the drivers for our full year outlook for our networks business. These *include uncertainties related to the timing of completions and acceptances of certain projects, particularly in the second half, 2017 as well as the level of R&D investment needed to maintain product competitiveness and accelerate 5G*. We believe that we can manage through these headwinds and risks in 2017 with a relatively small impact on our targets for the full year.

*Id.* ¶ 45 (emphasis added). In response to a question regarding the timing of completions and acceptances of certain projects, Defendant Suri stated that they were

> seeing a bigger than expected workload on the radio mobile networks division, one due to platform migration ... [W]e're also seeing advancement of some features by customers and now we are seeing acceleration of 5G. *So when you put these three things together, there is even more pressure on workload and product road maps*, particularly in the

Radio team. *So this leads to a slight elevation of risk* that in certain projects -- and I want to say that the operative word is really certain that there could be some timing impact on acceptances and this could affect our revenues. Now I wanted to clear, this is not broad based and we are talking just about certain projects and we expect to be confident to manage through this as Kristian said.

*Id.* ¶ 46.

On October 26, 2017, Nokia held their Q3 2017 earnings call. During this call Defendant Suri discussed "challenges" Nokia was facing in their Mobile Networks business, "partly reflecting market conditions and part[l]y driven by some issues specific to our Mobile Networks business." Ex. 5 at 6. In addressing market conditions, Defendant Suri stated that their current view was that "we will see a full year 2017 decline compared to 2016 in our primary addressable market .... When we look into 2018, we think conditions will continue to be difficult." *Id.* He went on to address the multiple technology transitions the sector was experiencing, including 4G to 5G, and noted that Nokia was "well positioned" in the market:

> As I said last quarter however, we believe that 5G will come faster than originally expected, starting in 2019. As that happens, Nokia is well positioned. It is important to remember that unlike earlier technologies, 5G solutions require much more than radio... And Nokia is one of the very few companies that is able to meet all those needs.

After addressing market conditions, Defendant Suri went on to address the issues specific to Nokia's Mobile Networks business:

> When we spoke last quarter, I noted that our R&D team in Mobile

Networks has faced an extraordinarily high workload ... With this pressure, we have seen some issues with the time it has taken to converge a limited set of products, and that has unfortunately impacted a small number of customers. We're having to change out more products with more repeat site visits than originally planned. As a result, Mobile Networks has experienced both revenue pressure and an increase in expected network equipment swap costs... The product migration challenges have also caused some near-term deal delays in some of our other Networks businesses. *Id.*

**\*5** He then noted that there was good news in that "[f]ield deployments of our new AirScale products were ramping up in all geographies." *Id.* "This is an activity that will result in our latest 5G-ready AirScale products in wide use with considerable future upsell opportunities." *Id.* at 7.

During this call, Mr. Pullola also expanded on the "network equipment swap outs." *Id.* at 10. He explained that "[i]t has taken extended time to converge a limited set of products and, as a result, we are having to swap out more products, as [Defendant Suri] said. We are now *fully in the deployment phase of our swaps program.*" *Id.*

In response to an analyst question regarding the timing of completions and acceptances of certain projects extending into the first half of 2018, Defendant Suri noted that

that [was] to do with -- the extensive R&D workload [with] relate [sic] to migration .... And so that has a risk with those customers, where there is the element of network equipment swaps related to the portfolio migration. And so it's contained to less than a handful of customers, but we see a risk that it could last until [the] first half of 2018 .... [T]he good part is that we are

now in full deployment mode, and that of course, is helpful.

SCAC ¶ 50; Ex. 5 at 13. In response to another analyst question regarding what the engineering issues associated with migrating platforms were and what had changed in the past few months (since they were previously not made aware of these issues), Defendant Suri stated:

[N]umber one, we did say there will be network equipment swaps ... but they will be mitigated by the use of technology, which we have done... I think it isn't about a particular hardware issue or software [issue] per se. It is just the feature requirements in particular customers with former Alcatel-Lucent footprint, have been greater than we've originally expected... And then the second thing is at the same time ... there have [sic] been feature creep in the market due to competitive pressure... And then as things would happen sometimes, that 5G also got accelerated in 2020 and 2019. So it's really about getting the quality right when you ship the software. I think the good news is that the software is now shipped, i.e. the software release is now available. The AirScale hardware is now available, and it is now moving into this full deployment phase .... So the heavy lifting is over. It's down to a few projects, less than a handful. And we're in bulk deployment phase.

SCAC ¶ 51.

### 2. 2018

On February 1, 2018, Nokia held its Q4 2017 earnings call. SCAC ¶ 53. Defendant Suri dug into "some issues related to product integration challenges in Mobile Networks" that he had "flagged" on past calls. *Id.* He stated that "[l]ooking at the

In re Nokia Corporation Securities Litigation, Slip Copy (2021)
2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

situation today, I think it is safe to say that we are coming back very fast. Recent software releases have been at our highest quality levels ever. The performance of our AirScale product is extremely good." *Id.*; Ex. 9 at 5. Defendant Suri also introduced Nokia's new ReefShark chipset, "a critical piece of hardware within the Company's 5G infrastructure," which "purportedly gave Nokia a huge competitive advantage ... especially insofar as the chip was 5G ready and could be updated remotely through software upgrades." SCAC ¶ 54. [7] At the end of his prepared remarks, he gave a quick "recap":

> **\*6** Nokia delivered well in the fourth quarter and ended the full year with improved group-level performance compared to the previous year. We are moving fast and successfully to put the portfolio integration challenges in Mobile Networks behind us. We have a highly competitive set of products and services ideally suited to the world of 5G. *We expect 2018 to be challenging from a market perspective and due to the acceleration of near-term 5G investments.* We expect those investments to pay off. And in 2020, we believe we will be positioned to deliver strong financial performance, including significant EPS growth.

*Id.* ¶ 55 (emphasis added); Ex. 9 at 7. Defendant Suri concluded the call by saying that he was "pleased with where Nokia landed in Q4 and closed the year":

> The fact that we were able to turn-around the net working capital issues that we experienced in the third quarter demonstrates the execution power of Nokia, as does the speed at which we have addressed the portfolio integration challenges in Mobile Networks. *2018 will be another challenging year, and tapping the opportunity of 5G requires additional near-term investment.* I am confident, however, that our investment will

deliver the right future results... [W]e believe [ ] value is there to be created and have a high degree of confidence that the guidance we gave for 2020 is achievable.

*Id.* (emphasis added); Ex. 9 at 18.

[7]    ReefShark is "a chipset developed by Nokia that 'leverage[s] in-house silicon expertise to dramatically reduce the size, cost and power consumption of operators' networks and meet the massive compute [sic] and radio requirements of 5G.' " Defs.' Mot. at 12 n. 12 (quoting Ex. 13 at 13).

On March 22, 2018, Nokia filed its 2017 Annual Report on Form 20-F with the SEC ("2017 20-F"). SCAC ¶ 57. In the 2017 20-F, Nokia noted that one of the "major achievement[s]" of that year was "the closing of our agreement with our Chinese partner, which resulted in the formation of the joint venture—Nokia Shanghai Bell. This was the last major *organizational* step in [the] Nokia and Alcatel Lucent integration...." *Id.* (emphasis added). The 2017 20-F also disclosed that Defendant Suri had "received the payment under the first tranche of a special award granted in 2016 to incentivize the delivery of synergies from the Alcatel Lucent acquisition." *Id.* ¶ 58. The Company noted that the award "was based on financial synergies and cultural integration and the targets were achieved in full." *Id.*

The 2017 20-F also contained specific risk disclosures. For example:

> Potential challenges that we may encounter regarding the [Alcatel] integration process and operation as a combined company include ... claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition, including unknown or unasserted liabilities.

