*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

**KEY FALSE AND MISLEADING STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 1 | **When:** 02/04/19<br><br>**Where:** Capital Markets Day investor conference<br><br>**Speaker:** Shaw<br><br>(¶125), Ex. 1 at 8 | "We have <u>significant supply chain infrastructure on a global basis supporting pretty much the entire active ecosystem in our space</u> and a complete stack, a complete range of services, <u>the ability to bring – to meet the total needs of our customers</u> across practice management, prescription management, appointment management, inventory management and other added value services." | At the time of the merger, numerous facts establish that the Company did not have the supply chain infrastructure necessary to meet the total needs of its customers—facts well known to Shaw and the other Individual Defendants. ¶¶50-54, 56-57, 59, 80, 87-88.  As numerous former employees from different levels and departments within the Company stated, HSAH's legacy distribution and supply chain business was antiquated, fragmented, and competitively inferior. CW 1, a former Senior Manager of Logistics at Covetrus, described how Covetrus inherited supply chain infrastructure that lacked anything resembling an integrated supply chain and logistics system. ¶52. As a result, Covetrus was forced to use UPS for supply chain services and rely on manual Excel spreadsheets to track supply chain data. ¶53. This led to a mismatch of supply and demand (*id.*) and, as CW 11 (Territory Manager) added, numerous items "always on back order" (¶87) which caused customer dissatisfaction, decreased sales, and customer loss. ¶¶80, 87-88. CW 2 (Territory Manager) and CW 10 (Insider Sales Supervisor) each confirmed that the supply chain issues persisted through the merger and even "got worse after Covetrus was formed," which drove down sales "in a huge way." ¶¶87-88. CWs 1 and 10 described how there were discussions in 2019 about "upgrading the system" to fix the "notorious" supply chain, inventory management and distribution issues, but "nothing ever got fixed" because of strapped budgets and management infighting. ¶¶55-57, 87-88.<br><br>Moreover, CW 3 (Inside Sales Representative) and CW 10 (Inside Sales Supervisor) each described how after the merger, Covetrus lost the ability to sell *whole categories* of products. ¶¶81-82.<br><br>These serious problems with the legacy HSAH supply chain business were well-known to Shaw.  First, Shaw and the other executives planned and prepared for the integration for over a year before the merger was |

---

[1] "¶" references refer to paragraphs of the Amended Complaint [ECF No. 41].  "Ex." refer to exhibits of the accompanying appendix.

[2] Allegations in a securities complaint cannot be assessed in isolation.  The scienter inquiry "constantly assum[es] the plaintiff's allegations to be true" and asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322-23, 326-27 (2007).  A complaint adequately pleads scienter by alleging knowing or reckless misstatements, *i.e.*, that "defendants knew or, more importantly, should have known that they were misrepresenting material facts."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | ¶¶152-153; | | completed, giving them ample time to understand HSAH's pervasive supply chain deficiencies.  ¶¶152-153; Ex. 3 at 2  (highlighting the "[s]ignificant planning and preparation over the last year," "great planning effort," and "tremendous teamwork across the globe" when assuring investors regarding the purportedly successful integration and "day 1 launch" of Covetrus).  Shaw was directly involved in the lengthy merger preparation, and emphasized that "bringing [the Company] together" was his "most important job." ¶154; Ex. 4 at 2.

Second, the lack of a unified logistics system was readily apparent to Shaw through his participation in regular "Monday morning meetings" with the Company's other top executives.  ¶54.  CW 1 (Covetrus's Senior Manager of Logistics) described how every Monday morning, all of the top executives, including Defendants Shaw and Komola, held a meeting in the second floor of the Company's Portland, Maine headquarters to discuss Company performance, including supply and demand for the Covetrus's products.  *Id.*  During these meetings, the COO presented data that was pieced together from the Company's various business units each Sunday by CW 1 and other individuals in operations in a manual, time consuming process because there was no central platform at Covetrus.  *Id.*  Furthermore, CW 10 stated that it was very well known within Covetrus that the Company suffered from backorder issues to the point where it was a common topic of conversation at the Company.  ¶88.

Third, the legacy HSAH supply chain business constituted Covetrus' core operation, accounting for nearly all of the Company's sales and earnings during the Class Period. ¶¶35, 157.  Before the merger, the legacy HSAH supply chain business had net sales that were nearly 14 times VFC's net sales.  ¶157.  Covetrus's near-total reliance on the supply chain segment continued throughout the Class Period, comprising over 93% of the Company's total net sales.  ¶157.

Finally, while motive is not required to allege scienter, Shaw was financially incentivized to complete the merger notwithstanding the declining state of the legacy HSAH supply chain business because he received a "transaction bonus" of nearly $1 million.  ¶¶30, 169.  Moreover, the merger enabled Shaw to capitalize on a once-in-a-lifetime event by converting his illiquid shares in VFC – a small, privately-held start-up company that was burning cash and had never turned a profit in nearly ten years of existence – into publicly traded shares of Covetrus valued at over $55 million. *Id.* |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 2 | **When:** 02/04/19 **Where:** Capital Markets Day investor conference **Speaker:** Shaw (¶127), Ex. 1 at 36-37 | In response to a question from a securities analyst about what separates Covetrus from its competition, Shaw highlighted the Company's "unique… advanced prescription management and analytics capabilities… put … into the context of an integrated offering to customers, where it is hardwired into practice management software. It's interfaced and coordinated with appointment management capabilities, and it's coordinated with in-office inventory management." | The integration of VFC's fast-growing prescription management software with HSAH's legacy practice management software, or "PIMS," was hailed by Defendants as a key rationale for the merger and a key driver of the combined company's financial growth. ¶¶27-29, 36, (noting that the combination of VFC's prescription management software with PIMS's deep market penetration of approximately 50% of the veterinary practices in the United States promised to increase Covetrus's overall revenues substantially).  However, in sharp contrast to Shaw's statement that these critical software platforms had been "integrated" and "hardwired," multiple former employees have confirmed this never occurred. <br><br>For example, CW 6 stated that by February, the Company's software platforms were "absolutely not integrated" and the Company did not even have a plan for integration.  ¶65.  CW 6 – a Senior Manager of Strategy who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue."  ¶65 at n. 15, 68.  CW 1 – a Senior Manager of Logistics – similarly confirmed that, following its formation, Covetrus did not appear to have any roadmap for integrating the HSAH and VFC business, which continued to operate independently.  ¶70.  When asked if anyone at Covetrus ever provided her team with an integration plan relating to the various software systems and development teams operating under HSAH and VFC, CW 5 – a Senior Software Developer – *laughed*. Like her former colleagues, CW 5 confirmed that there were no plans to integrate the Company's different software systems and that no real attempts were made to integrate any of the Henry Schein or VFC software platforms before or after the formation of Covetrus. ¶¶70, 72. CW 4 – a Director of Creative Services – added that not only were these software systems never fully integrated during the Class Period, they were not even compatible. ¶71. Additional CWs confirmed a complete lack of platform integration between VFC's prescription management software and HSAH's legacy practice management software, including CW 8 (Total Solutions Specialist) who worked at Covetrus until May 2019 and stated that during her tenure VFC's prescription management and analytics capabilities were *not* hardwired into HSAH's practice management software, and CW 7 (Enrollment Specialist), who similarly confirmed that by the time she left the Company in September 2019, VFC's prescription management platform was still not integrated or hardwired into the Company's practice management software.  ¶73. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | Given the critical importance of these core software systems the Company's financial prospects and success, Shaw made these statements knowingly or at least recklessly.  Indeed, Shaw was highly familiar with VFC's prescription management software and HSAH's practice management software, having served as VFC's CEO and co-founder for over eight years, and planned for its integration with HSAH for over a year before the merger was completed.  ¶¶152-153; Ex. 3 at 2.  (highlighting the "[s]ignificant planning and preparation over the last year," "great planning effort," and "tremendous teamwork across the globe" when assuring investors regarding the purportedly successful integration and "day 1 launch" of Covetrus.)  Indeed, Shaw stated that "bringing [the Company] together as one integrated value proposition" was his "most important job coming to the new organization."  ¶154; Ex. 4 at 2. <br><br> Shaw reinforced to investors his deep knowledge of the Company's core systems and their purported integration by making repeated, specific, and emphatic statements to investors and analysts on that subject throughout the Class Period.  ¶¶125, 127, 137, 141, 145. <br><br> By the end of the Class Period, Covetrus's stock price had lost over 70% of its value (¶176), and Shaw was summarily fired without a permanent replacement. ¶106.  Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance in its first two quarters as a public company. ¶106; Ex. 12 at 1, Ex. 13 at 1, Ex. 14 at 3. <br><br> As part of a total change in leadership, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President.  ¶106.  After promising "a new approach where we are … being as transparent as possible with … our investors" (¶108, Ex 15 at 7), Wolin admitted in March 2020 that Shaw's statement about VFC's prescription management software being "hardwired" with HSAH's practice management software was not true.  Specifically, on March 4, 2020, the *day* after the Company announced that Wolin would become Shaw's permanent replacement, Wolin admitted at an investor conference that over a year after Shaw's statements, integration of the subject software systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS" – precisely the opposite of what Shaw told investors. ¶¶114-15; Ex. 16 at 9. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 3 | **When:** 03/29/19 **Where:** 2018 Form 10-K **Speakers:** Covetrus, Henry Schein (¶133), Ex. 2 at 3, DE 45-12 at 6 | The Company's "technology platform encompasses and <u>integrates the core functionality of pharmacy service and prescription and inventory management in a single… system.</u>  The underlying core of the platform is its <u>real-time integration with veterinary practice management software systems</u> …." | The integration of VFC's fast-growing prescription management software with HSAH's legacy practice management software, or "PIMS," was hailed by Defendants as a key rationale for the merger and a driver of the combined company's financial growth. ¶¶27-29, 36, (noting that the combination of VFC's prescription management software with PIMS's deep market penetration of approximately 50% of the veterinary practices in the United States promised to increase Covetrus's overall revenues substantially).  However, in sharp contrast to the Company's statement that Covetrus' technology platform "integrates the core functionality" of these critical software platforms – indeed, through "real-time integration" – multiple former employees have confirmed this never occurred.

