**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM and PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br>   v.<br><br>HENRY SCHEIN, INC., COVETRUS, INC., STEVEN PALADINO, BENJAMIN SHAW, and CHRISTINE T. KOMOLA,<br><br>     Defendants. | Case No.<br>2:19-cv-5530 (GRB)(RLM)<br><br><br>CLASS ACTION |

**LEAD PLAINTIFFS' RESPONSE TO**
**COVETRUS DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Just a week prior the hearing on their motions to dismiss, the Covetrus Defendants filed a Notice of Supplemental Authority (DE 57; "Notice") calling this Court's attention to the nearly four-month-old decisions in *In re Diebold Nixdorf, Inc., Sec. Lit.*, No. 19-6180, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) and *In re Nokia Corp. Sec. Lit.*, No. 19-3982, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021).[1]  Both decisions are off-point, as indicated by Defendants' belated submission.

As in their motion to dismiss briefing, the Covetrus Defendants attempt to manufacture a bright-line rule that ***all*** statements about a merger-integration are non-actionable as a matter of law.  *See* DE 45-1 at 16; DE 45-24 at 16.  Defendants are wrong.  There is no such rule.  The federal securities laws do not have a giant loophole that permits executives to misrepresent critical aspects of an integration—including by telling investors that specific and critical integration milestones have been completed, when, in fact, the opposite is true.  Abundant authority holds that the determination of whether an integration-related statement is actionable is a contextual inquiry that turns on the particular facts of the case.[2]

The facts of *Diebold* and *Nokia* are readily distinguishable from the facts here.  In *Diebold*, defendants painted a "rosy outlook" of an integration, issuing generalized and optimistic statements such as that the company "continue[d] to make progress on the integration," was "very encouraged" with the results, and "pleased with the pace of [the] integration efforts."  2021 WL 1226627 at *3, 4, 5, 10.  At the same time, however, the defendants continuously warned investors that the integration there "was not a trivial task" and that the company had experienced setbacks.

---

[1] Capitalized terms have the meanings given to them in Lead Plaintiffs' Omnibus Memorandum of Law In Opposition To Defendants' Motions To Dismiss The Amended Consolidated Class Action Complaint (DE-45-23) ("Opposition"). All "¶" references are to the Amended Consolidated Class Action Complaint (ECF No. 41).

[2] Lead Plaintiffs' Opposition cites over a ***dozen*** cases where integration-related statements have been found actionable ***and*** sustained over defendants' motion to dismiss.  *See* DE 44-5 at 29 n.4, 36 n.12 (collecting cases).

*Id.* at *3, 11, 11 n.14 (statements warning investors that the company was "wrestling down alligators [integration set-backs]" with "still a few more to go," "it's very fair to say that we underestimated the amount of distractions tied to the integration, the amount of change that we introduced to the organization, and also the size of the hole that we dug ourselves," and that "60% of all the M&A deals … fall short of the expectations"). Moreover, rather than blaming external factors, the *Diebold* defendants truthfully told investors the integration setbacks were due to internal problems, such as the lack of a "common management tool," and lowered their earlier financial guidance. *Id.* at *4-5. Moreover, after the COO voluntarily resigned and the CEO was asked to step down, the new CEO made statements that were consistent with the prior management team's statements, including that the integration created an overly "complex" operating model which was the "fundamental reason" for the company's disappointing earnings. *Id.* at *5-6. The company subsequently implemented a new integration plan and its stock price dropped. *Id.*

The *Diebold* court dismissed claims based on the integration related statements for two reasons. First, the court found the "general and vague" integration statements were mere "puffery" and given the defendants repeated and specific "cautionary statements," "Plaintiff's suggestion that the Company's Merger-related reporting was all roses is divorced from its own pleadings." *Id.* at *10. Second, because the plaintiffs principally relied on the new CEO's statements regarding "complexity" to establish the falsity of defendants' prior statements, the plaintiffs failed to adequately allege that defendants "knew their statements were misleading <u>when they were made.</u>" *Id.* at *11 (emphasis in original). The new CEO, who recognized the same problems, may simply have had a different vision for company operations and "shift[ed] gears" for "any number of reasons, most of which have nothing to do with fraud." *Id.*

The facts here are nothing like those in *Diebold*. Rather than vague optimistic integration

2

statements, Defendants falsely told investors that Covetrus had completed specific aspects of the integration that were critical to the Company's performance and were highly material to investors. For example, Defendant Shaw told investors (1) that specific software platforms had been "hardwired" with "real-time integration" (¶¶127, 133); (2) that two months prior, the Company had achieved "the integration of our sales team" which was "now representing the total scope of our capabilities" (¶¶141, 147); and (3) that the Company had successfully completed the structural integration of the companies, which were not being managed as "standalone legacy businesses" but rather were operating as "one integrated organization." ¶¶145, 149.

