FILED
CLERK
4:56 pm, Aug 03, 2021
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM and PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

-against-

HENRY SCHEIN, INC., COVETRUS, INC., STEVEN PALADINO, BENJAMIN SHAW, and CHRISTINE T. KOMOLA,

Defendants.

----------------------------------------------------------------X

**MEMORANDUM & ORDER**
CV 19-5530 (GRB)(RLM)

**GARY R. BROWN, United States District Judge:**

In this securities fraud class action, plaintiffs seek to bring claims for violations of Section 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against defendants emanating from the financially disappointing spin-off of Henry Schein Animal Health (HSAH), the veterinary businesses of Henry Schein, Inc., and a fast-growing startup into a new entity, eventually known as Covetrus, Inc. ("Covetrus"). The allegations supporting these claims are subject to the strict pleading requirements of Private Securities Litigation Reform Act of 1995 (PSLRA) as well as the heightened requisites of Rule 9(b) of the Federal Rules of Civil Procedure. Defendants have moved to dismiss. Docket Entry ("DE") 44 and 45.

The Amended Complaint, by its own terms, "centers on false statements made by Covetrus and its top officers regarding the status of its crucial merger-integration process and

corresponding financial health." The question at this juncture is whether plaintiffs have adequately alleged false statements – as distinct from puffery, forward looking statements and other inactionable representations – along with allegations supporting scienter. Because, in certain instances, plaintiffs have made such allegations as to certain defendants (though not with respect to others), the motions to dismiss are GRANTED in part and DENIED in part, as discussed further herein.

**Facts and Procedural History**

Plaintiffs filed an initial complaint on or about September 2019, which was twice amended. See DE 1, 23, 41. Notably, the second amendment followed a premotion conference with the Court, after defendants set forth their arguments in support of dismissal of the then-extant complaint, and was filed in lieu of motion practice. The amended, consolidated complaint alleges the following:

Covetrus was created in February 2019, resulting from a spin-off of HSAH, a large if lumbering veterinary health business, with Vets First Choice (VFC), a high-growth though unprofitable startup. DE 41 ¶ 1. Key to the merger was the expectation that VFC's technological platform, which helped veterinarians increase prescription compliance by pet owners could be combined with HSAH's broad product offerings to yield substantial profits, bolstered by cross-selling of products by a combined sales team. *Id.* ¶¶ 28, 35-38. Unsurprisingly, company officers involved in the transaction touted the planning and organization behind the deal, emphasizing the ready integration of the two businesses. *Id.* ¶ 3 (noting announcements of "deep integration" of software and sales forces).

A year later, the businesses continued to struggle to achieve integration, and new management advised that the efforts to achieve complete integration had not borne fruit. *Id.* ¶ 4.

In between, Covetrus had reported allegedly "extremely disappointing financial results for the first quarter of 2019." *Id.* ¶ 6. Then, in August 2019, the Company reported allegedly "disastrous" financial results, yielding a 50% drop in share price.[1] *Id.* ¶ 8.

*The Amended Consolidated Complaint and the Show Cause Order*

The amended complaint purports to tie significant losses to allegedly false and misleading statements by defendants. Yet, the amended complaint proves difficult to navigate, as it frequently reiterates quotations – sometimes inaccurately -- without attribution or context. *See, e.g. id.* ¶¶ 3, 5, 38, 42, 153 (unattributed references to "day 1" integration); *but see id.* ¶¶ 43, 46, 92 (attributing the statement that "we're not managing the business day 1 or day 2 as standalone legacy businesses" to defendant Shaw).[2]

After an initial review, the Court entered a show cause order providing as follows:

> The Amended Complaint, by its own terms, "centers on false statements made by Covetrus and its top officers regarding the status of its crucial merger-integration process and corresponding financial health." Rather than plainly identifying such statements, however, the twice-amended complaint, despite its heft, consists largely of snippets of statements, without context or citation. As a result, the complaint proves difficult to navigate, as it frequently reiterates quotations without attribution or context. Plaintiffs' oversized briefs fail to provide a map to this unrewarding treasure hunt, as the citations appear limited solely to the paragraphs of the complaint, seemingly oblivious to the fact that a massive documentary record has now been filed with the Court.
>
> In order to assist the Court in its preparation for oral argument and eventual resolution of this matter, counsel for plaintiffs is directed to file, on or before Friday, July 23, a chart listing (1) each alleged false statement relied upon by plaintiffs, (2) a pinpoint citation to the document in which such statement is recorded and the paragraphs in which it is alleged (3) the paragraphs of the

---

[1] At oral argument, counsel for Henry Schein made an interesting observation: the legacy veterinary business, which had revenues of $3.9 billion in the year preceding the transaction, had reported revenues of $2 billion for the first half of 2019. Thus, the financials appear not to have been "disastrous" from the perspective of the existing business, but disappointing insofar as the anticipated synergies had not emerged consistent with expectations. Tr. 27.

[2] After much searching, the Court determined that the seemingly critical "day 1" statement appears in DE 45-17, Ex. O at page 6, a document filed by defendants.

> complaint that set forth the evidence of scienter for such statement, along with pinpoint citation to the documents that support such contentions.

DE 58.

In response, counsel for plaintiffs provided a chart identifying 26 statements which plaintiffs contend support their claims for securities fraud. DE 59-1. Remarkably, notwithstanding unsubtle criticism by the Court, plaintiffs' counsel persisted in cobbling together selected, non-contextual, partial quotations and ubiquitously added emphasis[3] in an effort to create the illusion of particularized false statements.[4] This endeavor, much akin to the attempted transformation of sow's ears into silk purses, frequently fails. Nevertheless, as

---

[3] Abusing this technique, one could suggest that President Kennedy exhorted citizens to consider "what your country **could do for you."**

[4] Alleged false Statement No. 11 provides a ready example. Plaintiffs set forth the following allegedly false statement, which tracks the language of the complaint:

> Statements that one of the Company's "<u>key strengths</u>" is its "<u>inventory management and supply chain services and technology,"</u> and that one of the <u>"key benefits</u>" of the merger is "the complementary fit of Vets First Choice and the Henry Schein Animal Health Business, and the strategic benefits of a global, technology-enabled animal health business with a <u>comprehensive service and technology platform and supply chain infrastructure."</u>

DE 59-1 at 21 (emphasis as added by plaintiff but not in original). According to plaintiff's counsel, this statement, one of the few attributed to defendant Henry Schein, appears in four exhibits. *Id.*(citing Exs. 5-9). Yet this false statement does not appear as a coherent whole in any of those documents, none are reasonably attributed to Henry Schein, and the context renders them readily dismissible. The first sentence – focused on "key strengths" -- appears as part of a sentence that begins "In pursuing our strategy, we plan to capitalize on our key strengths . . . " DE 59, Ex. 5, 6 & 7 at 20; Ex. 8 & 9 at 98. Viewed in context, it is difficult to imagine a better example of an inactionable, forward-looking statement. The second sentence appears but once in the initial registration statement, in answer to a FAQ about why VFC entered the transaction, noting "Vets First Choice determined that the Transactions would be in the best interests of Vets First Choice and its stockholders because the Transactions would provide a number of key benefits . . . " DE 59, Ex. 8. Once again, properly contextualized, this statement was clearly an aspirational, forward-looking statement, plainly designed to show the planned intention of VFC rather than a misrepresentation about existing facts related to Covetrus. Counsel's non-contextual amalgamation of these snippets often proves misleading. Counsel is cautioned that, particularly where such editorial liberties are being taken, it should be done with great care. *See Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss or, indeed, to escape admonishment.").

discussed further below, a few of these statements – attributable only to two defendants – are plead with sufficient particularity so as to narrowly overcome the instant motion to dismiss.