Case 2:19-cv-05530-ARL   Document 57-2   Filed 07/20/21   Page 8 of 22 PageID #: 2831

Ex. 2 ("2017 20-F") at 77-78. The Company once again warned that the integration might not be successful, potentially as a result of discovering compliance issues. *Id.* The 2017 20-F also identified as a risk their "ability to correctly estimate technological developments, including the impending turn to 5G, or adapt successfully to such developments." *Id.* at 73-74.

On April 26, 2018, Nokia held its Q1 2018 earnings call where Defendant Suri stated that Nokia was "in a very strong position for 5G" and noting that "[r]ecent software releases are at the highest quality levels ever and the roadmap issues which we saw last year are *largely* behind us, even if *there is plenty of heavy R&D lifting still to come in the sprint to 5G*." SCAC ¶ 59 (emphasis added). In response to an analyst question regarding the ReefShark chipset and how margins might be impacted when the new product shipped, Defendant Suri stated that "[c]ustomer feedback is fantastic, both on [ReefShark] as well as the new chipset in optical, PSE-3.... It will improve the cost structure *over the long term*." *Id.* ¶ 60 (emphasis added). The accompanying earnings report identified among the various forward-looking statements the ability to achieve the anticipated benefits from the Alcatel acquisition. Q1 2018 Form-6K at 12. [8]

[8] Available at https://www.sec.gov/Archives/edgar/data/0000924613/000110465918027017/a18-12291_16k.htm.

**\*7** On July 26, 2018, Nokia held its Q2 2018 earnings call where Defendant Suri commented on the progress they were making in "the execution of [their] strategy":

> The good news here is that we see no change to the overall dynamics driving the acceleration of 5G. Nokia and its competitors are all hard at work, as there's been a radical shift in the time from the release of standards to the expectation of trial systems from around 12 months for 3G and 4G to just a few months for 5G. *With that intensity, if any company tells you they have everything done and dusted for 5G, well, I would approach that claim with more than a little skepticism. We all face some risks as we push to get*

> *5G products to market. Time is tight and development teams are stretched.* But despite the high pressure, the Mobile Networks team is making solid progress on its roadmaps.

*Id.* ¶ 61. On that call he also addressed reports that "Nokia lost a small number of markets in Verizon to a competitor," which he acknowledged was "true" and "unfortunate." *Id.* ¶ 62; Ex. 15 at 6. However, he also said that the Company was

> not losing any footprint in North America ... and any suggestion that Nokia is losing share as a result of some fundamental issue of product competitiveness is simply incorrect. It might make for interesting competitor-fueled speculation, but it does not reflect reality. When I look at our performance in the first half of the year and our backlog in the second half, I see no reason for concern about our market share position beyond normal execution challenges.

SCAC ¶ 62; Ex. 15 at 6. In answering an analyst question regarding the mix of new products and its impact on revenue and gross margin, Defendant Suri stated that with the "ramping up" of AirScale in their Mobile portfolio, they did expect "enhancements to product cost. And so we see product cost erosion, and therefore we will see also a benefit from that." SCAC ¶ 63; Ex. 15 at 12. The accompanying earnings report explained that results may be influenced by "the timing of completions and acceptances of certain projects, particularly related to 5G." Ex. 17 at 2.

On October 25, 2018, Nokia issued a press release on a Form 6-K, where Defendant Suri was quoted as saying that "Nokia has made considerable progress in executing on its strategy," that their "early progress in 5G is extremely strong," and noting that their "win rate for new deals suggests that we are in a very good competitive position." SCAC ¶ 64. He was also quoted as saying that "[w]ith the successful Alcatel-Lucent integration and cost-saving program soon to be behind us, we are taking steps to accelerate the execution of our strategy and sharpen our customer focus." *Id.* According to Defendant

Suri, while they had "noted earlier this year that we would need to take further cost actions in order to deliver on our 2020 guidance [,] [t]oday we are quantifying those actions and raising the certainty that we can meet those commitments." *Id.* "Since the acquisition of the business closed, we have been integrating and capturing synergies and now it is time to focus on optimizing and ensuring that we are lean in every part of our business." *Id.* ¶ 65.

**\*8** That same day, Nokia held their Q3 2018 earnings call. *Id.* ¶ 66. In response to an analyst question regarding whether the "swaps that you were doing in the first half of the year completely over," Mr. Pullola responded that he thought they "still have some swaps to do." *Id.* He continued by saying that Nokia

> expect[ed] that the cost of executing those swaps will be somewhat lower than what we originally anticipated. But there's really no kind of correlation between that and revenues. Of course, getting out of the swap phase will enable us to fully focus our delivery capacity on the 5G project in North America, and that will help. But I think one should not kind of see that as being a source of revenue upside going forward.

*Id.* In response to a different question regarding Nokia's new structuring plan and associated cost cuts, Mr. Pullola stated that on the one hand they were "making structural changes that will enable us to execute quicker on our strategy and to enhance our customer focus." *Id.* ¶ 67. On the other hand, he noted that Nokia was "also taking cost actions... We have now gone through ... one phase of cost optimization after the Alcatel Lucent integration, and we are now moving onto the next phase." *Id.* The accompanying earnings report, referenced during the conference call, identified as a risk "general economic and market conditions and other developments in the economies where we operate, including the timeline for the deployment of 5G and our ability to successfully capitalize on that deployment." Ex. 18 at 12.

On November 12, 2018, Defendant Suri gave a presentation at the UBS Global Technology Conference titled "Creating Value in the 5G Era." SCAC ¶ 68. At the end of the presentation Defendant Suri answered questions including on execution challenges related to the Alcatel transaction. *Id.* He recognized that they had "some issues regarding [ ] swaps" in Q3 of the previous year, more specifically, that they had "some delays on the swaps ... with a few customers, especially here in North America" which "hurt" Nokia "to some extent." *Id.* He noted that the following quarter was "actually pretty decent," but that they had seen "some regional mix issues and product mix issues" in the first half of 2018. *Id.* He continued by saying that they had seen some of those problems "reverse" in Q3, and that he "believe[d] from here on, things are starting to improve...." *Id.* He also answered another question about competition within the industry, specifically regarding "competitive intensity" and "competitive strategy differences between [Nokia] and some of [their] competitors over the next year or [two]." *Id.* ¶ 69. Defendant Suri stated that "competitive intensity [was] unchanged" because out of fourteen operators in the lead countries they were the only ones who worked with all of them, "[s]o it's a good position to be in right at the beginning of the outset of 5G." *Id.*

During that conference, Defendant Suri also answered questions regarding the successes and challenges of the Alcatel transaction. Defendant Suri touted that they had been able to "bring the roadmaps of the [two] products, i.e., product rationalized the wireless products fairly quickly ... in about a year." *Id.* ¶ 70.