For example, CW 6 stated that by February, the Company's software platforms were "absolutely not integrated" and the Company did not even have a plan for integration. ¶65. CW 6 – a Senior Manager of Strategy who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue." ¶68. CW 1 – a Senior Manager of Logistics – similarly confirmed that, following its formation, Covetrus did not appear to have any roadmap for integrated the HSAH and VFC business, which continued to operate independently. ¶70.  When asked if anyone at Covetrus ever provided her team with an integration plan relating to the various software systems and development teams operating under HSAH and VFC, CW 5 – a Senior Software Developer – laughed. Like her former colleagues, CW 5 confirmed that there were no plans to integrate the Company's different software systems and that no real attempts were made to integrate any of the Henry Schein or VFC software platforms before or after the formation of Covetrus. ¶¶70, 72. CW 4 – Covetrus's Director of Creative Services – added that not only were these software systems never fully integrated during the Class Period, they were not even compatible. ¶71. Additional CWs confirmed a complete lack of platform integration between VFC's prescription management software and HSAH's legacy practice management software, including CW 8 – a Total Solutions Specialist who worked at Covetrus until May 2019 and stated that during his tenure VFC's prescription management and analytics capabilities were *not* hardwired into HSAH's practice management software, and CW 7, an Enrollment Specialist, who similarly confirmed that by the time she left the Company in September 2019, VFC's prescription management platform was still not integrated or hardwired into the Company's practice management software. ¶73. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | Given the critical importance of these core software systems the Company's financial prospects and success, Shaw made these statements knowingly or at least recklessly. Indeed, Shaw was highly familiar with VFC's prescription management software and HSAH's practice management software, having served as VFC's CEO and co-founder for over eight years, and planned for its integration with HSAH for over a year before the merger was completed. ¶¶152-153, Ex. 3 at 2 (highlighting the "[s]ignificant planning and preparation over the last year," "great planning effort," and "tremendous teamwork across the globe" when assuring investors regarding the purportedly successful integration and "day 1 launch" of Covetrus.) Indeed, Shaw stated that "bringing [the Company] together as one integrated value proposition" was his "most important job coming to the new organization." ¶154, Ex. 4 at 2.<br><br>During the Class Period, Shaw reinforced to investors his deep knowledge of the Company's core systems and their purported integration by making repeated, specific, and emphatic statements to investors and analysts on that subject throughout the Class Period. ¶¶125, 127, 137, 141, 145; Ex. 3 at 2, 6; Ex. 1 at 4, 21; Ex. 4 at 1.<br><br>By the end of the Class Period, Covetrus's stock price had lost over 70% of its value (¶176), and Shaw was summarily fired without a permanent replacement. ¶106. Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance in its first two quarters as a public company. ¶106. Ex. 12 at 1; Ex. 13 at 1; Ex. 14 at 3.<br><br>As part of a total change in leadership, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President. ¶106. After promising "a new approach where we are … being as transparent as possible with … our investors" (¶108), Wolin admitted in March 2020 that Shaw's statement about VFC's prescription management featuring "real-time integration" with the Company's practice management software was not true. Specifically, on March 4, 2020, the *day* after the Company announced that Wolin would become Shaw's permanent replacement, Wolin admitted at an investor conference that over a year after Shaw's statements, integration of the subject software systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS" – precisely the opposite of what Shaw told investors. ¶¶114-15; Ex. 16 at 9. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | In their motion to dismiss briefing, Defendants contend that this statement concerned only the software that "VFC brought to the combined business," *i.e.*, VFC's pre-merger software *by itself*. ECF No. 45-1, at 25. In other words, Defendants claim what they actually meant was that VFC's software had the core capability of being able to integrate with *other companies'* PIMS, but not the Company's *own* PIMS (which boasted an over 50% market share). Defendants attempt to rewrite this statement to refer to integration with competitor products, but not the Company's own products, makes no sense and at most raises fact issues that cannot be resolved at this stage. Further, the entire section of the Form 10-K containing the statements never mentions VFC or its *pre-merger* capabilities; instead, it refers to "*[o]ur* technology platform" and "*[o]ur integrated* prescription management platform." In light of the Defendants numerous other statements touting the achieved integration of the Company's software platforms, this statement at minimum created a false impression that VFC's prescription management software had the capability of real-time integration with legacy HSAH PIMS, when no such integration was ever achieved. ¶27. |
| 4 | **When:** 05/15/19 **Where:** Q1 2019 Earnings Call **Speaker:** Shaw (¶137), Ex. 3 at 7-8 | Shaw represented that the Company had "achieved a deep integration between our practice management software and our prescription management workflow." Shaw claimed that this was "another important benefit and differentiator of our unique capabilities to the platform. And we're just pleased that we're able to launch this important innovation just a few weeks following completion of the merger." | The integration of VFC's fast-growing prescription management software with HSAH's legacy practice management software, or "PIMS," was hailed by Defendants as a key rationale for the merger and a driver of the combined company's financial growth. ¶¶27-29, 36 (noting that the combination of VFC's prescription management software with PIMS's deep market penetration of approximately 50% of the veterinary practices in the United States promised to increase Covetrus's overall revenues substantially). However, in sharp contrast to Shaw's statement that the Company had "achieved a deep integration" between these critical software platforms, multiple former employees have confirmed this never occurred.<br><br>For example, CW 6 stated that by February, the Company's software platforms were "absolutely not integrated" and the Company did not even have a plan for integration. ¶65. CW 6 – a Senior Manager of Strategy who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue." ¶68. CW 1 – a Senior Manager of Logistics – similarly confirmed that, following its formation, Covetrus did not appear to have any roadmap for integrated the HSAH and VFC business, which continued to operate independently. ¶70. When asked if anyone at Covetrus ever provided her team with an integration plan relating to the various software systems and development teams operating under HSAH and VFC, CW 5 – a Senior Software Developer – laughed. Like her former colleagues, CW 5 confirmed that there were no plans to integrate the Company's |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | VFC | | different software systems and that no real attempts were made to integrate any of the Henry Schein or VFC software platforms before or after the formation of Covetrus. ¶¶70, 72. CW 4 – Covetrus's Director of Creative Services – added that not only were these software systems never fully integrated during the Class Period, they were not even compatible. ¶71. Additional CWs confirmed a complete lack of platform integration between VFC's prescription management software and HSAH's legacy practice management software, including CW 8 – a Total Solutions Specialist who worked at Covetrus until May 2019 and stated that during his tenure VFC's prescription management and analytics capabilities were *not* hardwired into HSAH's practice management software, and CW 7, an Enrollment Specialist, who similarly confirmed that by the time she left the Company in September 2019, VFC's prescription management platform was still not integrated or hardwired into the Company's practice management software. ¶73.<br><br>Given the critical importance of these core software systems the Company's financial prospects and success, Shaw made these statements knowingly or at least recklessly. Indeed, Shaw was highly familiar with VFC's prescription management software and HSAH's practice management software, having served as VFC's CEO and co-founder for over eight years, and planned for its integration with HSAH for over a year before the merger was completed. ¶¶152-153, Ex. 3 at 2 (highlighting the "[s]ignificant planning and preparation over the last year," "great planning effort," and "tremendous teamwork across the globe" when assuring investors regarding the purportedly successful integration and "day 1 launch" of Covetrus.) Indeed, Shaw stated that "bringing [the Company] together as one integrated value proposition" was his "most important job coming to the new organization." ¶154; Ex. 4 at 2.<br><br>During the Class Period, Shaw reinforced his knowledge of the Company's core systems and their purported integration by making repeated, specific, and emphatic statements to investors and analysts on that subject throughout the Class Period. ¶¶125, 127, 137, 141, 145.<br><br>By the end of the Class Period, Covetrus's stock price had lost over 70% of its value (¶176), and Shaw was summarily fired without a permanent replacement. ¶106. Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance in its first two quarters as a public company. ¶106; Ex. 12 at 1; Ex. 13 at 1; Ex. 14 at 3. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | As part of a total change in leadership, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President. ¶106. After promising "a new approach where we are … being as transparent as possible with … our investors" (¶108), Wolin admitted in March 2020 that Shaw's statement that Covetrus had achieved a "deep integration" between the Company's practice management software and its prescription management software was not true. Specifically, on March 4, 2020, the *day* after the Company announced that Wolin would become Shaw's permanent replacement, Wolin frankly admitted that nearly a year after Shaw's "deep integration" statement, the integration of these critical software platforms was still in the "early days" and "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS" – precisely the opposite of what Shaw told investors. ¶¶114-15; Ex 16 at 9.<br><br>In their motion to dismiss briefing, Defendants contend that even though Shaw falsely promoted the "achieved" integration of "our practice management software" with "Vets First Choice prescription management" software—a purportedly "deep integration"—no one was misled because Shaw attributed the integration to a "recent[ly]" launched "appointment management service"that had launched "just a few weeks following completion of the merger." ECF Nos. 45-1 at 21-22; 45-24 at 9. Defendants' argument has scant factual support, and at best raises a fact issue that cannot be resolved at the pleading stage. Indeed, the Complaint alleges that the appointment management service was *part* of HSAH's legacy practice management software. ¶27. Defendants' argument is further belied by the nearly 50% decline in the Company's stock price after the August 13 disclosures revealed "across the board" sales declines (¶¶99, 101), the reaction of securities analysts who widely questioned Shaw's creditability (¶102-05; Ex. 17 at 1; Ex. 18 at 1-3; Ex. 19 at 2), the Company's out-of-the-blue firing of Shaw without a permanent replacement (¶106), and Wolin's promise of a new era of "accountability" to "rebuild trust with our investors." *Id*.; Ex. 14 at 4. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 5 | **When:** 05/15/19  **Where:** Q1 2019 Earnings Call  **Speaker:** Shaw  (¶139), Ex. 3 at 9 | Defendant Shaw reassured investors that while the Q1 2019 results were disappointing, "we've been pleased with the improved top line performance in Q2 thus far in North America." | At the time of Shaw's statement, rather than experiencing rising sales, Covetrus was in fact being hammered by "across the board" sales declines, particularly in the critical North America sales region. Shaw was well aware of these facts given the Company's contemporaneous internal reporting. ¶¶83-86, 158-161. As CW 2 detailed, Covetrus had extraordinarily up-to-the-minute sales reporting, daily "sales roll ups," and weekly sales reports, which apprised Shaw, Komola, and additional executives in real-time of the Company's "tanking" sales for both hardware and software. ¶¶84-85, 158-159. Indeed, CW 2 stated that, "In my 15 years of animal health sales, I never had more real time information on the performance of my clients" than during her employment at HSAH and Covetrus from June 2015 to August 2019. ¶84.  The Company's poor sales were widely known and openly discussed inside the Company. ¶¶75-89. In addition to the contemporaneous internal reporting, Shaw was informed at national sales meetings of the low and declining sales during Q2 2019 (¶¶86, 159), and in late April or early May 2019, Covetrus's sales department held a teleconference with top executives specifically to discuss the plummeting sales. ¶85.  Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171; Ex. 17 at 1; Ex. 18 at 1-3; Ex. 19 at 2. Shaw made these statements about the Company's "improved top line performance in Q2 thus far" in an attempt to distract investors from the Company's poor out-of-the-gate performance during Q1, which the Company was forced to announce earlier that same day. ¶¶90-93, 137-144; Ex 3 at 4. Shaw and Komola employed the same tactic after the Company was forced to report disastrous Q2 2019 results on August 13, 2019, by blaming external factors such as "near-term market dynamics," "slowing business … not specific to us," and "end market softness." Analysts, however, "didn't buy [these excuses] at all," noting that Shaw's and Komola's attempts to cover-up the truth was "counter to our views of the sector" and "inconsistent" with reality. ¶¶100, 103-06; Ex. 14 at 3; Ex. 17 at 1; Ex. 19 at 2.  A strong scienter inference is reinforced by additional events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 10; Ex. 14 at 4. Shaw was fired on October 22, 2019, without a permanent replacement. ¶172. Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's |