And rather than temper expectations like the *Diebold* executives, here Defendants issued overwhelmingly positive statements about the progress and purported success of the integrations. Indeed, halfway through the Class Period, Defendants reaffirmed their prior financial guidance and falsely claimed the achieved aspects of the integration had already resulted in "improved top line performance" during the second quarter and a "really robust pipeline" with "much greater year-over-year growth than what we experienced in the first quarter." ¶¶139, 142-43. Additionally, here, unlike in *Diebold*, the Complaint includes the firsthand accounts of eleven former employees who consistently describe how the specific aspects of the integration that Defendants told investors had successfully been completed had not even ***begun*** to occur. *See, e.g.*, ¶67 (Covetrus was "absolutely not integrated," by February 2019, was not "even integrating [its software platforms] yet" and had not yet devised a plan to integrate); ¶79 (VFC and HSAH sales forces operated with a "them versus us" mentality and cross-selling "just wasn't there"); ¶71 ("absolutely no communication" between the legacy HSAH and VFC businesses, adding "in fact there was a wall").[3]

---

[3] The scienter analysis in *Diebold* also does not help Defendants. In addition to being *dicta*, the *Diebold* plaintiffs did not allege that the defendants had contemporaneous information that "runs counter" to the alleged statements. 2021

The *Nokia* decision is also off-point. There, to help prepare for a 5G wireless rollout, Nokia acquired a company that had a history of compliance issues. 2021 WL 1199030 at *2 n.3. Soon after the merger, Nokia issued several generalized statements such as that the integration was "behind us" and that the "cultural integration … went beautifully." *Id.* *15. Without citing to any contemporaneous information that the integration was not proceeding as stated, the *Nokia* plaintiffs attempted to point to two alleged "corrective disclosures" to show that the general integration statements were false when made. First, Nokia disclosed the existence of compliance issues at the acquired company that could potentially subject the company to criminal liability. *Id.* at *11. The court easily held that Nokia's integration statements were too general and were "not necessarily at odds" with the existence of compliance issues because the complaint alleged no "concrete integration milestones" relating to fixing compliance problems. *Id.* at *15, 15 n.10, 17. Second, Nokia disclosed a delay in its 5G transition. *Id.* The court held that plaintiffs failed to connect the integration issues with any of Nokia's 5G problems and, regardless, Nokia had continuously and specifically warned throughout the class period that it was "facing challenges related to the 5G rollout." *Id.* at *18-19 & n.19.

By contrast, here the Complaint alleges that Defendants made highly specific statements about key aspects of the integration that purportedly had been completed but which were not even started. ¶¶118-124, 127-128, 133-138, 141-142, 145-150. For support, the Complaint includes,

---

WL 1226627 at *13. Here, in contrast, the Complaint includes detailed accounts of numerous former employees from different levels and departments within the Company showing that Defendants were kept up to date on the integration problems and, moreover, that critical aspects of the integration had not been achieved. ¶¶54, 68, 84-86. Further, the *Diebold* court recognized that executive resignations can be probative of scienter where, as here (*see* ¶106), there "are factual allegations linking the…resignation to the alleged fraud." *Id.* at *14. And while the *Diebold* court held that the new CEO's shift in integration strategy "does not itself show that the old approach was plagued by fraud," 2021 WL 1226627 at *14, here the new-CEO issued a series of statements that directly contradicted Defendant Shaw's prior statements about the specific aspects of the integration that had purportedly been achieved, while expressly committing to a new approach where we are … being as transparent as possible with … our investors." ¶108. Also, unlike *Diebold*, after the truth emerged and the Company's stock price declined by nearly 50% (¶101), and virtually every securities analyst that followed the Company openly questioned management's credibility. ¶¶102-106.

4

as noted, the firsthand accounts of numerous former employees who describe an internal state of affairs at the Company that was diametrically opposed to Defendants' public representations, as well as admissions by the Covetrus's current CEO that *none* of the integration milestones at issue had been achieved during (or since) the Class Period.  ¶¶45-89, 112-117.  The Complaint also shows how the market interpreted the corrective disclosures to reveal the fraud.  ¶¶102-111.  Further, unlike *Nokia*, Defendants here cannot point to continuous and specific disclosures warning that the integration milestones they explicitly told investors had been "achieved" were, in reality, at best still in the planning stages.  And while the *Nokia* plaintiffs pointed to analyst reports indicating the integration-related issues had more negative effects than "management had realized," 2021 WL 1199030 at *17, that is a far cry from the analysts here who widely questioned Defendants' creditability when the truth emerged and the Company's stock price was cut nearly in half.

Dated: July 26, 2021                                    Respectfully submitted,

                                        */s/ David Kaplan*

                                        **SAXENA WHITE P.A.**
                                        David R. Kaplan (admitted *pro hac vice*)
                                        12750 High Bluff Drive, Suite 475
                                        San Diego, CA 92130
                                        Telephone: (858) 997-0860
                                        Facsimile: (858) 369-0096
                                        Email: dkaplan@saxenawhite.com

                                        Steven B. Singer
                                        10 Bank Street, 8th Floor
                                        White Plains, NY 10606
                                        Telephone: (914) 437-8551
                                        Facsimile: (888) 631-3611
                                        Email: ssinger@saxenawhite.com

                                        Joseph E. White, III
                                        (*pro hac vice* forthcoming)
                                        7777 Glades Road, Suite 300

5

Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: jwhite@saxenawhite.com

*Counsel for Lead Plaintiffs City of Hollywood Police Officers' Retirement System and Pembroke Pines Pension Fund for Firefighters and Police Officers*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner (pro hac vice forthcoming)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
Email: bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Hollywood Police Officers' Retirement System*

6

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List via the Court's filing system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 26th of July 2021.

*/s/ David R. Kaplan*
**SAXENA WHITE P.A.**
David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
Email: dkaplan@saxenawhite.com

i