Defendant Benjamin Shaw served as VFC's Chief Executive Officer and Cofounder from May 2010 through October 2018. DE 14 ¶ 15. As a result of the transaction, he became Covetrus's CEO and President beginning in February 2019, a position which he held until October 2019. *Id.* He received a $927,000 bonus for completing the transaction and exchanged his shares of VTC stock for shares in Covetrus valued at $55 million. *Id.* ¶ 30.

Messaging around the transaction suggested that the value of Covetrus would emerge from the combination of strengths of HSAH and VTC, including (1) HSAH's supply chain infrastructure; (2) the integration of VTC's fast-growing prescription management software with HSAH's practice management software (PIMS), and (3) the merger of both company's sales teams to facilitate cross-selling of products to a broader base of customers. *Id.* ¶¶ 34-37. One underlying notion was that the HSAH team of more than 1,200 salespeople, with access to 90% of veterinary practices could readily introduce VTC's nimbler software and a joint, expanded product line to this larger customer base. *Id.*

During the class period, defendants made repeated representations that Covetrus had successfully completed some or all of these integration tasks. *Id.* ¶ 38. The complaint alleges that the defendants misrepresented that the software integration had been completed, noting:

> For example, during the Class Period Defendants specifically promoted the purportedly completed integration of the HSAH PIMS software and the VFC prescription management software. On February 4, 2019, in discussing "what we're able to do," Shaw stated that Company's "prescription management and analytics capabilities" were already "hardwired into practice management software." On May 15, 2019, Defendant Shaw emphasized that "we view PIMS to be the strategic enabler and an important on-ramp for Vets First Choice prescription management" and again claimed that the Company had already "achieved a deep integration between our practice management software and our prescription management workflow."

*Id.* ¶ 39. As to the sales teams, defendants represented as of May 29, 2019 that

> "[I]n March ... we brought our ... various sales organizations ... together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities. So that happened in March. And so we're talking about in Q1 those few weeks following March and we're really enthusiastic about the reception. I mean for the first time, our combined organization is able to leverage all of the unique assets of the organization and we're coming to market with a very differentiated and unique value proposition that allows us to leverage our PIMS practice management software position around appointment and prescription management, have new insights and to tightly integrate that within office inventory management."

*Id.* ¶ 40. Shaw reinforced this concept during a May 29 analyst call:

> "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses, right? There are several dozen different operating businesses. And so post closing, what we've achieved has been an integration of that value proposition. We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management. . . . [And] it's the integration and kind of power of that connected ecosystem that we're delivering to customers. So we're not managing the business day 1 or day 2 as standalone legacy businesses. I think that's a very important observation around sort of the structural changes we've been able to achieve in this."

*Id.* ¶¶ 42-43.[5]

Apparently, though, this wasn't the case. After Shaw was fired, some nine months later, a new CEO announced in March 2020 that "we are still transacting along the way that we did when [HSAH and VFC] were separate entities" and the Company was only "focus[ed] on driving

---

[5] While the complaint excerpts portions of this quotation, this more complete language is taken from the transcript of the call. DE 45-17 at page 6. The perils of the fragmented, repetitive quotations deployed by plaintiffs become plain when examining this quote and its characterization by counsel. The complaint comments upon "Defendant Shaw's claim that the integration had been so successful that 'we're not managing the business day 1 or day 2 as standalone legacy businesses' – a fact that Defendant Shaw emphasized was **'very important for investors to understand.'"** ¶4 (emphasis added). The portion of that statement in bold – though appearing in quotation marks in the complaint – was not made as quoted by the defendant. As the quotation above reveals, Shaw indicated this concept was "important to understand", as compared to "very important for investors to understand," a small but not insignificant difference. Such imprecision is entirely unacceptable.

the individual value" of the separate entities. *Id.* ¶ 46. And contrary to Shaw's representation that the sales forces had been fully integrated, in March 2020, Wolin announced:

> "[w]e're not trying to do all of that sales force integration in terms of pushing the two sales forces together, distribution and prescription management. We're going to have coordination, not integration right now."