> And then we were able to use the next 1.5 years to swap all that former Alcatel Lucent portfolio fairly well. Even though we had a hiccup in Q3 last year, we recovered very nicely from that... [I]t's 95% ... done and the rest will be done by the end of this year, which is quite remarkable .... So that rationalization has been positive. Inevitably, there are hiccups, but it's been positive.... The cultural integration worked very well because that can go really badly but that actually went beautifully.

**\*9** *Id.* In a follow-up exchange regarding cultural integration, Defendant Suri stated that they were "through *most of that*." *Id.* ¶ 71 (emphasis added). He stated that

he thought they were "in a good place now" and that he'd "say that integration is over at the end of this year. Cultural integration is 80% over.... *It's a journey, so it's never over... But I think most of the heavy lifting is over*." *Id.*

### 3. 2019

On January 31, 2019, the Company held its Q4 2018 earnings call where Defendant Suri referenced the "risks" largely related to "project timings and product deliveries" discussed on the previous earnings call. *Id.* ¶ 73.

> *Some of those risks did in fact materialize in the fourth quarter ... Looking ahead I expect those risks to carry over into at least the first half of 2019.* To be clear, I have absolutely no doubt that a fast and meaningful shift to 5G is underway. But there are several factors that point to 2019 being very second half loaded similar to what we saw in 2018.

*Id.* (emphasis added). The first factor was "the staggered nature of 5G rollouts;" the second, that "the 5G ecosystem ... is still in its early days;" and finally, "while Nokia has a massive amount of 5G-ready hardware already deployed and we ended 2018 with a backlog considerably larger than the previous year, conversion of orders and backlog to sales could be somewhat slower than normal." *Id.* With regards to the second factor, Nokia "expect[ed] this to stabilize in the coming months," but noted that this meant that "development and testing are operating under considerable time pressure." *Id.* With regards to the last factor, Defendant Suri stated that "[s]ome of the hardware that has been deployed is waiting for the availability and acceptances of key 5G software releases." *Id.* Looking at these factors together, Defendant Suri thought it was "safe to say that 2019 will be one focused on full year results, not those of individual quarters." *Id.* In the accompanying earnings report, Nokia once again identified timing of rollouts relating to 5G as a risk factor. Ex. 20 at 15.

On March 21, 2019, the Company filed their 2018 Annual Report on Form 20-F with the SEC ("2018 20-F"). The 2018 20-F stated that Nokia "took steps during 2018 to accelerate the execution of [their] strategy and position [their] business

for 5G leadership" given the "considerable momentum of [their] strategy," and "the successful Alcatel Lucent integration" and completion of the "associated cost-saving program." *Id.* ¶ 75. Nokia also touted its R&D capabilities, stating that it was "one of the industry's largest R&D investors in information communication technology" that "drive[s] innovations across telecommunications and vertical industries to meet the needs of a digitally connected world," with "[p]roduct development [ ] continually underway." *Id.* ¶ 76. They also highlighted that they "continue[d] to develop [their] 5G portfolio according to the latest 3GPP specifications ... [and] continue[d] to invest significantly in [their] ReefShark processor family for baseband and RF." *Id.* ¶ 77. The Company noted that they "ha[d] a global installed base that is expected to provide [Nokia] with the platform for success in 5G." *Id.* More specifically, "they ha[d] more than 400 customers in 4G/LTE and a robust AirScale platform, which can be upgraded from 4G to 5G." *Id.* The 2018 20-F also stated that "[u]pon completion of the Alcatel Lucent integration as of the end of 2018, we are now moving to the next phase of restructuring, where we will focus on optimization and ensuring that we are lean in every part of our business." *Id.* ¶ 78. The 2018 20-F also identified 5G statements as "forward-looking," Ex. 13 at ECF 5, and identified as a risk their "ability to correctly estimate technological developments, including the impending turn to 5G, or adapt successfully to such developments," *id.* at 61.

**\*10** On April 25, 2019, Nokia held its Q1 2019 earnings call where Defendant Suri "openly address[ed] the question of Nokia mobile radio road maps." *Id.* ¶ 79. He stated that they did "have some short-term issues, weeks and, at most, a few months in some select cases." *Id.* He continued:

> But these need to be understood in the context of a technology cycle that will last well over the next decade and that is still in the process of maturing... As a proof point that the ecosystem is still maturing, we have found software defects and instability in the consumer device chipsets in the process of testing our 5G base station software. It seems reasonable to believe that if we were significantly behind our competition as some have suggested, such defects and stability issues would have already been found

and then fixed by the chipset makers. I do not find these gaps particularly surprising, given the speed at which things have been and are continuing to move ....

*Id.* The contemporaneous earnings release identified as a risk factor the "timing of the deliveries of our products and services, including our short term and longer term expectations around the rollout of 5G and our ability to capitalize on such rollout, and the overall readiness of the 5G ecosystem." Ex. 23 at 14.

On May 30, 2019, Nokia participated in Cowen's 47th Annual Technology, Media and Telecommunications conference, which included a fireside chat with Marcus Weldon, Chief Technology Officer and President of Nokia's Bell Labs to discuss the future of 5G. SCAC. ¶ 80. In this chat, Mr. Weldon stated that they had "500,000 [ ] SKL platform base stations [that] have been deployed that are 5G-ready and 3.8 million 5G-ready radios." *Id.* He went on to say that they had "sort of put the foundation in, but then the releases have to go in those, the actual features have to be built on those sort of 5G, and *that's going to be years*." *Id.* (emphasis added).

On July 25, 2019, Nokia held its Q2 2019 earnings call. *Id.* ¶ 81. During this call Defendant Suri stated that

> Nokia has a solid position in the early stages of 5G with our win rates and deployments[;] our 4G performance and deep customer base give us confidence about the opportunities to come and given the expected timing of large scale deployments as 5G moves beyond the lead countries, Nokia will be ready to support our customers at scale.

*Id.* ¶ 82. In response to an analyst question regarding the software issues that needed to be resolved and chipset development being "on track," Defendant Suri said that they "were a few weeks delayed, and that's why [they] couldn't get that revenue recognition in Q1." *Id.* ¶ 84. He clarified that they now had "general availability," and had "9 live commercial

networks" with a "fantastic" conversion rate from 4G to 5G, as a result of the 45 deals they had. *Id.* He noted that "*there is still some work to do* ... perhaps in some features which have to come later in the year." *Id.* (emphasis added). With regards to the 5G chipset development, Defendant Suri stated that it was "on track for both radio and baseband" with the ReefShark family of products "starting to come out during '19 and '20." *Id.* The accompanying earnings report identified as a risk Nokia's ability to capitalize on the rollout of 5G. Ex. 25 at 14.

### D. Nokia's Code of Conduct

 **\*11** Nokia also had a Code of Conduct which was published on the Company's website and disclosed to the investing public at all times during the Class Period. *Id.* ¶ 86; *id.* ¶ 86 n.8. This Code of Conduct "outline[d] [Nokia's] commitment to act compliantly and ethically in [their] business activities." *Id.* ¶ 87. It emphasized that "Nokia managers and leaders are compliance stewards for their organizations: they own the culture of compliance." *Id.* ¶ 89. The Code of Conduct laid out a number of compliance responsibilities for managers. *Id.* It also required that all Nokia employees "[p]romptly raise any and all compliance concerns through one of the channels provided by the business" and described "these thorough reporting procedures." *Id.* ¶ 90. Additionally, the Code of Conduct recognized the importance of compliance to Nokia's shareholders by stating that "our shareholders expect us to do business the right way" and "[v]iolations of our Code of Conduct erode the trust we have built with our shareholders ...." *Id.* ¶ 91.