10

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | disastrous financial performance. ¶106; Ex. 12 at 1; Ex. 13 at 1. Highlighting how the Company was far less valuable than Defendants had represented, Covetrus took a massive $939 million impairment charge against the Company's value at the time of the merger. ¶¶107-118, Ex. 24 at 1.  By January 2020, Covetrus's Board had cleaned house, including by (i) firing both Shaw and Komola; (ii) firing the Company's North American President and Global Supply Chain Officer; and (iii) accepting the "resignation" of the Company's Chairman, (Shaw's father) and the departure of its Compensation Committee Chair. ¶¶107, 109; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 10. <br><br> In the wake of these departures, Benjamin Wolin, the interim CEO candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5.  Simply stated, one does not need to "rebuild" trust unless that trust has been destroyed. |
| 6 | **When:** 05/15/19 <br><br> **Where:** Q1 2019 Earnings Call <br><br> **Speaker:** Shaw <br><br> (¶142), Ex. 3 at 18 | During the question-and-answer period, Shaw reiterated a purported "really robust pipeline in April that was much greater year-over-year growth than what we experienced in the first quarter." | Rather than experiencing a "really robust pipeline in April" with "much greater year-over-year growth than what we experienced in the first quarter," in reality, in Q2 2019 the Company was experiencing declining sales and missed all major financial guidance by wide margins. ¶¶75-89. <br><br> Shaw was well aware of these facts given the Company's contemporaneous internal reporting.  ¶¶83-86, 158-161.  As CW 2 detailed, Covetrus had extraordinarily up-to-the-minute sales reporting, daily "sales roll ups," and weekly sales reports, which apprised Shaw, Komola, and additional executives in real-time of the Company's "tanking" sales for both hardware and software. ¶¶84-85, 158-159. As CW 2 stated, "[b]y April 2019 it was quite apparent that we were not off to the rocket ship start that we were hoping for," and the message from senior management included "we are aware of this."  ¶85. <br><br> The Company's poor sales were widely known and openly discussed inside the Company.  ¶¶75-89.  In addition to the contemporaneous internal reporting, Shaw was informed at national sales meetings of the low and declining sales during Q2 2019 (¶¶86, 159), and in late April or early May 2019, Covetrus's sales department held a teleconference with top executives specifically to discuss the plummeting sales. ¶85. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171; Ex. 17 at 1; Ex. 18 at 1-3; Ex. 19 at 2.  Shaw made these statement about the Company's purportedly "robust pipeline in April" in an attempt to distract investors from the Company's poor out-of-the-gate performance during Q1, which the Company was forced to announce earlier that same day. ¶¶90-93, 137-144; Ex. 3 at 4.  Shaw and Komola employed the same tactic after the Company was forced to report disastrous Q2 2019 results on August 13, 2019, by blaming external factors such as "near-term market dynamics," "slowing business … not specific to us," and "end market softness." Analysts, however, "didn't buy [these excuses] at all," noting that Shaw's and Komola's attempts to cover-up the truth was "counter to our views of the sector" and "inconsistent" with reality. ¶¶100, 103-06; Ex.17 at 1; Ex. 19 at 2. <br><br> A strong scienter inference is reinforced by additional events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 10; Ex. 14 at 4.  Specifically, Shaw was fired on October 22, 2019, without a permanent replacement. ¶172.  Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance. ¶106. Highlighting how the Company was far less valuable than Defendants had represented, Covetrus took a massive $939 million impairment charge against the Company's value at the time of the merger. ¶¶107-118, Ex. 24 at 1.  By January 2020, Covetrus's Board had cleaned house, including by (i) firing both Shaw and Komola; (ii) firing the Company's North American President and Global Supply Chain Officer; and (iii) accepting the "resignation" of the Company's Chairman (Shaw's father) and the departure of its Compensation Committee Chair. ¶¶107, 109; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1.  In the wake of these departures, the interim CEO candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5.  Simply stated, one does not need to "rebuild" trust unless that trust has been destroyed. |

12

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 7 | **When:** 05/15/19 **Where:** Q1 2019 Earnings Call **Speaker:** Shaw (¶141), Ex. 3 at 18 | Shaw stated that the Company had achieved "the integration of our sales team." | Like software integration, the integration of HSAH's and VFC's sales teams was hailed by Defendants as a key rationale for the merger and a key driver of Covetrus's financial growth. ¶37 (stating that a "driver[] of embedded growth" for Covetrus was the ability to "cross-sell" and "drive adoption" of VFC's platform using HSAH's 1,200 sales professional and 90% market penetration). However, in sharp contrast to Defendant Shaw's statement that Covetrus had achieved sales force integration, in reality, Covetrus's sales forces were completely unintegrated. ¶¶61-62, 75-79, 116; Ex. 16 at 12.