*Id.* ¶ 47. Finally, despite Shaw's report of the "deep integration" of the software systems, Wolin acknowledged that, by March 2020, the company was just "starting to see some integration of prescription management into PIMS." *Id.* ¶ 48.

**Discussion**

*Standard of Review*

Generally, motions to dismiss are decided under the well-established standard of review for such matters, as discussed in *Burris v. Nassau County District Attorney*, No. 14-5540 (JFB) (GRB), 2017 WL 9485714, at *3-4 (E.D.N.Y.), *adopted by* 2017 WL 1187709 (E.D.N.Y. 2017), incorporated by reference herein. The gravamen of that standard, of course, is the question of whether, assuming the allegations of the complaint to be true solely for the purposes of the motion, the complaint sets forth factual material to render the claims plausible.

Additionally, "a claim under Section 10(b) ... sounds in fraud and must [also] meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA. Under Rule 9(b) and the PSLRA, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Diebold Nixdorf, Inc., Sec. Litig.,* No. 19-CV-6180 (LAP), 2021 WL 1226627, at *7 (S.D.N.Y. 2021).[6]

As the Second Circuit recently observed:

---

[6] Unless otherwise noted, alterations in case quotations are omitted.

> Section 10-b of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device ... in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j. SEC Rule 10b-5, in turn, declares it unlawful for any person, directly or indirectly:
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.
>
> "To state a claim for securities fraud under these provisions a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)

*In re Synchrony Fin. Sec. Litig.,* 988 F.3d 157, 167 (2d Cir. 2021). Thus, "[t]o state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Diebold,* 2021 WL 1226627, at *7 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 267 (2014)).

*Claims against Covetrus and Shaw*

*Synchrony* provides important guidance for this resolution of the pending motions. In that case, the Circuit rejected a broad swath of alleged misrepresentations, finding that the claims were predicated upon statements that constituted "a generally optimistic view of the state of business partnerships and the synergies of Synchrony's business model." 988 F.3d at 173. The rejected allegations included statements that were "vague . . . generic statements about

Synchrony's overall business model [that] do not invite reasonable reliance," or otherwise constituted inactionable "corporate puffery." *Id.* The same is true of many of the statements alleged herein. *See, e.g.,* Stmt. No. 5 (stating that management was "pleased with the improved top line performance. . . thus far"); Stmt. No. 11 (amalgamation of statements concerning potential strengths of the merger); Stmt. No. 12 (claiming that Covetrus was "well suited to compete in this market"); Stmt. No. 17 (regarding IT assets); Stmt. No. 19 (Covetrus was "off to a fast start towards executing against both our short-term priorities and our long-term strategies"). DE 59-1. Remarkably, Statement No, 13, a PowerPoint slide contained in several of the public filings, consists solely of the following:




*Id.* This graphic, emblematic of the concept of corporate puffery, cannot reasonably be construed to have invited reasonable reliance by any investor.

*The Integration Statements*

In *Synchrony,* the Court of Appeals was troubled by one statement made in response to a question from an analyst to whether "tightened underwriting" by the company may have raised concerns, asking if the Synchrony's "retail partners voiced 'any pushback'" regarding the practices. 988 F.3d at 168. The Company's CEO had responded in the negative when, in fact, the Company had received negative feedback. *Id.* The Circuit found that rather than a "vague expression of opinion," this "pushback statement . . . was a 'concrete' description and a 'factual representation,' that purported to describe the state of Synchrony's business relationships." *Id.* at 168. Thus, the Circuit found such an allegedly false statement was sufficiently particular at the pleading stage. *Id.* Moreover, the Second Circuit held that other allegations of the complaint – including statements from former employees familiar with the facts – helped establish the falsity of the statement with sufficient particularity. *Id.*