### E. Nokia's "Corrective" Disclosures

Nokia's 2018 20-F, filed on March 21, 2019, disclosed that "[d]uring the course of the ongoing integration process, [they] [had] been made aware of certain practices relating to compliance issues at the former Alcatel Lucent business that have raised concerns." *Id.* ¶ 93. It noted that Nokia had "initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities, with whom [they] [we]re cooperating with a view to resolving the matter." *Id.* Nokia warned that "[t]he resolution of this matter could result in potential criminal or civil penalties, including the possibility of monetary fines, which could have a material adverse effect on [their] business, brand, reputation or financial position." *Id.* The Company's ADSs fell from a previous close of $6.26 per share to $5.88 per share the next day, a 6% decline in a single day of "unusually heavy trading volume." *Id.* ¶ 94.

In re Nokia Corporation Securities Litigation, Slip Copy (2021)
2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

In an after-hours press release issued on March 22, 2019, Nokia stated that "given the market reaction and inquiries related to a disclosure in [their 2018 20-F], the [C]ompany issues this statement to clarify that the specified investigation is not expected to have a material impact on Nokia." *Id.* ¶ 96. According to the press release, they had "seen no evidence that would suggest that criminal penalties would apply in this case," and "believe[d] it [was] highly likely that any penalties that might apply would be limited and immaterial." *Id.* Nokia emphasized that "the disclosure does not reflect Nokia's assessment of the expected or likely impact of the investigation on Nokia." *Id.* Nokia's securities continued to decline over the next few trading days, falling an additional $.19 per share from its close price on March 22, 2019 to close at $5.69 per share on March 28, 2019, a drop of approximately 3.23%. *Id.* ¶ 97.

On October 24, 2019, the Company filed their third quarter earnings report which stated that

> some of the risks that we flagged previously related to the initial phase of 5G are now materializing. In particular, our Q3 gross margin was impacted by product mix; a high cost level associated with our first generation 5G products; profitability challenges in China; pricing pressure in early 5G deals; and uncertainty related to the announced operator merger in North America.

> We expect that we will be able to progressively mitigate these issues over the course of next year. To do so, we will increase investment in 5G in order to accelerate product roadmaps and product cost reductions, and in the digitalization of internal processes to improve overall productivity. We will also continue to invest in our enterprise and software businesses, which are developing rapidly and performing well. Given these investments and the risks we see materializing, we are adjusting our targets for full-year 2019 and 2020; and we expect our recovery to drive improvement in our 2021 financial performance relative to 2020.

 **\*12** Ex. 11 at 1-2. This report also announced a suspension of Nokia's dividend and a decrease in 2019 and 2020's financial guidance. *Id.* at 4; *see also* SCAC ¶ 99. The price of Nokia's ADSs subsequently fell 23.7% on the New York Stock Exchange, closing at $3.90 per ADS on October 24, 2019 (down from $5.11 per ADS the day before), on an "unusually high trading volume" of more than 250 million shares traded. SCAC ¶ 104.

## II. Procedural Background

On April 19, 2019, Plaintiff Tanner Tom, individually and on behalf of all others similarly situated, brought this suit against Defendants for securities fraud. ECF No. 1. On May 3, 2019, Plaintiff J. Phillip Max filed a class action complaint against Defendants that alleged substantially similar violations of the securities laws. *See* 19-cv-3982, ECF No. 1. On June 18, 2019 multiple plaintiffs (including Mr. Waite) moved to serve as lead plaintiff and to consolidate both actions. ECF Nos. 5, 8, 12, 14. On June 27, 2019, the Court consolidated this case and 19-cv-3982 into a "Consolidated Action." ECF No. 26. In an Order dated July 16, 2019, the Court granted Mr. Waite's motion for appointment as lead plaintiff. ECF No. 32. On October 30, 2019, Plaintiff filed a Consolidated Amended Complaint. ECF No. 41. On January 8, 2020, Plaintiff filed a Second Consolidated Amended Complaint ("SCAC"), the operative complaint in this action. ECF No. 47. Defendants filed a motion to dismiss Plaintiff's SCAC along with a supporting memorandum of law on May 1, 2020 ("Defs.' Mot."). ECF Nos. 61-62. Plaintiff opposed Defendants' motion on June 30, 2020 ("Pl. Opp."), ECF No. 67, and Defendants submitted a reply memorandum of law in further support of their motion on August 14, 2020 ("Defs.' Reply"), ECF No. 69. On February 9, 2021, Defendants filed a letter with supplemental authority in support of their motion and Plaintiff responded on February 18, 2021. ECF Nos. 71-72. Defendants' motion is therefore deemed fully briefed.

## III. Allegations in the Complaint

Plaintiff alleges that the statements made during the Class Period regarding 5G and the integration were "materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading" because (1) "they falsely conveyed that the risks associated with the Company's integration efforts were behind it" when they had "learned of material compliance issues at Alcatel," SCAC ¶ 42; and (2) they "created (and were intended to create) the false and misleading impression that Nokia's integration with Alcatel was complete and successful and that the Company was fully prepared for the 5G transition" and "omitted to disclose material information concerning significant problems ... that were necessary to make Nokia's statements concerning 5G readiness and the progress of the integration not materially false and misleading," *id.* ¶¶ 52, 72, 85. According to Plaintiff, the

statements in and regarding Nokia's Code of Conduct were also "materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading because they falsely conveyed that Alcatel had been fully integrated into the Company's Code of Conduct and compliance mechanisms." *Id.* ¶ 92. Plaintiff contends that "[t]hese statements ... communicated to the market that Alcatel ... had been brought within and was in compliance with Nokia's Code of Conduct" and "omitted to disclose that ... the Company had discovered compliance issues during the integration." *Id.* The challenged statements can be grouped into three categories: (1) references to the progress of the Alcatel integration; (2) statements concerning 5G progress; and (3) statements contained in and relating to Nokia's Code of Conduct.

**\*13** Plaintiff also asserts that Defendants' scienter is demonstrated by several facts including: (1) Defendant Suri's "personal involvement" in the Alcatel integration process, *id.* ¶¶ 107, 111-117; (2) Nokia's implementation of "a detailed reporting and personnel infrastructure to monitor Alcatel's operations and the status of the integration" which "reported to Defendant Suri and other Nokia senior executives," *id.* ¶¶ 108, 118-127; (3) the existence of compensation arrangements tied to the integration which "created a strong incentive for [Defendant] Suri and his direct reports to misrepresent the status and progress of the integration and to conceal or disregard negative information concerning the Alcatel integration or the related transition to 5G," *id.* ¶¶ 109, 128-131; and (4) the status of the Alcatel integration as "the single most important operational priority for Nokia during (and in the period leading up to) the Class Period," *id.* ¶¶ 110, 132-135.

## STANDARD OF REVIEW

### I. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must

allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are " 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir.), *cert. denied*, 554 U.S. 930 (2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also ATSI Commc'ns*, 493 F.3d at 98.