For example, CW 3, an Inside Sales Representative who worked at HSAH and then Covetrus for approximately six and a half years – described how after the merger, a "them versus us" mentality prevailed between HSAH and VFC salespeople and there were no integrated sales teams to increase sales or cross-sell. ¶79. CW 6 – a Senior Manager of Strategy who was specifically hired to assist with the integration and HSAH and VFC – also confirmed a lack of sales force integration, and stated that rather than integration, extensive infighting prevailed between the different sales forces. ¶78. CW 6 added that due to the fragmentation and disorganization within the Company, sales representatives "couldn't get to the point of cross-selling" the VFC platform. *Id.* Likewise, CW 8 – a Total Solutions Specialist at HSAH and then Covetrus for nearly a decade – stated that the sales organizations were "not cohesive at all" and remained separate inside Covetrus after the merger. ¶76. Three former Covetrus employees – CWs 3, 4, 9 – specifically attested that Shaw's statements claiming achievement of sales force integration were false when made. ¶¶62, 76. CW 9 added that not only were the sales forces not integrated, the Company did not provide any meaningful training to HSAH's sales personnel to sell the VFC platform. ¶77. CW 6 described that even if HSAH wanted to sell the VFC platform, "[w]e didn't even know what the hell we were selling" because the Company never provided any training. *Id.*

Given the critical importance of sales force integration to the Company's financial prospects and success, Shaw made these statements knowingly or at least recklessly. Shaw and Komola were intensely focused on the integration and regularly updated investors and analysts about its importance, progress, and purported success. ¶¶38-43, 92, 137-138, 145-150, 152-156; Ex. 3 at 2, 4, 6; Ex. 4 at 1-2; Ex. 1 at 14, 21. After a year of "significant planning and preparation," Shaw and Komola were admittedly focused on the integration after the merger and repeatedly touted the importance of the achieved integrations, including at the February 4 Capital |

13

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | Markets Day, in the 2018 Form 10-K filed on March 29, and May 15 investor conference call. *Id.* Shaw emphasized that "bringing [the Company] together as one integrated value proposition" was his "most important job." ¶154; Ex. 4 at 2. Furthermore, Covetrus's executives were kept apprised of the Company's lacking integration throughout the Class Period, including through Monday morning meetings and national sales meetings. ¶¶54, 86.

By the end of the Class Period, Covetrus's stock price had lost over 70% of its value (¶176), and Shaw was summarily fired without a permanent replacement. ¶106.  Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance in its first two quarters as a public company. ¶106; Ex. 12 at 1; Ex. 13 at 1.

As part of a total change in leadership, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President.  ¶106.  After promising "a new approach where we are … being as transparent as possible with … our investors" (¶108, Ex. 15 at 10), Wolin admitted in March 2020 that Shaw's statement that Covetrus had achieved a "the integration of our sales team" was blatantly false.  On March 4, 2020, the *day* after the Company announced that Wolin would become Shaw's permanent replacement, Wolin admitted that nearly a year after Shaw's statement proclaiming achieved sales force intervention, not only were the Company's three sales forces (distribution, software, and prescription management) still unintegrated, but the Company had still not integrated even two of the three sales forces.  ¶116; Ex. 16 at 12; *see also* ¶¶40 n.7, 76 n.19 (describing the three types of sales forces).  Wolin was blunt, stating "[w]e're not trying to do all of that sales force integration in terms of pushing the 2 sales forces together, distribution and prescription management" and "[w]e're going to have coordination, not integration" – precisely the opposite of what Shaw told investors. *Id.* |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 8 | **When:** 05/29/19 <br><br> **Where:** Stifel Dental & Veterinary Conference <br><br> **Speaker:** Shaw <br><br> (¶145), Ex. 4 at 5 | Shaw stating that "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses," including "several dozen different operating businesses." Shaw then reassured investors that, after the merger close, "what we've achieved has been an integration of that value proposition. We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management." Shaw further stated that "it's the integration and kind of power of that connected ecosystem that we're delivering to customers. So we're not managing the business day 1 or day 2 as standalone legacy businesses. I think that's a very important observation around sort of the structural changes we've been able to achieve in this." | Shaw's claims of a deep structural and organization integration of HSAH's pre-existing and sprawling 80+ constituent groups with VFC were manifestly false. While Shaw assured investors that it was "very important" for them to understand that while HSAH "was actually comprised of many different businesses," Covetrus was "not managing the business day 1 or day 2 as standalone legacy businesses, in March 2020, *more than one year after the merger's finalization*, his replacement, Benjamin Wolin, admitted that Covetrus was *still* managing the businesses as standalone legacy businesses, stating "we are still transacting along the way that we did when they were separate entities" and "that will remain the same as we continue to focus on driving the individual value of separate entities." ¶¶46, 113, Ex. 25 at 14. Wolin's admission in March 2020 that Covetrus was still operating "along the way that we did when they were separate entities" (Ex. 25 at 14) directly refutes and contradicts Shaw's statements about the integration of the two business, and in particular Shaw's statement that Covetrus "was not managing the business day 1 or day 2 as standalone legacy businesses." <br><br> Wolin went further still, candidly stating that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113; Ex. 25 at 14. Essentially, the Company's new (and current) CEO called Shaw a liar. <br><br> Wolin's frank admissions are corroborated by the accounts of multiple former employees from different levels and departments within the Company, who experienced the highly fragmented and unintegrated nature of the businesses firsthand. For example, CW 6 – a Senior Manager of Strategy – stated that Shaw's description of how the Company was managed after the merger was not consistent with her experience at the Company— commenting that while "[w]e were working under one name," "[a]ll of these products were still separate." ¶68. CW 6 described a complete lack of progress with the integration and a wholly fragmented Company (*id.*), adding that while Covetrus had "a new logo, new brand, and a new look … it was all papering, a veneer." ¶66. CW 6 stated that the internal fragmentation and disarray was illustrated by a February 4, 2019 internal Company presentation which showed very clearly the "logo soup" and "mess of different products" that were offered by Covetrus at the time of its launch, but had yet to be integrated. ¶69. Numerous other former employees similarly confirmed that, following its launch, Covetrus continued to operate each of its |