In Statement Nos. 8, 9, 10 and 22, Shaw made a series of representations during an analyst call which, particularly when taken together, appear to suggest that the company had successfully completed integration of the sales force. DE 59, Ex. 4 at 5. Like the "pushback" statement in *Synchrony*, these statements represent concrete, factual representations in which Shaw assured the public that the integration of the sales force had been completed. The amended complaint contains factual assertions which demonstrate that, even a year after the merger, this was still not the case. DE 41 ¶ 113; *cf. id.* ¶¶ 66, 68-74 (employees corroborating failure to integrate the sales forces).

Counsel for defendants point to the decision in *Diebold* dismissing certain securities fraud claims premised on statements regarding post-merger integration efforts 2021 WL 1226627, at *9. The difference, however, is that the statements in *Diebold* were largely opinion-based assessments as to the organization's progress toward integration. *See, e.g. id.* at *2 (teams were "working very diligently on integration activities and driving cost synergies") and *3 (organization "continue[d] to make progress on [the] integration"). Thus, the court in *Diebold* held that the optimistic assessments of progress were tempered by other disclosures and plaintiffs had failed to set forth allegations demonstrating that the statements "were misleading when they were made." *Id.* at *11.

As demonstrated above, given the allegedly woeful state of the sales force integration efforts, Shaw's repeated and seemingly erroneous representations that those efforts had been successfully completed satisfies this standard. A closer question arises around Shaw's statements about the IT integration of the two entities, but plaintiffs have, on balance, submitted sufficient allegations to survive the motion to dismiss as to this purported misstatement. *See, e.g.,* DE 59-1, Stmt. No. 20 (touting "a single integrated online and in-office platform.")

Shaw's significant financial stake in this transaction – far beyond that of an ordinary corporate official – helps support plaintiffs' allegations. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 325 (2007) ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). Furthermore, the repeated representations made, compared to the factual material concerning the actual state of the integration, leads to an inference that, at a minimum, Shaw acted recklessly in making such statements. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("allegations of recklessness [are] sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or

check information that they had a duty to monitor"). "Recklessness is 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), a*ff'd sub nom. Tongue v. Sanofi,* 816 F.3d 199 (2d Cir. 2016) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir.2009)). This may be established though allegations showing that "'defendants knew facts or had access to non-public information contradicting their public statements' and therefore 'knew or should have known they were misrepresenting material facts.'" *In re Sanofi,* 87 F. Supp. 3d at 529 (quoting *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir. 2001)).

Here, the allegations establish that integration represented the key to the Covetrus transaction. *See, e.g.* DE 41 ¶¶3, 33-37. Shaw repeatedly assured investors that these critical integration processes had been successfully completed, while his successor, months later, acknowledged that no integration had taken place. *Compare id.* ¶¶ 43, 46, 92 *with* ¶¶ 47-48, 116. Moreover, several former employees advised that no integration had taken place. *Id.* ¶¶ 76-80. Thus, by "assess[ing] all the allegations holistically," the Court finds that the strong inference of fraud arising from these allegedly false assurances are sufficient, at this juncture, to establish recklessness. *Tellabs,* 551 U.S. at 326.

For avoidance of doubt, with respect to the integration statements (DE 59-1 Stmt. Nos. 2, 3, 4, 7, 8, 9, 10 20 and 22), plaintiffs have cleared the hurdle of Rule 12, if narrowly. Depending on the development of the facts herein, the Court may well reconsider this determination at a later juncture.