### II. Motions to Dismiss Under Fed. R. Civ. P. 9(b) and the PLSRA

When a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citations and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

**\*14** Defendants assert that the SCAC fails to state a claim for securities fraud for four principal reasons. First, Defendants argue that the SCAC does not adequately allege that any of the challenged statements were false or misleading at the time they were made, especially when considered in the context of Nokia's numerous disclosures regarding the Alcatel integration and their 5G progress. Second, Defendants contend that the bulk of the challenged statements are non-actionable statements of puffery and/or opinion. Third, Defendants assert that many of the challenged statements are protected forward-looking statements, thus immunized from liability by the PSLRA safe harbor. Lastly, Defendants argue that Plaintiff's allegations are not sufficient to raise a "strong inference" of scienter.

### I. Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5

Plaintiff asserts a securities fraud claim against Defendants under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. SCAC ¶¶ 151-158. "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Defendants' motion to dismiss challenges the first two factors.

### A. Plaintiff Has Not Adequately Alleged That Defendants' Statements Were False or Misleading at the Time They Were Made

Defendants' principal argument is that Plaintiff has failed to identify any false or misleading statements and thus, Plaintiff's § 10(b) and Rule 10b-5 claims must fail. The Court agrees.

"The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (citations and internal quotation marks omitted), *aff'd*, 605 F. App'x 62 (2d Cir. 2015). Furthermore, "[t]he test for whether a statement is materially misleading under Section 10(b) ... is whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 172 n. 11 (2d Cir. 2004) (citation and internal quotation marks omitted) (emphasis added). Plaintiff's Complaint, which lists statements made over year-long periods and concludes that these statements were false and misleading based on subsequent "corrective" disclosures, falls far from meeting the mark. *See Lululemon*, 14 F. Supp. 3d at 571 ("A statement believed to be true when made, but later shown to be false, is insufficient. In such a circumstance, there is a lack of actionable falsity." (internal citation omitted)).

First, "Plaintiff['s] use of large block quotes ..., followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements." *See, e.g.*, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008) (dismissing claims regarding particular statements where plaintiffs had "not alleged exactly which statements ... were false nor explained how the statements were false, but instead rel[ied] on vague and conclusory statements that [were] not supported by any specific factual allegations"); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (summary order).

Second, Plaintiff has failed to identify any statements that were false or misleading when made. The challenged statements can be grouped into three categories: (1) references to the progress of the Alcatel integration; (2) statements

concerning Nokia's 5G progress; and (3) statements contained in and relating to Nokia's Code of Conduct. The Court will examine each category of statements in turn. [9]

[9] Plaintiff's Complaint includes statements that precede the Class Period. However, these cannot serve as the basis for liability for a § 10(b) or Rule 10-b(5) claim. *See, e.g.*, *Wilder v. News Corp.*, No. 11-cv-4947, 2014 WL 1315960, at *7 (S.D.N.Y. Mar. 31, 2014) ("[S]tatements that pre-date the Class Period are not actionable.").

### 1. Statements Concerning the Alcatel Integration

**\*15** Plaintiff contends that Defendants made materially false and misleading statements regarding the Alcatel integration such as "[w]ith the integration of Alcatel-Lucent behind us," SCAC ¶ 40 (Q1 2017 earnings call); describing the formation of Nokia Shangai Bell as the "last major organizational step in [the] Nokia and Alcatel Lucent integration," *id.* ¶ 57 (2017 20-F); "[w]ith the successful Alcatel-Lucent integration and cost-saving program soon to be behind us," *id.* ¶ 64, and "[s]ince the acquisition closed ...," *id.* ¶ 65 (Q3 2018 Earnings Report); the "cultural integration ... went beautifully," *id.* ¶ 70, and the "[c]ultural integration is 80% over," *id.* ¶ 71 (UBS Global Technology Conference on Nov. 12, 2018).

Assuming, without deciding, that these statements are actionable, the Court concludes that Plaintiff has not sufficiently alleged that these statements were false or misleading when made. Plaintiff attempts to capitalize on Nokia's March 2019 disclosure regarding Alcatel's compliance issues, *id.* ¶ 93, to suggest that all of Nokia's prior statements regarding the Alcatel integration were false and misleading, instead of demonstrating with "specificity" why that was so. However, considering the challenged statements in their full context, the Court declines to find that these statements were false or misleading. *See, e.g.*, *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) ("[A] court [should not] accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court." (citations omitted)).

For starters, the identification of a compliance issue at Alcatel is not necessarily at odds with senior management's belief that they were "effectively moving beyond the integration."

*See* *In re Razorfish Sec. Litig.*, No. 00-cv-9474, 2001 WL 1111502, at *1-2 (S.D.N.Y. Sept. 21, 2001) (stating that " 'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud," and concluding that the complaint nowhere alleged that the respect as to which such integration had been said to occur had not occurred). Plaintiff does not "meaningfully specif[y] the respects as to which such integration is said to have occurred" which had not actually occurred. [10] *Id.* at *2. Instead, Plaintiff relies on vague references to "integration" and alleged "significant problems." That is not sufficient to plead falsity. The Complaint nowhere alleges that Nokia claimed that all compliance issues had been identified. In fact, Nokia continued to warn otherwise. *See, e.g.*, Ex. 1 ("2016 20-F") at 67-68, 79; Ex. 2 ("2017 20-F") at 77-78. Contrary to Plaintiff's assertion that the Company's compliance disclosure was "tantamount to an admission that their earlier declarations about the successfully completed integration were materially false and misleading," Pl. Opp. at 22, the mere fact that Nokia disclosed that it had discovered a compliance issue "during" the ongoing Alcatel integration does not render all their statements regarding the integration false. [11]

[10] The only references to concrete integration milestones were (1) the formation of Nokia Shanghai Bell, SCAC ¶ 57, (2) "the acquisition of the [Alcatel] business" closing," *id.* ¶ 65; (3) the Alcatel Lucent portfolio "swap" being "95% ... done," *id.* ¶ 70; (4) the completion of the cost-savings program associated with the Alcatel integration, *id.* ¶ 75; and (5) the move into the next phase of "restructuring," *id.* ¶ 78. However, Plaintiff does not allege that these milestones had not been met or demonstrate with specificity why these statements were false. The Complaint's deficiency in this regard is also highlighted by the fact that Plaintiff does not allege that the targets that formed the basis for receiving the compensation initiatives (tied specifically to the integration) were not met.

[11] Plaintiff asserts that Defendant Suri's November 2018 statements that the "[c]ultural integration is 80% over" and that the "cultural integration ... went beautifully," SCAC ¶¶ 70, 71, were false because of a Bloomberg article from October 2019 entitled "Nokia Staff Say Internal Politics Distracting Managers from 5G" which reported

that according to a "worker representative for senior salaried staff" "[e]mployees in Finland are frustrated because they believe that management at the telecom equipment maker has been distracted by disagreements over priorities and staffing since Nokia's ... takeover of ... Alcatel-Lucent," *id.* ¶ 105. *See also* Pl. Opp. at 21. However, Plaintiff does not point to any facts that suggest that Defendant Suri held the same beliefs as the employees and that would have made his statements false or misleading when made. *See In re Fed Ex Corp. Sec. Litig.*, No. 19-cv-05990, 2021 WL 396423, at *10 (S.D.N.Y. Feb. 4, 2021).

**\*16** Plaintiff also alleges that Defendants communicated to the market that the Alcatel integration was "complete and successful" and omitted the "problems in the process of combining Nokia and Alcatel." *Id.* at 14-15, 17-19. However, Plaintiff's argument that the challenged statements were misleading by omission also fails.