15

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | ¶74. | | businesses independently from one another and that no real attempts were made to integrate any of the HSAH businesses or VFC software platforms. ¶¶70-74. The lack of integration continued to be discussed internally even after the Class Period. CW 4 – Covetrus's Director of Creative Services – stated that after the Company's August 13, 2019 disclosures and resultant stock drop of nearly 50%, the various department heads spoke to voice concerns about the ongoing lack of integration, and that CW 4 spoke directly with many of her fellow department heads to try to come up with a way to integrate the Company's core systems. ¶74.<br><br>In their motion to dismiss briefing, Defendants assert that Shaw's statement did not refer to integrating HSAH and VFC, as Shaw was speaking only "about the integration of <u>legacy HSAH businesses</u>." ECF No. 45-1, at 22. This argument is meritless and directly contradicted by the facts. The question Shaw responded to asked specifically about "bringing the 2 organizations together"—*i.e.*, VFC and HSAH. ¶145, Ex 4 at 1. Defendants' counterfactual argument fails in any event, as the Complaint amply alleges that both before and after the merger, HSAH was *itself* internally unintegrated and fragmented. ¶¶51-53, 60-71, 115; Ex. 16 at 9. As numerous former Covetrus employees have attested, after the merger, HSAH continued to operate as "separate businesses," with teams "isolated" amid lacking integration of supply chain systems, sales forces, and software teams. ¶¶56-79. Wolin, too, has admitted that HSAH was internally fragmented, with "lots of different platforms there, often competing with one another." ¶115; Ex. 16 at 9. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 9 | **When:** 05/29/19 **Where:** Stifel Dental & Veterinary Conference **Speaker:** Shaw (¶147), Ex. 4 at 5 | "[I]n March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities." | Like software integration, the integration of HSAH's and VFC's sales teams was hailed by Defendants as a key rationale for the merger and a key driver of Covetrus's financial growth.  ¶37 (stating that a "driver[] of embedded growth" for Covetrus was the ability to "cross-sell" and "drive adoption" of VFC's platform using HSAH's 1,200 sales professional and 90% market penetration). However, in sharp contrast to Defendant Shaw's statement that Covetrus had achieved sales force integration, in reality, Covetrus's sales forces were completely unintegrated.  ¶¶61-62, 75-79, 116.  For example, CW 3, an Inside Sales Representative who worked at HSAH and then Covetrus for approximately six and a half years – described how after the merger, a "them versus us" mentality prevailed between HSAH and VFC salespeople and there were no integrated sales teams to increase sales or cross-sell. ¶79.  CW 6 – a Senior Manager of Strategy who was specifically hired to assist with the integration and HSAH and VFC – also confirmed a lack of sales force integration, and stated that rather than integration, extensive infighting prevailed between the different sales forces. ¶78.  CW 6 added that due to the fragmentation and disorganization within the Company, sales representatives "couldn't get to the point of cross-selling" the VFC platform.  *Id.*  Likewise, CW 8 – a Total Solutions Specialist at HSAH and then Covetrus for nearly a decade – stated that the sales organizations were "not cohesive at all" and remained separate inside Covetrus after the merger. ¶76. Three former Covetrus employees – CWs 3, 4, 9 – specifically attested that Shaw's statements claiming achievement of sales force integration were false when made. ¶¶62, 76.  CW 9 added that not only were the sales forces not integrated, the Company did not provide any meaningful training to HSAH's sales personnel to sell the VFC platform. ¶77.  CW 6 described that even if HSAH wanted to sell the VFC platform, "[w]e didn't even know what the hell we were selling" because the Company never provided any training. *Id.* Given the critical importance of sales force integration to the Company's financial prospects and success, Shaw made these statements knowingly or at least recklessly.  Shaw and Komola were intensely focused on the integration and regularly updated investors and analysts about its importance, progress, and purported success. ¶¶38-43, 92, 137-138, 145-150, 152-156; Ex. 3 at 2, 4, 6; Ex. 4 at 1-2; Ex. 1 at 14, 21. After a year of "significant planning and preparation," Shaw and Komola remained keenly focused on the integration after the merger and repeatedly touted the importance of the achieved integrations, including at the February 4 Capital Markets Day, in the 2018 Form 10-K filed on March 29, May 15 investor conference call, and the May 29 |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
|  |  |  | industry conference. *Id.* Shaw emphasized that "bringing [the Company] together as one integrated value proposition" was his "most important job." ¶154; Ex. 4 at 2. Furthermore, Covetrus's executives were kept apprised of the Company's lacking integration throughout the Class Period, including through Monday morning meetings and national sales meetings. ¶¶54, 86.<br><br>By the end of the Class Period, Covetrus's stock price had lost over 70% of its value (¶176), and Shaw was summarily fired without a permanent replacement. ¶106. Securities analysts readily linked Shaw's firing to the August 13 disclosures and his false excuses for the Company's disastrous financial performance in its first two quarters as a public company. ¶106, Ex. 12 at 1, 13 at 1.<br><br>As part of a total change in leadership, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President. ¶106. After promising "a new approach where we are … being as transparent as possible with … our investors" (¶108, Ex. 15 at 10), Wolin admitted in March 2020 that Shaw's statement that Covetrus had "tightly integrated" its three sales forces into an "aligned group that's now representing the total scope of our capabilities" was blatantly false. In March 2020, Wolin made clear that not only were the three sales forces (distribution, software, and prescription management) still unintegrated a full year after when Shaw had said they had been integrated, but the Company had still not integrated even two of the three sales forces. ¶116; Ex. 16 at 12; *see also* ¶¶40 n.7, 76 n.19 (describing the three types of sales forces). Wolin was blunt, stating "[w]e're not trying to do all of that sales force integration in terms of pushing the 2 sales forces together, distribution and prescription management" and "[w]e're going to have coordination, not integration" – precisely the opposite of what Shaw told investors. *Id.*<br><br>In their motion to dismiss briefing, Defendants assert that this statement did not refer to integrating HSAH and VFC, as Shaw was speaking only "about the integration of <u>legacy HSAH businesses</u>." ECF No. 45-1, at 22. However, this statement is clearly referring to "3 various sales organizations," *i.e.*, the sales teams for: (i) VFC's prescription management software; (ii) HSAH's practice management software (PIMS); and (iii) HSAH's legacy distribution business. ¶40 n.7. Furthermore, CW3 described how in addition to a lack of integration between HSAH's and VFC's sales forces, HSAH's sales force was internally fragmented. ¶¶61-62. |

18

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| 10 | **When:** 05/29/19 **Where:** Stifel Dental & Veterinary Conference **Speaker:** Shaw (¶149), Ex. 4 at 6 | In response to a securities analyst asking Shaw to "talk a little bit" about the integration, Defendant Shaw stated that Covetrus "is really a story of how 80 very special <u>animal health organizations around the world</u>, <u>representing everything from software and distribution, manufacturing capabilities, insights, group purchasing capabilities</u>, how 80 distinct separate organizations with different ownership structures, different governance structures now, for the first time, <u>are part of one integrated organization</u>." | Shaw's claim that the businesses that made up Covetrus were "now… part of one integrated organization" is contradicted by admissions made by the Company's new CEO and statements from numerous former employees. Indeed, in March 2020, *more than one year after the merger's finalization*, Wolin admitted that Covetrus was still managing the businesses as standalone legacy businesses, stating "we are still transacting along the way that we did when they were separate entities" and "that will remain the same as we continue to focus on driving the individual value of separate entities." ¶¶46, 113, 25 at 14.  Wolin went further still, candidly acknowledging that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113, Ex. 25 at 14.  Essentially, the Company's new (and current) CEO called Shaw a liar.<br><br>Wolin's frank admissions are corroborated by the accounts of multiple former employees from different levels and departments within the Company, who experienced the highly fragmented and unintegrated nature of the businesses firsthand.  For example, CW 6 – a Senior Manager of Strategy – stated that Shaw's description of how the Company was managed after the merger was not consistent with her experience at the Company— commenting that while "[w]e were working under one name," "[a]ll of these products were still separate." ¶68.  CW 6 described a complete lack of progress with the integration and a wholly fragmented Company (*id.*), adding that while Covetrus had "a new logo, new brand, and a new look … it was all papering, a veneer." ¶66.  CW 6 stated that the internal fragmentation and disarray was illustrated by a February 4, 2019 internal Company presentation which showed very clearly the "logo soup" and "mess of different products" that were offered by Covetrus at the time of its launch, but had yet to be integrated. ¶69.  Numerous other former employees similarly confirmed that, following its launch, Covetrus continued to operate each of its businesses independently from one another and that no real attempts were made to integrate any of the HSAH businesses or VFC software platforms.  ¶¶70-74.  The lack of integration continued to be discussed internally even after the Class Period.  CW 4 – Covetrus's Director of Creative Services – stated that after the Company's August 13, 2019 disclosures and resultant stock drop of nearly 50%, the various department heads spoke to voice concerns about the ongoing lack of integration, and that CW 4 spoke directly with many of her fellow department heads to try to come up with a way to integrate the Company's core systems.  ¶74. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint, and Source Document[1] | False and Misleading Statement | Facts Giving Rise to a Strong Inference of Scienter[2] |
|---|---|---|---|
| | | | In their motion to dismiss briefing, Defendants assert that this statement did not refer to integrating HSAH and VFC, as Shaw was speaking only "about the integration of <u>legacy HSAH businesses</u>." ECF No. 45-1, at 22. This argument lacks merit. The question Shaw responded to asked: "You're integrating these two companies. So, maybe you can talk a little bit about that … integrating VFC in legacy Schein?" ¶149, Ex. 4 at 1-2.  In any event, the Complaint amply alleges that both before and after the merger, HSAH was *itself* internally unintegrated and fragmented. *E.g.*, ¶¶51-53, 60-71, 115. Indeed, after the merger, HSAH continued to operate as "separate businesses," with teams "isolated" amid lacking integration of supply chain systems, sales forces, and software teams. ¶¶56-79. As Wolin has admitted, HSAH was internally fragmented, with "lots of different platforms there, often competing with one another." ¶115. |