*EBITDA Guidance Statements*

Only two alleged false statements are attributed to defendant Komola, the CFO of Covetrus, both related to the Company's anticipated EBITDA guidance. DE 59-1, Stmt. Nos. 14

and 24; *cf. id.* Stmt. No. 23. Generally speaking, such forward-looking projections, without more, generally prove inactionable in the securities fraud context. *See City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.,* No. 17 Civ. 350 (JFK), 2019 WL 452051, at *3 (S.D.N.Y. 2019) (EBITDA expectations constitutes "a projection of revenue and future economic performance," and is therefore an inactionable, forward-looking statement absent allegations of actual knowledge of false, misleading nature."). Here, the statements fall squarely within the ambit of forward-looking statements, *see,* e.g. Stmt. No. 14 (discussing the Company's "plan for double-digit growth"), and the allegations regarding the statements' alleged falsity and Komola's knowledge thereof are conclusory at best. DE 59-1 at 24, 30, 31. Therefore, claims predicated upon the EBITDA statements are subject to dismissal.

*The Pipeline and Other Inactionable Statements*

Several remaining alleged misstatements also fail to satisfy the pleading requirements. Claims that Shaw made misstatements about the "sales pipeline" are not rebutted by proof of decline in sales, as the two concepts are not coextensive.[7] DE 59-1, Stmt. Nos. 21, 25. In fact, at oral argument, plaintiffs' counsel acknowledged that, without discovery, he could not identify the metrics used by Covetrus to define its pipeline. Tr.18 ("we haven't gotten to discovery what the specific metrics Covetrus used and how it counted what criteria customers had to meet to be included in the pipeline"). Others fall plainly into the category of forward-looking statements that are simply inactionable and/or fall within the ambit of the safe harbor provision. *See, e.g.,* DE 59-1, Stmt. No. 15 (discussing "opportunities" from the transaction, including as an

---

[7] According to one source, "[t]he sales pipeline is a tool for converting leads into sales. It provides sales leaders with a visual representation of the different stages of the sales process (such as when a prospect becomes a qualified lead or when salespeople should follow up with a lead)." *See* gartner.com. Absent specific allegations of quantifiable misrepresentations about the sales pipeline – a vague measure of sales opportunities not subject to uniform definition – it seems unlikely that a securities fraud plaintiff could adequately plead reliance on statements about the pipeline.

"example," "*will be* to leverage the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business") (emphasis added). Finally, Statement No. 26, which deals with disruption in certain deliveries, fails, as plaintiffs do not allege that Shaw had specific knowledge that deliveries were delayed, or that such delays were material. DE 59-1.

*Claims against Henry Schein and Steven Paladino*

The amended complaint purports to set forth claims against defendants Henry Schein, Inc., Stephen Paladino, the CFO of HSI and a board member of Covetrus. The only false statements attributed to Henry Schein are general forward-looking statements in the prospectus and registration statements. DE 59-1, Stmt. No. 11. Plaintiffs have failed to sufficiently allege that any of the statements identified were false or that Henry Schein had knowledge of any falsity. The most searching review of the complaint fails to reveal any allegedly false statement that can be attributed to Palladino (nor could counsel produce any at oral argument), or so much as a factual scintilla supporting scienter on the part of these parties. As such, their motion to dismiss, DE 44, is GRANTED in the entirety.

*Nature of the Dismissals*

Defendants seek dismissal with prejudice, noting that the subject complaints represent defendants' third attempt to adequately plead these matters, one of which was expressly intended to ward off a proposed motion to dismiss. Tr. 61. Counsel for plaintiffs acknowledged at oral argument that, while they have "more statements" similar in nature to those already addressed in the complaints, they could not add any new factual material in an amended complaint. Tr. 62. Thus, plaintiffs have provided "no particularized basis for any belief that any further amendment of the already-amended [c]omplaint would cure its deficiencies." *In re Razorfish, Inc. Sec.*

*Litig.,* 2001 WL 1111502, at *3 (S.D.N.Y. 2001). Thus, the dismissals of the claims against Henry Schein, Palladino and Komola, as well as the particular purported misstatements discussed above, are deemed with prejudice.

Dated: Central Islip, New York
August 3, 2021

/s/ Gary R. Brown
HON. GARY R. BROWN
United States District Judge