First, an "omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (citation omitted). "Such a duty may arise when there is ... a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.' " *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citations omitted). And a statement is "materially misleading" where "defendants' representations, *taken together and in context*, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n. 7 (citation and internal quotation marks omitted) (emphasis added).

Plaintiff appears to argue that Defendants had a "duty to disclose [ ] omitted facts" because the challenged statements would otherwise be misleading to a reasonable investor. [12] However, this argument ignores the disclosures that Nokia made regarding the Alcatel integration, including that their "integration activities in connection with the Acquisition of Alcatel Lucent [were] ongoing," 2016 20-F at 76, and that "Nokia and its businesses [were] exposed to various risks and uncertainties ... including ... those regarding ... [their] ability to integrate Alcatel Lucent into [their] operations and achieve the targeted business plans and benefits," Ex. 3 at 15 (Q1 2017 Earnings Report). [13] These risks were referenced at the beginning of the Q1 2017 earnings call where Defendant Suri stated that they were "*effectively moving beyond* the integration effort." Ex. 7 at 4. *See also*

SCAC ¶ 40. The 2016 20-F also disclosed Alcatel's historic compliance issues and that Nokia "may also be subject to claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify ... prior to the acquisition." 2016 20-F at 79. They further emphasized that "[d]espite [their] progress in the integration, there can be no assurance that the overall integration of Alcatel Lucent will be successful." *Id.* at 67. The 2017 20-F, where Nokia described the formation of Nokia Shangai as the "last major organizational step" in the Alcatel integration, contained similar disclosures. 2017 20-F at 77-78. [14]

[12]  To the extent Plaintiff attempts to argue that Defendants are liable for failure to disclose the Alcatel compliance issue they discovered earlier than they did, this argument must fail because "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650-652 (S.D.N.Y. 2017) (collecting cases).

[13]  The Q3 2018 Earnings Report also disclosed similar risks. *See* Ex. 18 at 11-13.

[14]  The 2017 20-F stated that "[p]otential challenges that we may encounter regarding the [Alcatel] integration process and operation as a combined company include ... claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition, including unknown or unasserted liabilities." 2017 20-F at 77-78.

**\*17** In support of Plaintiff's argument that the challenged statements were misleading, Plaintiff cites to numerous securities analysts who concluded that "post-Alcatel indigestion issues had more severe knock-on effects ... than management had realized" and that the Company had been "bogged down in an all-consuming post-merger integration process with Alcatel-Lucent." SCAC ¶ 102; *see also id.* ¶ 103 (citing to analyst report concluding that a "confluence of factors seemed to have caused this issue for Nokia," and that "[t]he key factor was no doubt the company's merger with Alcatel-Lucent and the complexity of aligning both companies 4G and 5G roadmaps"); Pl. Opp. at 17-18,

20-23. Plaintiff asserts that the Complaint's "allegations of falsity are consistent with multiple analysts' conclusions, which 'underscore the plausibility and reasonableness' of Lead Plaintiff's allegation that Defendants' statements were 'misleading to a reasonable investor.' " Pl. Opp. at 18-19 (quoting *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011)).

However, the analysts' conclusions do not change the fact that Nokia made robust disclosures related to the integration. The principal case Plaintiff relies upon for his argument is distinguishable. In *In re STEC Inc. Securities Litigation*, defendants argued that "[n]o reasonable investor could have believed that the [$120 million] [a]greement [for the second half of 2009] was just an ordinary course contract because [it] ... dwarfed the $41.2 million in ... sales ... during the first half of 2009." 2011 WL 2669217, at *8. The Court rejected defendants' argument, finding that it was plausible that investors reasonably understood STEC's announcement regarding the agreement to mean that it was a contract signed in the ordinary course of defendants' business, which was supported by "[p]articular statements made by analysts." *Id.* However, in contrast to Nokia's robust disclosures specifically regarding the integration, the court in *STEC* held that the defendants' disclosures were not "meaningfully cautionary" because they did not "relate directly to the forward-looking statements at issue." *Id.* at *10 (citation and internal quotation marks omitted). Further, *STEC* involved a specific misrepresentation, unlike here, where Plaintiff has not adequately alleged any false or misleading statements. [15]

15   So too in the other cases cited by Plaintiff to support the proposition that the Court can rely on analyst reports "as the basis for plausible inferences of falsity." Pl. Opp. at 19 n. 4. *See, e.g.*, *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp.3d 282, 298 (S.D.N.Y. 2018) (alleging "specific facts regarding the effects of integration efforts such as changes to the underwriting platform, a shift in focus from unsecured to secured lending, lack of (or inadequate) training, and changes to the tools available ... all of which Defendants allegedly knew, and failed to disclose, had caused productivity to decrease, delinquencies to increase, and growth to slow"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-

cv-6728, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (misrepresentation of reserves); *In re Salix Pharm., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (misrepresentation of current inventory levels; "a listener's misunderstanding of what was said does not, on its own, make a statement misleading"); *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1200, 1206 (E.D. Pa. 1992) (misrepresentation of drug efficacy and its prospects for FDA approval; finding that "securities analysts' reactions to Bioscience's allegedly false and misleading statements regarding [drug] are indicia, albeit not dispositively, of the materially misleading nature of the statements" and thus declining to strike them from plaintiff's complaint).

Even if the Court were to conclude that Plaintiff had alleged facts sufficient to plead the falsity of the challenged statements, Nokia's statements touting the progress of the integration are non-actionable puffery. Statements of "puffery" *i.e.*, "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor would not rely on [them]," are not actionable. *In re Adient plc Sec. Litig.*, No. 18-cv-9116, 2020 WL 1644018, at *21 (S.D.N.Y. Apr. 2, 2020) (citations and internal quotation marks omitted). Nokia's statements touting the progress of the integration as "complete" and "successful" or that the cultural integration "went beautifully" are "too general to cause a reasonable investor to rely upon them." *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 18-cv-3021, 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) (citation and internal quotation marks omitted); *see also* *In re Razorfish*, 2001 WL 1111502, at *1-2 (dismissing claims based on statements that "integration efforts" were "complete" and "successful"); *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16-cv-7840, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) (statement that integration "was smooth and seamless" is "far too vague to be actionable"), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). [16]

16   Statements concerning Nokia's pace and progress integrating products into their portfolio, for example that Nokia was "coming back very fast" from some "issues related to product integration challenges" previously flagged, SCAC ¶ 53, or that Nokia was "moving fast and successfully to put the portfolio integration challenges ... behind

[them]," *id.* ¶ 55, are also nonactionable puffery.

See 🔖 *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 341-42 (S.D.N.Y. 2012) (dismissing claims based on statements that integration was "progressing well" and was "off to a promising start" as "vague pronouncements of corporate optimism"), *aff'd sub nom.* 🔖 *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383 (2d Cir. 2015). Even assuming *arguendo* they were actionable, Plaintiff fails to adequately allege that these statements were false when made.