20

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

## ADDITIONAL FALSE AND MISLEADING STATEMENTS ALLEGED IN THE AMENDED COMPLAINT

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 11 | **When:** 12/26/18; 1/8/19; 1/15/19; 2/7/19; 2/13/19 <br><br> **Where:** Registration Statement; Prospectus <br><br> **Speakers:** Henry Schein; Covetrus <br><br> (¶118-123), Exs. 5-9, DE 45-3 at 10-12, 19, DE 45-7 at 54, DE 45-8 at 53 | Statements that one of the Company's "<u>key strengths</u>" is its "<u>inventory management and supply chain services and technology</u>," and that one of the "<u>key benefits</u>" of the merger is "the complementary fit of Vets First Choice and the Henry Schein Animal Health Business, and the strategic benefits of a global, technology-enabled animal health business with a <u>comprehensive service and technology platform and supply chain infrastructure</u>." | Facts similar to those described above in this column in Statement Nos. 1 and 2 also give rise to a strong inference of scienter for these statements. <br><br> • As numerous former employees stated, HSAH's legacy distribution and supply chain business was antiquated, fragmented, and competitively inferior — facts well known within HSAH prior to the merger, and Covetrus afterwards. ¶¶50-54, 56-57, 59, 80, 87-88. <br> • In contrast to the Company's statement touting its "comprehensive service and technology platform," multiple former employees have stated there was no integration between the Company's technology platforms. ¶¶60-74. <br> • In March 2020, Covetrus's new CEO, Benjamin Wolin, admitted that over a year after the merger, integration of the Company's software systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS." ¶¶114-115; Ex. 16 at 9. <br> • Covetrus and Henry Schein executives planned and prepared for the integration for over a year before the merger was completed, giving them ample time to understand HSAH's pervasive supply chain deficiencies and the inoperability between the Company's software platforms.  ¶¶152-153, Ex. 3 at 2. <br> • The Individual Defendants were also intensely focused on the merger, with Shaw stating it was his "most important job." ¶154; Ex. 4 at 2. <br> • The legacy HSAH supply chain business constituted Covetrus' core operation, accounting for nearly all of the Company's sales and earnings before and during the Class Period. ¶35, 157. <br> • While motive is not required to allege scienter, Shaw was financially incentivized to complete the merger notwithstanding the declining state of the legacy HSAH supply chain business because he received a "transaction bonus" of nearly $1 million and converted his illiquid shares in VFC into publicly traded shares of Covetrus valued at over $55 million. ¶30. Henry Schein was also motivated to complete the merger because the transaction |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | | | allowed Henry Schein to divest its sprawling, low-margin Animal Health business in a tax-free transaction, while paying itself a $1.12 billion dividend. ¶169. Paladino also personally benefited from the spin-merger through his ownership of over $10 million in Henry Schein stock. ¶169. |
| 12 | **When:** 12/26/18, 1/8/19, 1/15/19, 2/7/19, 2/13/19<br><br>**Where:** Registration Statement, Prospectus<br><br>**Speakers:** Henry Schein, Covetrus<br><br>(¶¶118-123), Exs. 5-9, DE 45-3 at 19, DE 45-7 at 54, DE 45-8 at 53 | The Company is "<u>well suited to compete in this market</u>" based on, among other things, the Company's "<u>global scale, comprehensive and integrated capabilities and expertise</u>." | Facts similar to those described above in this column in Statement Nos. 2, 7, and 8 also give rise to a strong inference of scienter for these statements.<br><br>• Rather than having "comprehensive integrated capabilities and expertise," numerous former employees have testified that prior to, and after the merger, critical aspects of the Company's business were not integrated, including the supply chain (¶¶52-53), sales force (¶¶61-62, 75-79), software platforms (¶¶60-74), and structurally (¶¶66-74). The Company's new CEO confirmed that over a year after the merger was completed, these critical aspects of the Covetrus's business remained unintegrated (¶¶113-116).<br>• Covetrus and Henry Schein executives planned and prepared for the integration for over a year before the merger was completed, giving them ample time to understand the inoperability between the Company's software platforms.  ¶¶152-153, Ex. 3 at 2.<br>• The Individual Defendants were intensely focused on the merger, with Shaw stating it was his "most important job." ¶154; Ex. 4 at 2.<br>• While motive is not required to allege scienter, Shaw was financially incentivized to complete the merger notwithstanding the declining state of the legacy HSAH supply chain business because he received a "transaction bonus" of nearly $1 million and converted his illiquid shares in VFC into publicly traded shares of Covetrus valued at over $55 million.  ¶30. Henry Schein was also motivated to complete the merger because the transaction allowed Henry Schein to divest its sprawling, low-margin Animal Health business in a tax-free transaction, while paying itself a $1.12 billion dividend. ¶169. Paladino also personally benefited from the spin-merger through his ownership of over $10 million in Henry Schein stock. ¶169. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 13 | **When:** 12/26/18, 1/8/19, 1/15/19, 2/7/19; 2/13/19 **Where:** Registration Statement, Prospectus **Speakers:** Henry Schein, Covetrus (¶¶118-123), Exs. 5-9, DE 45-3 at 18, 19, 107, DE 45-7 at 7, 54, DE 45-8 at 6, 52 | At the very beginning, the Registration Statement/Prospectus contained a graphic depicting each of the Company's "<u>Integrated Solutions</u>," including the purported integration of "<u>inventory management and supply chain services</u>," "<u>veterinary practice management software</u>," and "<u>proactive prescription management and pharmacy services</u>." | Facts similar to those described above in this column in Statement Nos. 2, 7, and 8 also give rise to a strong inference of scienter for these statements. <br><br> • Rather than having "Integrated Solutions" between the Company's constituent business groups, numerous former employees have testified that prior to, and after the merger, critical aspects of Covetrus were not integrated, including the supply chain (¶¶52-53), sales force (¶¶61-62, 75-79), software platforms (¶¶60-74). The Company's new CEO confirmed that over a year after the merger was completed, these critical aspects of the Covetrus's business remained unintegrated (¶¶113-116). <br> • Covetrus and Henry Schein executives planned and prepared for the integration for over a year before the merger was completed, giving them ample time to understand the inoperability between the Company's software platforms. ¶¶152-153, Ex. 3 at 2. <br> • The Individual Defendants were intensely focused on the merger, with Shaw stating it was his "most important job." ¶154; Ex. 4 at 2. <br> • While motive is not required to allege scienter, Shaw was financially incentivized to complete the merger notwithstanding the declining state of the legacy HSAH supply chain business because he received a "transaction bonus" of nearly $1 million and converted his illiquid shares in VFC into publicly traded shares of Covetrus valued at over $55 million. ¶30. Henry Schein was also motivated to complete the merger because the transaction allowed Henry Schein to divest its sprawling, low-margin Animal Health business in a tax-free transaction, while paying itself a $1.12 billion dividend. ¶169. Paladino also personally benefited from the spin-merger through his ownership of over $10 million in Henry Schein stock. ¶169. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 14 | **When:** 02/04/19 <br><br> **Where:** Capital Markets Day investor conference <br><br> **Speaker:** Komola <br><br> (¶129), Ex. 1 at 26-27 | Komola represented that the Company had an adjusted EBITDA base of $225 million for 2019. Komola stated that for 2019, "[w]e plan for double-digit growth off of the adjusted $225 million EBITDA, and feel confident in our ability to execute against that." Komola instructed investors and analysts to "work off of" these EBITDA figures in "building your models" for 2019, and added that "[w]e expect our EBITDA numbers to continue to grow at double-digit rates" in 2020. | • Defendants' guidance was unachievable in light of pre-merger issues, including infrastructure investments needed to remedy the Company's supply chain (¶¶50-59, 87-88), lack of integration or even an integration plan (¶¶60-74), and the fact that Covetrus loss access to entire categories of sales after the merger (¶¶80-82). <br> • Covetrus's former employees explained that the merger actually reduced the HSAH distribution business's ability to generate sales. Not only did the Company's persistent supply chain problems worsen after the merger, causing order delays and lost revenues, but as of the February 2019 merger, Covetrus lost the ability to sell whole categories of products—a fact Defendants and the former employees were well aware of months before the merger. ¶¶80-82, 87-89. In 2018, HSAH salespeople were encouraged to sell extra of these products before the merger so they would "have a cushion" before losing the sales. ¶¶75, 81-82. This artificially elevated HSAH's pre-Class Period sales (which in part formed the basis of the Company's false and misleading 2019 EBITDA guidance) and led to declines in Class Period sales. |