### 2. Statements Concerning Nokia's 5G Progress

 **\*18**  Plaintiff contends that Defendants made materially false and misleading statements regarding Nokia's 5G progress including that Nokia was "5G ready" and that its 5G products were "ready for full deployment." *See, e.g.*, SCAC ¶ 38; *cf. id.* ¶ 49 ("Nokia's *products* were '5G ready' and 'ready for full deployment.' " (emphasis added)). Nokia made various statements regarding their 5G progress including that "Nokia is well positioned ... [a]nd Nokia is one of the very few companies that is able to meet all those [5G] needs," *id.* ¶ 47, that "the heavy lifting is over," *id.* ¶ 51 (Q3 2017 earnings call); "we are in a very strong position for 5G," "the roadmap issues which we saw last year are largely behind us," *id.* ¶ 59 (Q1 2018 earnings call); "I see no reason for concern about our market share position beyond normal execution challenges," *id.* ¶ 62 (Q2 2018 earnings call); "our early progress in 5G is extremely strong" and "our win rate for new deals suggests that we are in a very good competitive position," *id.* ¶ 64 (Q3 2018 6-K Press Release); "I have absolutely no doubt that a fast and meaningful shift to 5G is underway," *id.* ¶ 73, and "Nokia has a massive amount of 5G-ready hardware already deployed," some of which was "waiting for the availability and acceptances of key 5G software releases," *id.* ¶ 74 (Q4 2018 earnings call); "the chipset development on 5G, again ... [is] on track for both radio and broadband, *id.* ¶ 83 (Q2 2019 earnings call).

Assuming, without deciding, that these statements are actionable, and taking into account the legal principles elucidated above, the Court concludes that Plaintiff has not sufficiently alleged that these statements were false or misleading when made. Plaintiff highlights several statements regarding Nokia's 5G progress that are allegedly false or misleading because Nokia did not disclose "significant

problems" with the Alcatel integration. Although the Alcatel integration was "crucial" for Nokia to prepare for the approaching 5G transition, *id.* ¶ 114, the Court cannot reasonably infer that Nokia's alleged difficulties with the Alcatel integration were sufficient on their own to cause Nokia to issue the October 2019 "corrective" disclosure, such that Nokia's statements regarding their progress in 5G would be "untrue outright." *See* 🔖 *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016); *see also In re Fed Ex Corp. Sec. Litig.*, No. 19-cv-05990, 2021 WL 396423, at \*10 (S.D.N.Y. Feb. 4, 2021). Indeed, even securities analysts recognized that "a confluence of factors seemed to have caused this issue for Nokia," SCAC ¶ 103, including "the complexity of aligning both companies [sic] 4G and 5G roadmaps," *id.*, "feature creep in the market due to competitive pressure," *id.* ¶ 51, and the overall acceleration of 5G in the market (and resulting acceleration of Nokia's near-term 5G investments), *id.* ¶¶ 51, 55, 61. [17] Plaintiff also does not allege that any of the underlying facts serving as the basis for statements regarding Nokia's 5G progress were false. [18] *Cf. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Defendants' descriptions of ... results as 'encouraging' and 'an improvement'—actionable only when the speaker 'knew that the contrary was true.' " (citation omitted)). Thus, Plaintiff does not adequately allege that the challenged statements regarding Nokia's 5G progress were false or misleading.

[17]  The October 2019 "corrective" disclosure also stated that Nokia's Q3 gross margin was impacted by "profitability challenges in China; pricing pressure in early 5G deals; and uncertainty related to the announced operator merger in North America." Ex. 11 at 1.

[18]  *See, e.g.*, SCAC ¶ 53 ("Looking at the situation today, I think it is safe to say we are coming back very fast. Recent software releases have been at our highest quality levels ever. The performance of our AirScale product is extremely good."); ¶ 64 ("Our early progress in 5G is extremely strong, we continue to increase our investment in this critical technology, and our win rate for new deals suggests that we are in a very good competitive position."); *id.* ¶ 69 ("We're the only ones that work with all [four] [lead] countries, all [fourteen] operators. So it's a good position to be in right at the beginning of the outset of 5G."); ¶ 77 ("We have

a global installed base that is expected to provide us with the platform for success in 5G. We have more than 400 customers in 4G/LTE and a robust AirScale platform, which can be upgraded from 4G to 5G."). Many of the challenged statements are also non-actionable statements of puffery and "corporate optimism" that are far "too general to cause a reasonable investor to rely upon them." *See supra* pp. 31-32; *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable. We do not anticipate that reasonable investors place substantial reliance on generalizations regarding a company's health or the strength of a company's product." (citation omitted)).

**\*19** Reviewing the challenged statements in their full context reveals that Nokia did in fact disclose the 5G challenges they were encountering, including those in relation to the Alcatel integration. *See S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (summary order) ("Considering [the statement] in full—rather than considering the edited version that plaintiff provides ... — no misrepresentation or omission occurred."). For example, on their Q2 2017 earnings call, they noted that they believed that moving up the roadmap for the 5G rollout to meet market demands "create[d] *some near term risk*, as it makes the timing of certain project completions and acceptance [ ] more uncertain than is typical for us." SCAC ¶ 44 (emphasis added); *see also id.* ¶¶ 45-46 (discussing "uncertainties related to the timing of completions and acceptances of certain projects" and noting that there was "even more pressure on workload and product road maps ... lead[ing] to a slight elevation of risk [ ] in certain projects ... [that] could affect our revenues."). On their Q3 2017 earnings call, Defendant Suri noted that as he had previously flagged, the R&D team in Mobile Networks had "faced an extraordinarily high workload" and that "[w]ith this pressure, [they had] seen some issues with the time it has taken to converge a limited set of products...." Ex. 5 at 6. "As a result, Mobile Networks has experienced both revenue pressure[,] an increase in expected network equipment swap costs [and] ... some near-term deal delays ...." Ex. 5 at 6. On Nokia's Q4 2017 earnings conference call, Defendant Suri stated that "[w]e expect 2018 to be challenging from a market perspective and due to the acceleration of near-term 5G investments." SCAC ¶ 55; *see also id.* ¶ 56 (same). The disclosures regarding Nokia's 5G challenges continued during the remainder of the Class Period. *See id.* ¶ 59 (Q1 2018 earnings call) ("Recent software

releases are at the highest quality levels ever and the roadmap issues which we saw last year are *largely* behind us, *even if there is plenty of heavy R&D lifting still to come in the sprint to 5G*." (emphasis added)); *id.* ¶ 61 (Q2 2018 earnings call) ("[I]f any company tells you they have everything done and dusted for 5G, well, I would approach that claim with more than a little skepticism. We all face some risks as we push to get 5G products to the market."); *id.* ¶ 66 (Q3 2018 earnings call) ("[C]ost of executing [ ] swaps will be somewhat lower than what we originally anticipated... But I think *one should not kind of see that as being a source of revenue upside going forward*." (emphasis added)); ¶ 73 (Q4 2018 earnings call) ("Some of th[e] risks [previously discussed] did in fact materialize in the fourth quarter .... Looking ahead, I expect those risks to carry over into at least the first half of 2019."); *id.* ¶ 79 (Q1 2019 earnings call) ("I do not find these gaps particularly surprising, *given the speed at which things have been and are continuing to move ....*" (emphasis added)); *id.* ¶ 84 (Q2 2019 earnings call) (noting that they had nine live commercial networks and a "fantastic" conversion rate from 4G to 5G with the 45 deals they had, but that "there is still some work to do").