| 15 | **When:** 03/18/19 <br><br> **Where:** Animal Pharm Agribusiness article <br><br> **Speaker:** Shaw <br><br> (¶131), Ex. 10 at 6 | Defendant Shaw promoted Covetrus's infrastructure as key to a purported "$100 [million] in value-capture opportunities," including stating that "[o]ne example of [the value-capture opportunities] will be to leverage the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business." | Facts similar to those described above in this column in Statement No. 1 also give rise to a strong inference of scienter for these statements. <br><br> • As numerous former employees stated, HSAH's legacy distribution and supply chain business was antiquated, fragmented, and competitively inferior — facts well- within HSAH prior to the merger, and Covetrus afterwards. ¶¶50-54, 56-57, 59, 80, 87-88. <br> • Covetrus and Henry Schein executives planned and prepared for the integration for over a year before the merger was completed, giving them ample time to understand HSAH's pervasive supply chain deficiencies. ¶¶152-153, Ex. 3 at 2. <br> • The legacy HSAH supply chain business constituted Covetrus' core operation, accounting for nearly all of the Company's sales and earnings before and during the Class Period. ¶35, 157 <br> • While motive is not required to allege scienter, Shaw was financially incentivized to complete the merger notwithstanding the declining state of the legacy HSAH supply chain business because he received a "transaction bonus" of nearly $1 million and |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | | | converted his illiquid shares in VFC into publicly traded shares of Covetrus valued at over $55 million. ¶¶30, 169. |
| 16 | **When:** 03/29/19 <br><br> **Where:** 2018 Form 10-K <br><br> **Speakers:** Covetrus <br><br> (¶135), Ex. 2 at 2, DE 45-12 at 4 | Covetrus had "br[ought] together leading practice management software and supply chain businesses with a platform approach based on technology-driven insights, [that]… [l]ink[s] the power of insight and analytics, client engagement, practice management software and supply chain expertise into a multi-channel platform." | Facts similar to those described above in this column in Statement No. 2 give rise to a strong inference of scienter for these statements. <br><br> • In contrast to statements touting the integration of the Company's software platforms, multiple former employees have stated that the Company's software platforms were not integrated when this statement was made. ¶73 (software platforms not integrated as of September), *see generally* ¶¶60-74. In March 2020, Wolin frankly admitted that a year after the Company's statement that Covetrus's practice management and prescription management software had been integrated, the integration of the systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS." ¶¶114-115; Ex. 16 at 9. <br> • Covetrus's executives were kept apprised of the Company's lacking integration throughout the Class Period, including through Monday morning meetings. ¶54. CW 6 – who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue." ¶68. |
| 17 | **When:** 03/29/19 <br><br> **Where:** 2018 Form 10-K <br><br> **Speakers:** Covetrus | Defendants highlighted the Company's purported "comprehensive service and technology platform and supply chain infrastructure" and identified "inventory management and supply chain services" as one of its "key strengths" and "[k]ey [c]apabilities." | Facts similar to those described above in this column in Statement No. 2 give rise to a strong inference of scienter for these statements. <br><br> • In contrast to statements touting the integration of the Company's software platforms, multiple former employees have stated that the Company's software platforms were not integrated when this statement was made. ¶73 (software platforms not integrated as of September), *see generally* ¶¶60-74. In March 2020, Wolin frankly admitted that a year after the Company's statement that Covetrus's practice management and prescription |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | (¶135), Ex. 2 at 2, DE 45-12 at 4, 8 | | management software had been integrated, the integration of the systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS." ¶¶114-115; Ex. 16 at 9.<br>• Covetrus's executives were kept apprised of the Company's lacking integration throughout the Class Period, including through Monday morning meetings. ¶54. CW 6 – who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue." ¶68. |
| 18 | **When:** 05/15/19<br><br>**Where:** Q1 2019 Earnings Call<br><br>**Speaker(s):** Shaw<br><br>(¶137), Ex. 3 at 6 | "[W]e're aligned, we're focused as one team armed with a powerful platform that provides differentiated compelling capabilities for our customers" | Facts similar to those described above in this column in Statement No. 7 give rise to a strong inference of scienter for these statements.<br><br>• In stark contrast to Shaw's statements that Covetrus was "aligned" and "focused as one team," the Company remained unintegrated at the time these statements were made. In March 2020, *more than one year after the merger's finalization*, Wolin admitted that Covetrus was still managing the businesses as standalone legacy businesses, stating "we are still transacting along the way that we did when they were separate entities" and "that will remain the same as we continue to focus on driving the individual value of separate entities." ¶¶46, 113, Ex. 25 at 14. Wolin went further still, candidly acknowledging that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113, Ex. 25 at 14.<br>• Wolin's frank admissions are corroborated by the accounts of multiple former employees from different levels and departments within the Company, who experienced the highly fragmented and unintegrated nature of the businesses firsthand. ¶¶66, 68-74. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 19 | **When:** 05/15/19 <br><br> **Where:** Q1 2019 Earnings Call <br><br> **Speaker:** Shaw <br><br> (¶137), Ex. 3 at 5 | After "a <u>very smooth transition and carve-out process</u>," the Company was "<u>off to a fast start towards executing against both our short-term priorities and our long-term strategies</u>." | Facts similar to those described above in this column in Statement Nos. 5 and 7 give rise to a strong inference of scienter for these statements. <br><br> • In stark contrast to Shaw's statements that the integration was "very smooth," and the Company was "off to a "fast start" the Company remained unintegrated at the time these statements were made and sales were "tanking" across the board. <br> • In March 2020, *more than one year after the merger's finalization*, Wolin admitted that Covetrus was still managing the businesses as standalone legacy businesses, stating "we are still transacting along the way that we did when they were separate entities" and "that will remain the same as we continue to focus on driving the individual value of separate entities." ¶¶46, 113; Ex. 25 at 14.  Wolin went further still, candidly acknowledging that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113; Ex. 25 at 14. <br> • Wolin's frank admissions are corroborated by the accounts of multiple former employees from different levels and departments within the Company, who experienced the highly fragmented and unintegrated nature of the businesses firsthand.  ¶¶66, 68-74. <br> • At the time of Shaw's statement, Covetrus was being hammered by "across the board" sales declines, particularly in the critical North America sales region.  Shaw was well aware of these facts given the Company's contemporaneous internal reporting and internal meetings. ¶¶83-86, 158-161. The Company's poor sales were widely known and openly discussed inside the Company.  ¶¶75-89. <br> • Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171; Ex. 14 at 3; Ex. 13 at 1. <br> • A strong scienter inference is reinforced by events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
|  |  |  | the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 10. <br> • In the wake of these departures, Wolin candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5. |
| 20 | **When:** 05/15/19 <br><br> **Where:** Q1 2019 Earnings Call <br><br> **Speaker:** Shaw <br><br> (¶137), Ex. 3 at 5-6 | As to the purportedly integrated nature of the platform, Shaw referenced "a <u>single integrated online and in-office platform</u>" that "<u>brings together practice management software, insights and analytics, proactive prescription management and pharmacy services, client communications and appointment management, inventory and supply chain services, all together in a coordinated and integrated approach</u>." | Facts similar to those described above in this column in Statement No. 2 give rise to a strong inference of scienter for these statements. <br><br> • In contrast to statements touting the integration of the Company's software platforms, multiple former employees have stated that the Company's software platforms were not integrated when this statement was made. ¶73 (software platforms not integrated as of September), *see generally* ¶¶60-74. In March 2020, Wolin frankly admitted that a year after the Company's statement that Covetrus's practice management and prescription management software had been integrated, the integration of the systems was still in the "early days" "early innings on that front," as Covetrus was only now "starting to see some integration of prescription management into PIMS." ¶¶114-115; Ex. 16 at 9. <br> • Covetrus's executives were kept apprised of the Company's lacking integration throughout the Class Period, including through Monday morning meetings and national sales meetings. ¶¶54, 86. CW 6 – who was specifically hired to assist with the integration of VFC and HSAH – added that Covetrus management was familiar with the internal fragmentation of the software platforms, stating "from a top level they were aware of the fact that the integration of the software was an ongoing issue." ¶68. |