Nokia also provided written disclosures in connection with their SEC filings. *See, e.g.*, 2017 20-F at 73-74 (identifying as a risk Nokia's "ability to correctly estimate technological developments, including the impending turn to 5G, or adapt successfully to such developments"); Ex. 20 at 15 (Q4 2018 Earnings Report) (identifying as a risk factor "timing of the deliveries of our products and services, including our short term and longer term expectations around the rollout of 5G and our ability to capitalize on such a rollout; and the overall readiness of the 5G ecosystem"); Ex. 23 at 14 (Q1 2019 Earnings Report) (same). Indeed, when Nokia made its October 2019 "corrective" disclosure, it stated that "some of the risks *that we flagged previously* related to the initial phase of 5G are now materializing." Ex. 11 at 1 (emphasis added). [19]

19    The SCAC's characterization of the disclosure ("Nokia announced *for the first time* that it had experienced severe difficulties with the initial phase of its 5G rollout, and was dramatically behind its competition in the race to 5G," SCAC ¶ 99 (emphasis added)) does not appear to have any basis in the actual disclosure itself. *See supra* p. 20. In fact, this was not the first time that Nokia

disclosed it was facing challenges related to the 5G rollout.

Even if the Court were to conclude that Plaintiff had alleged facts sufficient to plead the falsity of the challenged statements, the majority of these statements would not be actionable under PSLRA's safe-harbor protections. The PSLRA provides that a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and is "accompanied by meaningful cautionary statements," *or* (2) the forward-looking statement is "immaterial," *or* (3) the "plaintiff fails to prove that the forward-looking statement ... if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). Satisfaction of any of these three factors renders the statement nonactionable as a matter of law. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 355 (S.D.N.Y. 2020). "Forward-looking" statements include "plans and objectives of management for future operations" and statements relating to "future economic performance." 15 U.S.C. § 78u-5(i)(1). "[A] statement that projects results in the future is plainly forward looking," and "need not be specifically labeled as forward-looking or segregated into a separate section to qualify for safe-harbor protection." *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (internal citations and quotation marks omitted).

**\*20** "To fall within the 'meaningful cautionary statements' prong of the safe harbor, the cautionary language must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *In re Philip Morris*, 437 F. Supp. 3d at 355 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 771 (2d Cir. 2010)) (internal quotation marks omitted). Put another way, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* (quoting *Slayton*, 604 F.3d at 772) (internal quotation marks omitted); *see also In re Salix Pharm., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("Vague disclosures of general risks will not protect defendants from liability." (citations omitted)); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016) ("Plaintiffs may establish that cautionary language is not meaningful by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought

about plaintiffs' loss." (citation and internal quotation marks omitted)).

The vast majority of the challenged statements regarding Nokia's 5G progress are plainly forward-looking statements and fall within the first prong of the safe harbor as they were accompanied by "meaningful cautionary statements" expressly warning and directly relating to the risk that brought about Plaintiff's loss. [20] As discussed above, Nokia made robust disclosures in connection with their statements concerning their 5G progress.

[20]  *See, e.g.*, SCAC ¶ 46 ("[T]here could be some timing impact on acceptances and this could affect our revenues. Now I want[ ] to [be] clear, this is not broad based and we are talking just about certain projects and *we expect to be confident to manage through this ....*" (emphasis added)); ¶ 60 ("It will improve the cost structure *over the long term.*" (emphasis added)); ¶ 66 ("[W]e now expect that the cost of executing those swaps will be somewhat lower than what we originally anticipated."); ¶ 68 ("I do believe from here on, things are starting to improve in our move to 2020."); ¶ 77 ("We have a global installed base that is expected to provide us with the platform for success in 5G."); ¶ 82 ("[O]ur 4G performance and deep customer base give us confidence about the opportunities to come and given the expected timing of large scale deployments as 5G moves beyond the lead countries, Nokia will be ready to support our customers at scale."); ¶ 84 ("On the chipset development on 5G, again, it's *on track* for both radio and baseband." (emphasis added)). Many of the challenged statements can also be characterized as opinions and are not actionable unless the complaint "plead[s] facts sufficient to show that the defendant 'did not hold the belief ... professed.' " *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753 (S.D.N.Y. 2018) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)), *aff'd*, 806 F. App'x 35 (2d Cir. 2020). Plaintiff has plainly failed to do this.

### 3. Statements Concerning Compliance

In re Nokia Corporation Securities Litigation, Slip Copy (2021)
2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

In the Complaint, Plaintiff asserts that the "statements ... regarding Nokia's Code of Conduct were materially false and misleading when made, and omitted to disclose material information necessary to make those statements not misleading because they falsely conveyed that Alcatel had been fully integrated into the Company's Code of Conduct and compliance mechanisms." SCAC ¶ 92. These statements included an emphasis on the "culture of compliance" and an express "commitment to act compliantly and ethically;" "[w]e follow the laws of the countries where we do business;" and "[w]e hold each other accountable to this Code." SCAC ¶¶ 86-92.

This argument is deemed abandoned given that Plaintiff did not address it in his Opposition. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-cv-442, 2014 WL 4723299, at *7 ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim." (citation omitted)). Even if Plaintiff had addressed this argument, however, these statements say nothing about Alcatel, and Plaintiff has not alleged any facts to allow the Court do conclude that these statements were false or misleading when made. Additionally, claims premised on these statements must fail because "general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation and internal quotation marks omitted); *cf. In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019) ("[A] company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry" may "amount to more than 'puffery' and ... violate the securities laws" (quoting *Singh*, 918 F.3d at 98)).

\*\*\*

**\*21** Because the Court concludes that Plaintiff has failed to allege the challenged statements were materially false or misleading, the Court need not consider the remainder of the parties' arguments regarding scienter. Thus, the Court grants Defendants' motion to dismiss Plaintiff's § 10(b) and Rule 10b-5 claims.

**II. Plaintiff's Section 20(a) Claim Fails as a Matter of Law**

As Plaintiff has failed to adequately allege his § 10(b) claim, his claim under § 20(a) fails as a matter of law. Section 20(a) requires a predicate violation of the Exchange Act, which the SCAC does not adequately plead. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Therefore, this claim is dismissed.

**III. Plaintiff Will Not Be Granted Leave to Amend**

Plaintiff requests leave to amend the Complaint in the event that the Court determines that any part of the Complaint is deficient. Pl. Opp. at 40 n. 23. While the Second Circuit has recognized that "it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citation omitted), the Second Circuit has also recognized that "[l]eave to amend may properly be denied if the amendment would be futile." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citation omitted).

The Court concludes that amending the Complaint would be futile. Given Nokia's numerous and continuous disclosures regarding the Alcatel integration and 5G progress, it is not plausible that the challenged statements were misleading to a reasonable investor. *See In re Fed Ex*, 2021 WL 396423, at \*17. Leave to amend is therefore denied as futile. [21]

[21]     This Court's Individual Practices also state that "[i]f the non-moving party elects not to amend its complaint and the motion to dismiss is granted, **it is unlikely that the Court will grant the non-moving party leave to amend**." Individual Practices of Andrew L. Carter, Jr. at 2.D.ii.

**CONCLUSION**

For the reasons herein, Defendants' motion to dismiss Plaintiff's complaint is **GRANTED** with prejudice. The Clerk of Court is directed to terminate ECF No. 61 and close this case.

**SO ORDERED.**

2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

**All Citations**

Slip Copy, 2021 WL 1199030, Fed. Sec. L. Rep. P 101,072

---

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.