28

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 21 | **When:** 05/15/19 <br><br> **Where:** Q1 2019 Earnings Call <br><br> **Speaker:** Shaw <br><br> (¶139), Ex. 3 at 7 | "Our sales pipeline of qualified opportunities is strong with April growth meaningfully ahead of the pace seen in the first quarter." | Facts similar to those described above in this column in Statement No. 5 also give rise to a strong inference of scienter for these statements. <br><br> • At the time of Shaw's statement, rather than having "April growth meaningfully ahead of the pace seen in the first quarter," Covetrus was being hammered by "across the board" sales declines, particularly in the critical North America sales region. Shaw was well aware of these facts given the Company's contemporaneous internal reporting and internal meetings. ¶¶83-86, 158-161. The Company's poor sales were widely known and openly discussed inside the Company. ¶¶75-89. <br> • Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171, Ex. 14 at 3; Ex. 13 at 1. <br> • A strong scienter inference is reinforced by events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173. Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 5. <br> • In the wake of these departures, Wolin candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 22 | **When:** 05/15/19 <br><br> **Where:** Q1 2019 Earnings Call <br><br> **Speaker:** Shaw <br><br> (¶141), Ex. 3 at 16-17 | A securities analyst asked Shaw to further discuss "the lift in revenue that … you've seen in … April and May" and "[w]hat in your mind is driving that?"  Shaw responded that "really <u>immediately following closing of the transaction, we stood up and aligned a strong North American commercial organization,</u>" that "this has really allowed us to have one face to the customer, where we have strong account management organizations who now can pull on integrated and aligned teams of specialists to have expertise in prescription management or have expertise in practice management software." | Facts similar to those described above in this column in Statement No. 7 give rise to a strong inference of scienter for these statements. <br><br> • In stark contrast to Shaw's statements that "immediately following closing of the transaction, we stood up and aligned a strong North American commercial organization," the Company remained unintegrated at the time these statements were made.  In March 2020, *more than one year after the merger's finalization*, Wolin admitted that Covetrus was still managing the businesses as standalone legacy businesses, stating "we are still transacting along the way that we did when they were separate entities" and "that will remain the same as we continue to focus on driving the individual value of separate entities." ¶¶46, 113; Ex. 25 at 14.  Wolin went further still, candidly acknowledging that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113, Ex. 25 at 14. <br> • Wolin's frank admissions are corroborated by the accounts of multiple former employees from different levels and departments within the Company, who experienced the highly fragmented and unintegrated nature of the businesses firsthand.  ¶¶66, 68-74. |
| 23 | **When:** 05/15/19 <br><br> **Where:** Press release <br><br> **Speaker:** Covetrus <br><br> (¶143), Ex. 11 at 1 | Covetrus provided full year 2019 adjusted EBITDA guidance of "<u>$235 to $250 million</u>," compared to $223 million of realized EBITDA in 2018, amounting to growth of 12% at the top end of the range. | Facts similar to those described above in this column in Statement No. 5 also give rise to a strong inference of scienter for these statements. <br><br> • Defendants' guidance was unachievable in light of pre-merger issues, including infrastructure investments needed to remedy the Company's supply chain (¶¶50-59, 87-88), lack of integration or even an integration plan (¶¶60-74), and the fact that Covetrus loss access to entire categories of sales after the merger. ¶¶80-82. <br> • Covetrus's former employees explained that the merger actually reduced the HSAH distribution business's ability to generate sales. Not only did the Company's persistent supply chain problems worsen after the merger, causing order delays and lost revenues, but as of the February 2019 merger, Covetrus lost the ability to sell whole categories of |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | | | products—a fact Defendants and the former employees were well aware of months before the merger. ¶¶80-82, 87-89. In 2018, HSAH salespeople were encouraged to sell extra of these products before the merger so they would "have a cushion" before losing the sales. ¶¶75, 81-82. This artificially elevated HSAH's pre-Class Period sales (which in part formed the basis of the Company's false and misleading 2019 EBITDA guidance) and led to declines in Class Period sales.<br>• At the time of this statement, Covetrus was being hammered by "across the board" sales declines, particularly in the critical North America sales region, rendering the Company's EBITDA guidance unachievable.  Shaw and Komola were well aware of these facts given the Company's contemporaneous internal reporting and internal meetings. ¶¶83-86, 158-161. The Company's poor sales were widely known and openly discussed inside the Company.  ¶¶75-89.<br>• Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171; Ex. 14 at 3; Ex. 13 at 1.<br>• A strong scienter inference is reinforced by events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173. Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 10.<br>• In the wake of these departures, Wolin candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5, 11. |
| 24 | **When:**<br>05/15/19<br><br>**Where:**<br>Q1 2019 Earnings Call | Defendant Komola reiterated the Company's full-year 2019 adjusted EBITDA guidance and stated that the "<u>range incorporates funding of new investments in innovation to support our long-term growth initiatives</u>, including a year-over-year increase of $5 million in software and prescription | Facts similar to those described above in this column in Statement No. 5 also give rise to a strong inference of scienter for these statements.<br><br>• This statement created the misleading impression that the Company would meet its guidance, even taking into account necessary infrastructure investments. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | **Speaker:** Komola <br><br> (¶143), Ex. 3 at 12 | management R&D investments, <u>many of which are a onetime step-up in expenditures</u>." | • Defendants' guidance was unachievable in light of pre-merger issues, including infrastructure investments needed to remedy the Company's supply chain (¶¶50-59, 87-88), lack of integration or even an integration plan (¶¶60-74), and the fact that Covetrus loss access to entire categories of sales after the merger. ¶¶80-82. <br> • Covetrus's former employees explained that the merger actually reduced the HSAH distribution business's ability to generate sales. Not only did the Company's persistent supply chain problems worsen after the merger, causing order delays and lost revenues, but as of the February 2019 merger, Covetrus lost the ability to sell whole categories of products—a fact Defendants and the former employees were well aware of months before the merger. ¶¶80-82, 87-89. In 2018, HSAH salespeople were encouraged to sell extra of these products before the merger so they would "have a cushion" before losing the sales. ¶¶75, 81-82. This artificially elevated HSAH's pre-Class Period sales (which in part formed the basis of the Company's false and misleading 2019 EBITDA guidance) and led to declines in Class Period sales. <br> • At the time of this statement, Covetrus was being hammered by "across the board" sales declines, particularly in the critical North America sales region, rendering the Company's EBITDA guidance unachievable. Shaw and Komola were well aware of these facts given the Company's contemporaneous internal reporting and internal meetings. ¶¶83-86, 158-161. The Company's poor sales were widely known and openly discussed inside the Company. ¶¶75-89. As numerous former employees from different levels and departments within the Company stated, HSAH's legacy distribution and supply chain business was antiquated, fragmented, and competitively inferior, facts that Shaw and Komola were aware of. ¶¶50-54, 56-57, 59, 80, 87-88. <br> • Komola's scienter is further evidenced by her repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned management's integrity. ¶¶100, 102-106, 111, 171; Ex. 14 at 3; Ex. 13 at 1. <br> • A strong scienter inference is reinforced by events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 5. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | | | • In the wake of these departures, Wolin candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5, 10-11. |
| 25 | **When:** 05/29/19<br><br>**Where:** Stifel Dental & Veterinary Conference<br><br>**Speaker:** Shaw<br><br>(¶149), Ex. 4 at 6 | A securities analyst asked Shaw whether the purported sales momentum that Shaw had promoted during the May 15, 2019 investor conference call, in March and "into April … has continued even more recently into the month of May?" Shaw responded "Yes…. The organization understood the power of the integrated capability set of the Company. And that's manifested itself in a <u>very big pipeline, really strong engagement activity, and we see that coming into Q2</u>." | Facts similar to those described above in this column in Statement No. 5 also give rise to a strong inference of scienter for these statements.<br><br>• At the time of Shaw's statement, rather than having a "very big pipeline" and "really strong engagement activity" "coming into Q2," Covetrus was being hammered by "across the board" sales declines, particularly in the critical North America sales region, which made his statements touting the Company's "very big pipeline, really strong engagement activity … coming into Q2" were at minimum misleading. Shaw was well aware of the declining sales given the Company's contemporaneous internal reporting and internal meetings. ¶¶83-86, 158-161. The Company's poor sales were widely known and openly discussed inside the Company. ¶¶75-89.<br>• Shaw's scienter is further evidenced by his repeated attempts to cover-up the truth, and the reaction of securities analysts who saw through the fiction and questioned Shaw's integrity. ¶¶100, 102-106, 111, 171; Ex. 14 at 3; Ex. 13 at 1.<br>• A strong scienter inference is reinforced by events that transpired in the aftermath of the August 13, 2019 corrective disclosures, including an executive-level housecleaning and the Board's promise to "rebuild trust with our investors." ¶¶45, 94, 106-110, 172-173; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex. 23 at 1; Ex. 15 at 5.<br>• In the wake of these departures, Wolin candidly admitted that Covetrus needed to "rebuild trust with our investors and the analyst community," adopt "a new approach where we are … being as transparent as possible with… our investors," and pledged that going forward, Covetrus would "build a culture focused on… trust[] [and] transparency." ¶108; Ex. 15 at 5, 10-11. |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| 26 | **When:** 05/29/19<br><br>**Where:** Stifel Dental & Veterinary Conference<br><br>**Speaker:** Shaw<br><br>(¶149), Ex. 4 at 7 | "[W]e didn't miss a beat on the first hour of the first day. <u>Not a single order was delayed.  There was no disruption in customer experience</u>." | Facts similar to those described above in this column in Statement No. 1 also give rise to a strong inference of scienter for these statements.<br><br>• In contrast to Shaw's statement, numerous former employees indicated that Covetrus suffered from significant delay and backorder issues, both prior to and after the merger, due to the Company's deficient supply chain infrastructure – issues Shaw and the other Covetrus executives were aware of. ¶¶50-54, 80, 87-88.  For example, CW 11 stated that even prior to the merger, "[t]hings were always on backorder" and, "*[a]bsolutely, customers were leaving because of these inventory issues*." ¶87.  CW 1 described how Covetrus inherited supply chain infrastructure that lacked anything resembling an integrated supply chain and logistics system. ¶¶51-53, 59. As a result, Covetrus was forced to use UPS for supply chain services and rely on manual Excel spreadsheets to track supply chain data (¶¶52-53, 57), which led to order delays and a mismatch between product supply and demand. ¶53. CWs 2 and 10 confirmed that the supply chain issues persisted through the merger and even "got worse after Covetrus was formed," which drove down sales "in a huge way." ¶¶87-88. CW 4 similarly confirmed that supply chain and logistics issues resulted in lost sales. ¶88. CW 10 attested that Shaw's statements were "not accurate." *Id.* CWs 1 and 10 described how there were discussions in 2019 about "upgrading the system" to fix the "notorious" supply chain, inventory management, and distribution issues, but "nothing ever got fixed" because of strapped budgets and management infighting. ¶¶56-57, 59, 87-88.<br>• CWs 3 and 10 each described how after the merger, Covetrus lost the ability to sell *whole categories* of products. ¶¶81-82.<br>• These issues were well-known to Shaw and the other Individual Defendants.  *First*, Shaw and the other executives planned and prepared for the integration for over a year before the merger was completed, giving them ample time to understand HSAH's pervasive supply chain deficiencies.  ¶¶152-153, Ex. 3 at 6. *Second*, the legacy HSAH supply chain business constituted Covetrus' core operation, accounting for nearly all of the Company's sales and |

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc. et. al.*, 19-cv-05530-GRB-RLM

| Stmt. # | The Speaker(s), Date, Medium, Paragraph of Complaint Alleged, And Source Document | False And Misleading Statements | Facts Giving Rise To A Strong Inference of Scienter |
|---|---|---|---|
| | | | earnings during the Class Period. ¶¶35, 157; *Third*, the lack of a unified logistics system was readily apparent to Shaw through his participation in regular "Monday morning meetings" with the Company's other top executives. ¶54. *Fourth*, CW 10 stated that it was very well known within Covetrus that the Company suffered from backorder issues to the point where it was a common topic of conversation at the Company. ¶88. |