**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM and PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> HENRY SCHEIN, INC., COVETRUS, INC., STEVEN PALADINO, BENJAMIN SHAW, and CHRISTINE T. KOMOLA, <br><br> Defendants. | No. 2:19-cv-5530 (GRB)(RLM) <br><br><br> CLASS ACTION |

**DECLARATION OF LESTER R. HOOKER IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................................. 2

II.    PROSECUTION OF THE ACTION ......................................................................... 9

    A.    The Commencement of the Action and the Appointment of Lead Plaintiffs ......... 9

    B.    The Pleading Stage ........................................................................................ 11

    C.    Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts ..................... 16

III.   THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE ........................... 22

    A.    The Mediation Session..................................................................................... 22

    B.    The Settlement Agreement and Preliminary Approval........................................ 23

    C.    Reasons for the Settlement................................................................................. 24

IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
    APPROVAL ORDER............................................................................................... 26

V.     THE PLAN OF ALLOCATION ............................................................................... 27

VI.    THE FEE AND EXPENSE APPLICATION .............................................................. 28

VII.   THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND
    LEAD PLAINTIFFS' APPROVAL ........................................................................... 35

VIII.  CONCLUSION....................................................................................................... 37

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of David Williams, Administrator of the City of Hollywood Police Officers' Retirement System |
| B | Declaration of Rachel Maldonado, Assistant Plan Administrator of Pembroke Pines Pension Fund for Firefighters and Police Officers |
| C | Declaration of Jed D. Melnick, Esq. |
| D | Declaration of Eric Nordskog on behalf of A.B. Data, Ltd. |
| E | Declaration of Lester R. Hooker on behalf of Saxena White P.A. |
| F | Declaration of Robert D. Klausner on behalf of Klausner, Kaufman, Jensen & Levinson P.A. |

1.    I am a Director of the law firm Saxena White P.A. ("Saxena White" or "Lead Counsel"). I respectfully submit this Declaration in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Approval Motion"), and Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Motion").[1]

2.    Saxena White is Lead Counsel for Lead Plaintiffs City of Hollywood Police Officers' Retirement System ("Hollywood Police") and Pembroke Pines Pension Fund for Firefighters and Police Officers ("Pembroke Pines F&P," and together with Hollywood Police, "Lead Plaintiffs" or "Plaintiffs") and the Settlement Class in the above-captioned action (the "Action"). I have personal knowledge of the matters stated in this Declaration and if called upon as a witness, could testify competently thereto.

3.    Due to the Court's familiarity with the litigation, this Declaration does not seek to detail each and every event during the Action. Rather, the Declaration provides the Court with a summary of the prosecution of the Action, highlights of the events leading to the Settlement, and the basis upon which Lead Counsel and Lead Plaintiffs recommend the Settlement's approval, as well as the approval of Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses.

---

[1] Unless otherwise indicated, capitalized terms have the meanings set forth in the Amended Stipulation and Agreement of Settlement, dated June 17, 2022 (ECF No. 91-1) (the "Settlement Agreement" or "Stipulation"), all emphasis has been added, and internal quotation marks have been omitted. All references to "Ex." are to the exhibits hereto. Defendants are Covetrus, Inc. ("Covetrus" or the "Company") and Benjamin Shaw ("Shaw"). Dismissed Defendants are Henry Schein, Inc. ("Henry Schein" or "HSIC"), Steven Paladino ("Paladino"), and Christine Komola ("Komola"), who were named as defendants in this Action but against whom all claims were dismissed with prejudice by the Court.

## I.       **PRELIMINARY STATEMENT**

4.       After nearly three years of hard-fought litigation, Lead Plaintiffs and Lead Counsel have secured an outstanding recovery of $35,000,000 for the Settlement Class. If approved, the proposed Settlement will rank among the Eastern District of New York's ***top ten securities fraud class action recoveries in history*** and as the ***second largest securities class action settlement achieved in this District since 2010***.  The Settlement provides a very favorable result for the Settlement Class, which faced the risk of a much smaller recovery (or no recovery at all) had Lead Plaintiffs continued to litigate the Action through class certification, summary judgment, trial, and the inevitable appeals.

5.       Significantly, the proposed $35 million Settlement represents approximately 15% of the probable maximum damages that Plaintiffs could have obtained at trial—an outstanding result equivalent to ***more than three times*** the typical securities class action recovery percentage of 4.8% of damages, and ***more than four times*** the $7.9 million median recovery.[2]  Thus, by any measure, the proposed Settlement provides an outstanding benefit for the Settlement Class that far outpaces the normal range of recoveries in complex securities class actions.

6.       Before agreeing to settle this Action, Lead Plaintiffs and Lead Counsel undertook extensive efforts to advance the Settlement Class's claims and to ensure that Plaintiffs were able to maximize their recovery.  Indeed, Lead Plaintiffs and Lead Counsel initiated this Action without the benefit of any governmental actions or investigative reports by short sellers or the news media upon which Plaintiffs could "piggyback," thus developing their allegations entirely based on their own investigation.  Moreover, Lead Plaintiffs were the only institutional investors

---

[2] *See* Cornerstone Research, Securities Class Action Settlements, 2021 Review and Analysis at p. 7, *available at* https://www.cornerstone.com/wp-content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf (median recovery of 4.8% of "simplified tiered damages" for Rule 10b-5 Class Actions; median 10b-5 recovery from 2012 to 2021 was $7.9 million).

to seek a leadership position in the Action, and only one other leadership application was filed on behalf of an individual retail investor—a rare occurrence in these types of cases, where the PSLRA specifically requires that notice of the lead plaintiff deadline be disseminated to shareholders, and multiple applications by multiple willing and capable institutional investors are routinely filed. These facts underscore the perceived difficulty of the case. Absent the efforts of Lead Plaintiffs and Lead Counsel in developing and initiating this Action, it is almost certain that Settlement Class Members would have recovered nothing for their claims.

7.    Additionally, Plaintiffs and Lead Counsel expended significant litigation efforts throughout the course of the Action, including, among other things, conducting a comprehensive legal and factual investigation into the events underlying the Settlement Class's claims, which included identifying and contacting numerous potential witnesses, including former high ranking Covetrus employees. This culminated in the drafting of three highly detailed complaints. The operative complaint—the Amended Complaint—was drafted as a result of Lead Counsel's continuing investigation into the Company and Plaintiffs' allegations and included facts concerning alleged admissions from the Company's new CEO that were disseminated after the filing of the initial complaint and the Consolidated Complaint. Furthermore, Lead Plaintiffs successfully opposed in part Defendants' motion to dismiss, which meaningfully challenged every major element of Plaintiffs' claims. Thereafter, Plaintiffs aggressively pursued extensive discovery, including obtaining and reviewing nearly 400,000 pages of documents produced by Defendants and third parties, preparing to take or defend at least 14 fact and expert depositions, and commencing work on Plaintiffs' upcoming motion for class certification.

8.    Furthermore, the Settlement is particularly noteworthy when considering the substantial risks had the litigation continued, as Plaintiffs faced formidable defenses from

3

Defendants regarding falsity, scienter, loss causation and damages.  In fact, at the pleading stage, the Court credited many of Defendants' arguments and noted that the sustained allegedly false statements "narrowly overc[a]me" dismissal.  *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.,* 552 F. Supp. 3d 406, 412 (E.D.N.Y. 2021) (Brown, J.).  In particular, the Court dismissed claims against all but two defendants; dismissed 17 of the 26 statements Plaintiffs alleged were materially false and misleading; and informed the Parties that the viability of the surviving claims would be revisited as the litigation progressed.  *See id.* at 417 ("For avoidance of doubt, with respect to the integration statements (DE 59-1 Stmt. Nos. 2, 3, 4, 7, 8, 9, 10, 20 and 22), *plaintiffs have cleared the hurdle of Rule 12, if narrowly.  Depending on the development of the facts herein, the Court may well reconsider this determination at a later juncture*").  The risk that the Settlement Class would recover nothing was not merely hypothetical, especially where, as here, Plaintiffs faced the immediate possibility of an adverse decision at class certification or summary judgment.

9.      Indeed, Defendants would have continued to vigorously assert their defenses on every major element of Plaintiffs' claims throughout the litigation.  For example, with respect to falsity, Defendants would have continued to advance arguments, purportedly supported by internal documents, that Defendants' statements were not in fact misleading, and that Defendants, in fact, fully warned the market that Covetrus' integration was not complete and carried ongoing risks.  *See, e.g.*, ECF No. 45-1 at 1-4.  With respect to scienter, Defendants would have argued that Defendant Shaw had no knowledge of, or motive to commit, the alleged fraud, particularly given that he sold no stock during the Class Period.  *See, e.g., id.* at 28.  With respect to loss causation and damages, Defendants would have argued that non-fraud-related factors, such as a sluggish animal health market and reduced EBITDA guidance due to planned

4

IT infrastructure spending, caused the decline in Covetrus' stock price, rather than disclosures relating to the allegedly false and misleading statements. *See, e.g., id*. at 39-40.

10.    While Lead Plaintiffs had arguments to respond to these points, there is no question that Defendants' arguments could have been accepted by the jury at trial.  In fact, if the jury ultimately concluded that a substantial portion of the stock price declines on August 13 and August 14, 2019 were not attributable to the alleged fraud, the potential recovery could have been reduced dramatically—or even eliminated.  Moreover, even a favorable jury verdict would have been subjected to an inevitable and lengthy appeals process, the conclusion of which would have been highly uncertain.  Accordingly, even if Lead Plaintiffs had prevailed at trial, it is highly questionable as to whether Lead Plaintiffs would have recovered more than (or even as much as) the substantial Settlement Amount.

11.    Further, Plaintiffs submit that the value provided by the Settlement's definite and immediate benefit to the Class far outweighs the mere future possibility of recovery after protracted litigation.  Indeed, courts nationwide have held that the presumption in favor of voluntary settlement agreements is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation. *See Clem v. Keybank, N.A.*, 2014 WL 2895918, at *5 (S.D.N.Y. June 20, 2014) (Francis, J.) ("courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere"); *Peace Officers' Annuity and Benefit Fund of Georgia v. DaVita Inc.*, 2021 WL 1387110, at *4 (D. Colo. Apr. 13, 2021) ("Courts have held that the presumption in favor of voluntary settlement agreements is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").

5

12.    The Settlement is also eminently fair, adequate, and reasonable given the extensive settlement negotiations between the Parties, including at the formal mediation session before nationally renowned independent and experienced mediator, Jed D. Melnick, Esq.  *See* Ex. C.  In preparation for the mediation, the Parties submitted detailed mediation statements, made extensive presentations on liability and damages, and engaged in vigorous debate about the strengths and weaknesses of their positions.  *See id.* at ¶¶4-5.  It was only after these lengthy negotiations and a mediator's proposal that the Parties agreed to settle the Action and proceeded to memorialize their agreement in the Stipulation.  *See id.* at ¶¶5-6.

13.    Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and respectfully submit that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors that courts in the Second Circuit consider in the settlement approval process, as set forth in Federal Rule of Civil Procedure 23(e) and *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

14.    In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation ("Plan") as fair and reasonable.  To prepare the Plan, Lead Plaintiffs engaged Global Economics Group LLC, a well-recognized firm of professionals with economic, financial, and statistical expertise who have been engaged in some of the most prominent and complex class action securities matters in the last several decades. Under the proposed Plan of Allocation set forth in the Court-approved Notice, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Class who timely submit valid proofs of claim based on their "Recognized Loss Amount" as calculated pursuant to the Plan.

15.     Lead Counsel also requests an award of attorneys' fees for their efforts, which resulted in a substantial recovery for the Settlement Class in the face of significant risks, and for reimbursement of their litigation expenses.  Specifically, Lead Counsel is applying for an attorneys' fee award of one-third of the Settlement Fund.  Lead Counsel is also seeking reimbursement of Litigation Expenses in the amount of $159,480.05, to be paid from the Settlement Fund.

16.     The requested fee is well within the range of fees routinely approved by courts in this Circuit and around the country in comparable securities or complex class actions, and is amply supported by the each of the relevant factors set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).  *See e.g., Toure v. Amerigroup Corp.,* 2012 WL 3240461, at *5 (E.D.N.Y. Aug. 6, 2012) (Mann, J.) ("Class Counsel's request for one-third of the fund is reasonable and consistent with the norms of class litigation in this circuit"); *Fulton Cty. Empl. Ret. Sys. v. Blankfein*, No. 19-CV-1562 (VSB) (ECF No. 93) (S.D.N.Y. Sept. 16, 2022) (Broderick, J.) (noting that "'[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater"); *Nichols v. Noom, Inc.,* 2022 WL 2705354, at *10 (S.D.N.Y. July 12, 2022) (Parker, J.) (awarding fee of one-third of $56 million settlement fund, finding "[a] fee equal to one-third of a settlement fund is routinely approved in this Circuit"); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,* 2020 WL 6193857, **5-6 (E.D.N.Y. Oct. 7, 2020) (Gershon, J.) (approving fee of one-third of $51.25 million settlement); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2019 WL 4734396, at *6 (S.D.N.Y. Sept. 23, 2019) (Broderick, J.) (one-third fee awarded on a $75 million recovery); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2022 WL 3220783, at *1 (S.D.N.Y. Aug. 5, 2022) (Schofield, J.) (one-third fee awarded on $44 million PSLRA recovery); *In re Perrigo Company PLC Sec. Litig.*, 2022 WL

7

500913, at *1 (S.D.N.Y. Feb. 18, 2022) (Cote, J.) (one-third fee awarded in $31.9 million PSLRA recovery); *In re Cnova N.V. Sec. Litig.*, 2018 WL 11447878, at *3 (S.D.N.Y. Mar. 20, 2018) (Swain, J.) (one-third fee awarded for $28.5 million recovery in action that settled prior to a motion to dismiss ruling); *Landmen Partners,* 2013 WL 11330936, at *3 (S.D.N.Y. Dec. 18, 2013) (Baer, J.) (one-third fee awarded on $85 million recovery).

17.    The reasonableness of the requested one-third fee is also confirmed by a lodestar cross-check, which yields a multiplier of 2.0, which is at the lower end of the range of multipliers routinely awarded in the Second Circuit. *See, e.g., Kelwin Inkwel, LLC v. PNC Merch. Servs. Co., L.P.,* 2022 WL 3127633, at *5 (E.D.N.Y. Apr. 12, 2022) (Block, J.) (approving one-third fee equivalent to 2.54 lodestar multiplier and noting that "'[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers[,]'"); *Cnova*, No. 1:16-cv-00444, ECF No. 139 at 2, 22-23 (S.D.N.Y. Dec. 22, 2017) and 2018 WL 11447878, at *3 (awarding one-third fee equaling a 3.79 multiplier).

18.    In accordance with the PSLRA, Lead Plaintiffs Hollywood Police and Pembroke Pines F&P seek reimbursement of their reasonable time and expenses incurred directly in connection with their representation of the Settlement Class, in the amounts of $10,200 and $3,284.25, respectively.    The considerable time and effort devoted to this Action by the representatives of Lead Plaintiffs in actively supervising this litigation over a multi-year period—which included reviewing pleadings, memoranda of law, and mediation submissions, responding to discovery requests, collecting and producing numerous documents, and overseeing the Settlement, is detailed in the accompanying Lead Plaintiff Declarations. *See* Exs. A and B.

19.    Significantly, although the deadline for objections and exclusions has not passed, to date, no members of the Settlement Class have objected to any aspect of the Settlement, the

8

Plan of Allocation, or the attorneys' fees and expenses request, and no investors have requested exclusion.  This reaction of the Settlement Class is significant, given that the vast majority of the Settlement Class consists of sophisticated institutional investors with the resources and motivation to opt-out or object, if warranted.   Moreover, Lead Plaintiffs—sophisticated institutional investors who have actively supervised the prosecution of this Action, who fully understand their fiduciary duties to act in the best interests of the Settlement Class, and who have achieved notable settlements on behalf of investors—wholly endorse the Settlement and the requested fee and expense award.  *See* Exs. A and B.

20.     For all of the reasons discussed in this Declaration, its attached exhibits, and in the accompanying memoranda, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Plaintiffs respectfully submit that their motion for an award of attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     The Commencement of the Action and the Appointment of Lead Plaintiffs

21.     On September 30, 2019, Hollywood Police filed the original securities class action complaint in this litigation, thereby commencing the Action.  ECF No. 1.  Hollywood Police's preliminary investigation was based upon review and analysis of publicly available information concerning the Company, including: (a) Covetrus' public filings with the SEC; (b) press releases and other publications disseminated by Covetrus and other related non-parties; (c) news articles, shareholder communications, conference call transcripts, and postings on Covetrus' website concerning the Company's public statements; and (d) other publicly available information concerning the Company.   Importantly, Lead Counsel and Hollywood Police

9

commenced the Action and formulated their allegations and theories of the case entirely based on their own seven-week investigation, and without the aid of any governmental actions or inquiries, short seller reports, media investigations, or any clear public admission by Defendants that could serve as a roadmap for the claims asserted against Defendants. Lead Counsel's careful investigation prior to initiating the Action shows that they were able to develop unique insight into the facts of the case, and that Lead Plaintiffs' efforts at evaluating their claims and initiating and maintaining the Action were critical to the Settlement Class's ability to obtain a recovery.

22.     On December 23, 2019, the Court appointed Hollywood Police and Pembroke Pines F&P as Lead Plaintiffs and approved Saxena White P.A. as Lead Counsel. *City of Hollywood Police Officers Retirement System v. Henry Schein, Inc.*, 2019 WL 13167890, at *8 (E.D.N.Y. Dec. 23, 2019) (Mann, J.). The Court found that Lead Plaintiffs were "institutional investors with substantial financial interest in the litigation" with the "resources, experience, and incentive to vigorously represent the Class and prosecute this action against the Defendants." *Id.* at *6. The Court also found that Lead Counsel had "substantial experience litigating securities fraud class actions" and noted that "[o]ther courts have concluded that, based on Saxena White's experience, it is qualified to serve as lead or co-lead counsel in securities law cases." *Id.* at *7.

23.     Thereafter, Lead Counsel continued to conduct an extensive investigation of Plaintiffs' claims. In addition to expanding upon their initial review and analysis of publicly available information regarding the two companies that were merged together to form Covetrus (Vets First Choice ("VFC"), which operated a veterinary prescription management business, and Henry Schein, Inc.'s ("HSIC") spun-off animal health division containing its veterinary supply and veterinary practice management businesses) and the veterinary supply industry, Lead Counsel's multi-faceted investigation included: (i) contacting and/or interviewing at least 140

10

former employees of Covetrus, VFC, and/or HSIC, including at least eleven who provided detailed information that was highly important in developing and supporting Plaintiffs' claims; (ii) reviewing additional research reports by securities and financial analysts concerning Covetrus; (iii) continuing to monitor Covetrus' SEC filings and earnings call transcripts as they were filed or occurred; (iv) analyzing data reflecting the pricing of Covetrus common stock; and (v) consulting with experts on market efficiency, loss causation, and damages.

24.    Lead Counsel's investigation significantly bolstered the strength of Plaintiffs' claims.  Without the benefit of discovery, Lead Counsel relied heavily on their interviews with former employees of VFC, Covetrus, and HSIC, which produced detailed accounts that were critical in learning the specifics of the alleged fraud.  Lead Counsel's ongoing review of Covetrus' SEC filings and conference call transcripts would also prove especially significant during the pleading stage, as detailed further below.

**B.    The Pleading Stage**

25.    Plaintiffs filed their Consolidated Complaint on February 21, 2020.  ECF No. 23.

26.    In March 2020, Covetrus' new CEO, Benjamin Wolin ("Wolin"), made statements on two conference calls that Plaintiffs believed amounted to admissions to many of their claims.  Plaintiffs would later allege that, in contrast to Defendants' claims that the integration had been successful, Wolin stated that the opposite was true: that even then, more than a year after the spin-off, the two companies were "still transacting along the way that we did when they were separate entities"; that Covetrus was not even trying to "push[] the 2 sales forces together" from the merged companies; and that by March 2020, Covetrus was only "starting to see some integration of prescription management into [practice management software]."  ECF No. 41 at ¶4.  By continuing to review Covetrus' SEC filings and conference call transcripts,

Lead Counsel identified these statements as relevant to Plaintiffs' claims and sought to amend the Consolidated Complaint. The Parties jointly moved for leave to amend on May 7, 2020 (ECF No. 39), which motion the Court so ordered on May 8, 2020.

27.    Plaintiffs subsequently filed their 98-page Amended Complaint (the "Complaint") on May 21, 2020 (ECF No. 41), incorporating allegations related to Wolin's March 2020 statements. The Complaint alleged that, prior to and throughout the Settlement Class Period (which begins on the day Covetrus common stock began trading publicly), Defendants made materially false and misleading statements and omissions regarding the integration of VFC and HSIC's animal health businesses into Covetrus, including, most significantly, statements regarding the integration of VFC's prescription management platform with the suite of veterinary practice management software ("PiMS") spun-off from HSIC; the merging of the organizations' sales forces into one; and the ability of Covetrus to present "one face to the customer," *i.e.*, to create a unified, full-service platform that could meet all of the supply, practice management, and technology needs of veterinary practices. *See, e.g.*, Complaint ¶¶38-41, 127, 133, 135, 137, 141, 145, 147, 149. The Complaint alleged that the statements about the integration were material to investors, because as the Court later summarized, the "[k]ey to the merger was the expectation that VFC's technological platform, which helped veterinarians increase prescription compliance by pet owners could be combined with" the spun-off HSIC businesses' "broad product offerings to yield substantial profits, bolstered by cross-selling of products by a combined sales team." *City of Hollywood Police Officers' Ret. Sys.*, 552 F. Supp. 3d at 410.

28.    The Complaint further alleged that Covetrus' common stock price was artificially inflated throughout the Settlement Class Period due to Defendants' materially false and misleading statements and omissions, and that shareholders were harmed when the truth about

the alleged fraud was revealed.  Plaintiffs alleged that the truth regarding the fraud was revealed on August 13, 2019, when Covetrus announced results for the second quarter of 2019, which led to a two-day stock price decline of 47%, from a close of $23.19 per share on August 12, 2019 to a close of $12.35 per share on August 14, 2019.  *See, e.g.,* Complaint ¶¶101, 177.

29.     Pursuant to the Court's chamber rules, on October 21, 2020, all briefing of the motions to dismiss was filed simultaneously, after briefing was complete.  ECF Nos. 44 and 45. On July 2, 2020, (i) HSIC and Paladino (the "HSIC Defendants") and (ii) Covetrus, Shaw, and Komola (the "Covetrus Defendants") served their motions to dismiss the Amended Complaint (respectively, the "HSIC MTD" and "Covetrus MTD").  *See* ECF Nos. 44-1 and 45-1.

30.     Among other things, the HSIC MTD argued: (i) that Plaintiffs had failed to adequately allege that any of the statements attributed to the HSIC Defendants were false; (ii) that "nearly all" the alleged false statements were forward-looking statements protected by the PSLRA safe harbor; (iii) that many of the alleged false statements were vague statements of corporate optimism upon which no investor would rely; (iv) that Plaintiffs had failed to allege scienter for the HSIC Defendants because Plaintiffs had not alleged that Covetrus' failure to meet financial expectations was known to Covetrus until months after the alleged false statements by the HSIC Defendants were made; and (v) that the Complaint had not adequately alleged loss causation because the alleged corrective disclosure did not correct any statements attributed to the HSIC Defendants.  *See, e.g.*, ECF No. 44-1 at 7-20.

31.     Additionally, the Covetrus MTD argued that a number of alleged false statements, including statements related to financial guidance, were forward-looking statements protected by the PSLRA safe harbor; that the other remaining statements were either vague statements of optimism, and therefore immaterial as a matter of law; or that such statements were, in fact,

13

accurate statements about the integration. *See, e.g.*, ECF No. 45-1 at 8-23. The Covetrus MTD argued that Plaintiffs had not pleaded facts supporting a strong inference of scienter, because: (i) Plaintiffs had not alleged any actionable motive such any suspicious sales of stock by Covetrus insiders, including Shaw, during the Settlement Class Period; (ii) Plaintiffs had not identified specific facts to show that the Covetrus Defendants knew that their statements were false when made (e.g. during direct meetings between Shaw or Komola and any confidential witnesses); (iii) the allegations made by confidential witnesses were conclusory and vague; (iv) the "core operations" doctrine did not apply; and (v) Wolin's statements after the Settlement Class Period did not constitute admissions by any Covetrus Defendant. *See id.* at 27-37. Finally, the Covetrus MTD asserted that the decline in Covetrus' stock price following the August 13, 2019 announcement of disappointing financial results was the result of market factors unrelated to the alleged fraud, and that, regardless, the Company had previously disclosed the risks associated with the integrations and had made clear that the integration was a work in progress. *See id.* at 38-40.

32.   On September 8, 2020, Lead Plaintiffs served an omnibus opposition to the motions to dismiss. ECF No. 44-5. Among other things, Plaintiffs argued that: (i) Defendants had previously made highly specific representations that the Company's core software platforms and sales organizations had been successfully integrated, and that the Company admitted the falsity of these representations on August 13, 2019; (ii) Defendants' statements were not forward-looking because they included statements about present and past facts; (iii) the Complaint adequately alleged a strong inference of scienter because Shaw himself stated that personally overseeing the integration was his "most important job," and Covetrus' Board had fired both Shaw and Komola in order to "rebuild trust with investors"; and (iv) the Complaint

adequately alleged loss causation because, on August 13, 2019, Covetrus disclosed the integration failures and disastrous financial results tied to such failures, causing Covetrus' stock price to plummet by nearly 50%, wiping out over $1 billion in market capitalization. *See* ECF No. 45-23 at 4-44.

33.     On October 21, 2020, Defendants filed their various replies in further support of their motions to dismiss. ECF Nos. 44-6, 45-24.

34.     On July 23, 2021, pursuant to Court order, Plaintiffs filed a False Statement Chart (ECF No. 59-1), which summarized and numbered the statements alleged as false in the Amended Complaint, for use at the upcoming hearing on the motions to dismiss, which the Court conducted on July 27, 2021.

35.     On August 3, 2021, the Court issued an Order granting the HSIC MTD and granting in part and denying in part the Covetrus MTD. *See City of Hollywood Police Officers' Ret. Sys.*, 552 F. Supp. 3d at 410. The Court held that Plaintiffs had stated actionable claims for eight statements made by Shaw on various occasions, and one statement made by Covetrus in its 2018 Form 10-K, as well as actionable claims against Shaw under Section 20(a) of the Exchange Act. *Id*. at 417. The sustained false statements generally pertained to Covetrus' sales force integration and the IT integration. The Court found that "Shaw repeatedly assured investors that these critical integration processes had been successfully completed, while his successor, months later, acknowledged that no integration had taken place." *Id*. at 416-17. The Court found that scienter was adequately alleged for Shaw because of his significant financial stake in the merger and because the undisclosed facts about the actual state of the integration created an inference of recklessness at a minimum. *Id*. at 416.

15

36. The Court dismissed all other claims and all Dismissed Defendants with prejudice, including alleged false statements about EBITDA guidance (which the Court held to be inactionable forward-looking statements) and alleged false statements about Covetrus' sales pipeline. *Id*. at 417-18. Importantly, even though the Court had sustained nine statements as actionable, it noted that Plaintiffs had only "narrowly" succeeded at "clear[ing] the hurdle" of the PSLRA, and that although certain of Defendants' statements about Covetrus' IT integration could "survive the motion to dismiss," their survival was "[a] close[] question," and "[d]epending on the development of the facts herein, the Court may well reconsider" its sustaining of these statements "at a later juncture." *Id.* at 416-17.

### C.    Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts

37. Given the length of the Settlement Class Period, the scope of Plaintiffs' claims, and the complex subject matter at issue in this Action, factual discovery was a significant undertaking. From September 2021 through April 2022, counsel for Lead Plaintiffs and Defendants engaged in extensive fact discovery. Among other things, Plaintiffs served document requests on Defendants and subpoenaed certain third parties, including Henry Schein. Defendants produced more than 41,000 documents to Plaintiffs, comprising a total of over 392,000 pages, and Plaintiffs effectively reviewed all of these documents over a period spanning less than four months, between January and April 2022, as Defendants had produced virtually none of the documents prior to that time. The volume and intensity of work done by Lead Plaintiffs during this compressed time period is extraordinarily compelling evidence of Lead Plaintiffs' vigorous prosecution of and commitment to this Action, as set forth below.

38. Lead Plaintiffs served Defendants with their First Requests for Production of Documents on September 7, 2021. These 55 requests sought, among other things, documents

16

concerning: (i) plans and efforts to integrate the Company and its legacy business, before and after the merger of VFC and HSIC's animal health businesses to form Covetrus (the "Merger"); (ii) the due diligence for the Merger, including retrospective analyses; (iii) the false and misleading statements and corrective disclosures alleged in the Complaint; (iv) the statements made by Wolin in March 2020; (v) Defendants' communications with journalists, analysts, and investors; and (vi) recurring or one-time investments, costs, or expenditures by Covetrus resulting from the Company's integration disclosed on August 13, 2019. Defendants served their responses and objections to Plaintiffs' first document requests on October 7, 2021.

39.    The Parties frequently exchanged correspondence and held numerous meet-and-confers to negotiate the appropriate scope of discovery. These interactions involved lengthy disputes about the length of the relevant time period, which custodians' e-mail accounts should be searched, and what search terms to use.

40.    In response to Plaintiffs' requests, Defendants produced e-mails and attachments from the custodial files of individual custodians, including Defendant Shaw. Ultimately, Defendants made multiple document productions, beginning on December 11, 2021, and concluding on April 1, 2022.

41.    On October 26, 2021, the Court conducted a Rule 26(f) hearing with counsel for the Parties. The Court entered a schedule, ordering: (i) document discovery to be substantially completed by January 28, 2022; (ii) fact discovery to close on March 30, 2022; (iii) expert discovery to close on July 13, 2022; (iv) that requests for a premotion conference to move for summary judgment were due by July 19, 2022; and (v) that if Plaintiffs wished to file for class certification before a ruling on a summary judgment motion, they should first request a premotion conference. ECF No. 80.

17

42.    Defendants served document requests and interrogatories on Plaintiffs on November 4, 2021 and subpoenaed Plaintiffs' investment advisors on January 21, 2022. Defendants made 40 separate and distinct document requests (not including subparts) and sought wide-ranging information concerning this Action, Lead Plaintiffs' investments, their roles as Lead Plaintiffs and proposed Class Representatives, their business operations, and numerous other topics.  Plaintiffs served their responses and objections to Defendants' document requests on December 6, 2021 and to Defendants' interrogatories on December 13, 2021.  The Parties exchanged correspondence to determine the parameters of Lead Plaintiffs' productions. Ultimately, Lead Plaintiffs and their investment advisors produced 215 documents in response to Defendants' requests, totaling over 8,700 pages.

43.    On November 23, 2021, Lead Plaintiffs subpoenaed Henry Schein, Inc., making 16 separate and distinct requests for the production of documents concerning, among other things: (i) plans or efforts to integrate the HSIC PiMS software with the VFC prescription management software; (ii) plans to integrate the sales forces of the two companies; (iii) due diligence on the merger, including retrospective analyses; and (iv) HSIC's decision to merge its animal health businesses with VFC.  On December 30, 2021, HSIC served its responses and objections to Plaintiffs.  Critically, HSIC responded that it did not intend to search for or produce any documents responsive to any of Plaintiffs' requests.  Lead Counsel and HSIC's counsel conducted a meet and confer on January 4, 2022 to make a good faith effort to resolve their impasse, but failed to reach an agreement.  At this point, Plaintiffs prepared to move to compel production from HSIC, including preparing a draft motion.  Ultimately, the two sides were able to begin a process that would have resulted in production of potentially thousands of documents had this Action not settled on April 6, 2022.

18

44.     On February 16, 2022, the Parties moved for an extension of the deadlines in the case schedule, because they required additional time to prepare for fact witness depositions in light of the fact that Defendants had produced a large volume of documents close to or shortly after the January 28, 2022 substantial completion deadline.  ECF No. 84.  In this motion, the Parties proposed extending all deadlines by approximately 45 days.  On February 16, 2022, the Court granted the joint request to extend the schedule, agreeing to new deadlines as proposed by the Parties, but directed the Parties to file a joint status report concerning their efforts to engage in private mediation by March 31, 2022.  Thus, absent the Settlement, all depositions (and any other remaining fact discovery) would have been completed at an accelerated pace over the course of just five weeks (in the period from April 8, 2022 through the close of fact discovery on May 16, 2022) requiring significant attorney time and expense.

45.     Lead Counsel's discovery plan leveraged a sophisticated electronic document hosting system and a dedicated team of attorneys with substantial experience in electronic document discovery, deposition, and trial preparation.  Attorneys on the litigation team prepared and continuously updated a highly detailed document review coding manual and protocol, which included detailed case information as well as instructions on coding documents.  Document reviewers were trained to code documents for level of responsiveness or importance to the case (e.g., "Hot," "Warm," "Relevant," "Irrelevant") and for case issues (e.g., "software integration," "sales force integration," and "scienter").  Throughout document discovery, the senior attorneys in the litigation team met regularly with staff attorneys to ensure their understanding of the case and discuss key facts uncovered by the review, and the staff attorneys were instructed to prepare detailed memoranda on potential witnesses and subject matters of importance to assist the senior attorneys in their preparations for depositions and further litigation.

46.     Many of the documents produced to Plaintiffs were substantively complex and laden with veterinary and IT jargon and terms of art.  As such, Lead Counsel also developed and continuously updated a set of reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, a list with descriptions of the many software platforms operated by Covetrus, and a glossary of technical terms and acronyms utilized in the veterinary industry.

47.     The Parties had negotiated a schedule for depositions in principle, with depositions set to commence in mid-April 2022.  To prepare for fact witness depositions, attorneys on the review team were assigned to conduct an in-depth review of the custodial files of and other relevant documents for each potential deponent and identify key documents and issues for that deponent.  During this process, attorneys met multiple times to discuss potential deposition candidates, review samples of relevant documents for these candidates, and debate the relative merits of each.  A similar process was conducted to prepare to defend the depositions of Lead Plaintiffs, which included the preparation of detailed memoranda and materials for review by Lead Counsel and representatives of Lead Plaintiffs.  Lead Counsel also secured third-party vendor Veritext Legal Solutions to manage the logistics of the planned remote depositions and to assist with the subpoenaing of certain individuals in the event the mediation was unsuccessful.[3] One former Covetrus employee (not represented by Defendants' counsel) had relocated to Mexico, and Plaintiffs likely would have had to spend significant time and expense to ensure that this deposition occurred.

---

[3] While no depositions were ultimately conducted, a certain amount of logistical groundwork by Lead Counsel was necessary to be prepared to meet the planned deposition schedule had the Parties not agreed to the Settlement.

48.     Lead Counsel consulted with Mr. Chad Coffman, CFA and his team at Global Economics Group LLC to provide expert advice on market efficiency, damages, and loss causation issues, and such consultations continued throughout the litigation of the Action.  Most importantly, in connection with the Parties' April 6, 2022 mediation, Mr. Coffman and his team provided numerous detailed analyses of class-wide damages, which were essential components to the successful negotiation of the Settlement.

49.     Although the Court had not entered a schedule for briefing of class certification, Lead Counsel conducted a thorough factual and legal investigation into the merits of such a motion.  Plaintiffs were preparing to move the Court for permission to file a motion for class certification in mid to late April 2022, had there been no successful conclusion to the April 6, 2022 mediation.  To prepare for this, Lead Counsel had requested and received an advanced draft market efficiency report from Global Economics Group and had prepared substantial portions of a draft memo in support of the motion.  Although no such motion was filed, Lead Counsel was able to develop a strong understanding of the strengths and weaknesses related to class certification that was critical in advancing class certification-related arguments during the April 6, 2022 mediation.  Based on these efforts, Lead Counsel determined that Plaintiffs likely would secure certification of a class with an identical or highly similar scope to the Settlement Class, but that there was no guarantee of this.

50.     In sum, Lead Counsel devoted substantial time to reviewing and analyzing the documents provided by Defendants.  Lead Counsel generated an effective and efficient discovery plan and took significant steps designed to quickly identify the custodians and documents most important to uncovering the facts at the heart of the Action.  As a result of these efforts, Lead Counsel was able to utilize key documents found in discovery in connection with the Parties'

settlement negotiations. Accordingly, Lead Counsel's extensive and targeted discovery efforts were crucial to achieving the highly favorable Settlement for the Class.

## III.    THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

51.    The $35,000,000 cash settlement was the result of arm's-length negotiations between experienced and well-informed counsel, overseen by a highly qualified and well-respected independent mediator, and reached as a result of a full day, in-person mediation session consisting of vigorous negotiations regarding a potential resolution of the Action. The Settlement provides the Class with an immediate and substantial benefit before trial and eliminates the very real risk of protracted litigation through trial and appeals under circumstances where a favorable recovery—or any recovery at all—could not have been assured. Lead Counsel accordingly believes that the Settlement is fair, adequate, and reasonable, and that it represents an excellent result for the Class.

### A.    The Mediation Session

52.    The Parties had intended to pursue mediation from the outset of discovery once they had undertaken a sufficient review of the various productions, but, as noted above, in granting an extension of the schedule, the Court ordered that the Parties file a joint status report concerning their efforts to engage in private mediation by March 31, 2022. The Parties filed a status report on March 30, 3022, advising the Court that the Parties had scheduled a mediation before Jed D. Melnick of JAMS and would submit a status report by April 8, 2022 advising the Court of the result of the scheduled mediation, which was so ordered by the Court. ECF No. 85.

53.    On April 6, 2022, the Parties and Defendants' liability insurance carriers participated in the mediation with Mr. Melnick serving as mediator. The mediation session took place in person at JAMS in New York City. In advance of the mediation, the Parties submitted

and exchanged detailed mediation statements and exhibits, which addressed, among other things, issues related to falsity, scienter, loss causation, and damages.  During the mediation session, Plaintiffs shared their positions and conveyed to the mediator their understanding of the strengths and weaknesses of their claims and the defenses in this Action, as well as potential sources of recovery.

### B.     The Settlement Agreement and Preliminary Approval

54.     After the full-day mediation, on April 7, 2022, the mediator, Mr. Melnick, made a proposal to settle the Action for $35,000,000.  On April 8, 2022, the Parties accepted the mediator's proposal.

55.     After agreeing on the broad contours of the proposed Settlement, the Parties engaged in extensive negotiations regarding the material terms of the Stipulation; the Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Class reach a certain threshold—a standard agreement in securities class action settlements generally called a "blow provision"; and various supporting documents, including proposed Class notices and proposed orders for the Court.

56.     On May 9, 2022, Lead Plaintiffs filed their motion for preliminary approval of the proposed Settlement, along with a stipulation and exhibits.  ECF Nos. 87-89.  On May 17, 2022, Defendants filed a notice of compliance with the requirements of the Class Action Fairness Act.  ECF No. 90.  On June 17, 2022, in response to the Court's June 9, 2022 order, Plaintiffs filed a corrected Stipulation and revised exhibits, and provided other requested information to the Court.  ECF Nos. 91-92.  On July 5, 2022, Magistrate Judge Roanne L. Mann recommended granting Plaintiffs' motion for preliminary approval of the proposed Settlement, which recommendation was adopted by Judge Gary R. Brown on July 15, 2022.  On July 19, 2022, the Parties consented

to referral of the Settlement Approval Motion and the Fee Motion to Magistrate Judge Mann, which Judge Brown so ordered. ECF No. 94. On July 19, 2022, the Court scheduled a Settlement Fairness Hearing before Magistrate Judge Mann for October 25, 2022.

### C.    Reasons for the Settlement

57.    The Settlement provides the Class with an immediate and certain cash benefit of $35 million. The Settlement thus represents one of the top ten largest recoveries in securities class actions in the history of this District, and the second largest securities class action settlement in this District since 2010. Moreover, the Settlement represents a high percentage (15%) of the likely maximum recoverable damages for the Settlement Class at trial—which Plaintiffs' expert estimated at $241 million.[4] Thus, the Settlement is more than three times the typical recovery of 4.8% of damages in comparable securities class action settlements, and more than four times the $7.9 million median size of such settlements nationwide. Moreover, as discussed further below and in the memoranda of law in support of the Settlement Approval Motion and the Fee Motion, the extraordinary nature of the Settlement is further underscored by the fact that Defendants had credible arguments that damages in the Action were significantly lower than Plaintiffs' expert's estimated maximum damage amount. These arguments could have been credited by the Court at class certification or summary judgment, or by the jury at trial, which could have resulted in a dramatically lesser recovery, or no recovery at all, for the Settlement Class.

58.    Lead Plaintiffs and Lead Counsel fully endorse the Settlement. *See* Exs. A and B. Court-appointed Lead Plaintiffs are sophisticated institutional investors who have actively

---

[4] Plaintiffs' expert computed a range of $241-298 million in damages; however, the upper end of that range did not account for the fact that Covetrus' stock price recovered significantly the day after the stock price decline at the end of the Class Period; thus the $241 million damage estimate (which does account for the stock price recovery) is the most realistic estimate of maximum recoverable damages.

overseen the prosecution of this Action for almost three years and have executed their fiduciary duty to act in the best interests of the Settlement Class. Lead Counsel, Saxena White, specialize in complex securities class action litigation, and are highly experienced in such litigation. *See* Ex. E, at Ex. 3 (Saxena White firm resume). Based on their experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead Plaintiffs have determined that the Settlement is in the best interests of the Settlement Class. Both Lead Plaintiffs agree that the "Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation." Exs. A and B at ¶9.

59. Indeed, while the claims asserted in this Action are meritorious, continued litigation against Defendants posed significant risks that made recovery in any amount uncertain. For example, Plaintiffs were aware of significant challenges that Defendants raised in their motion to dismiss and in Defendants' mediation statement on the key issues of falsity, scienter, loss causation, and damages, as elaborated further *supra*. Indeed, although Lead Plaintiffs' claims survived dismissal in part, the Court dismissed a majority of the false statements alleged by Plaintiffs and all but two of the named defendants, explicitly warning that the remaining claims had only "narrowly" survived. *See City of Hollywood Police Officers' Ret. Sys.*, 552 F. Supp. 3d at 417, 418. The risk of dismissal would have continued to resurface at every subsequent stage of the litigation—at class certification, summary judgment, at trial, and on appeal. Had any of Defendants' arguments been accepted in whole or in part, any potential recovery would have been dramatically reduced or eliminated altogether.

60. Moreover, even if Lead Plaintiffs had prevailed at trial, Defendants might have convinced a jury to award a fraction of Plaintiffs' estimated maximum recoverable damages, by contending that the Covetrus stock price drop at the end of the Class Period was substantially due

to market forces unrelated to the fraud rather than the alleged corrective disclosure.  Regardless, such arguments undoubtedly would have resulted in a "battle of the experts" at trial with no certainty of which expert the jury would credit.

61.    Furthermore, the proceeds of Defendants' insurance policies were rapidly wasting.  Continued litigation likely could have significantly reduced the remaining proceeds and thereby hampered the Settlement Class in obtaining a larger recovery than the Settlement Amount, even if the Settlement Class prevailed in full at class certification, summary judgment, or trial.  Thus, there were very significant risks attendant to the continued prosecution of the Action against Defendants.

62.    The Settlement eliminates these substantial risks and guarantees the Settlement Class a favorable, certain cash recovery.  Lead Counsel firmly believe that settling the Action with Defendants at this stage in the litigation is in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

63.    As required by the Court's Preliminary Approval Order, beginning on August 5, 2022, Lead Plaintiffs, through their Claims Administrator, A.B. Data,[5] notified Settlement Class Members of the Settlement by mailing a copy of the Notice to Settlement Class Members and their nominees.  *See* ECF No. 91-3; Ex. D, ¶¶3-10.  In the aggregate, as of September 19, 2022, A.B. Data has disseminated 54,467 copies of the Notice to Settlement Class Members and their nominees.  Ex. D, ¶10.

---

[5] Lead Counsel selected A.B. Data via a bidding process in which several prospective administrators submitted bids. Lead Counsel chose A.B. Data for a combination of reasons including the relatively lower projected cost of its proposed notice and claims administration program, its qualifications and experience, and Lead Counsel's positive experiences with A.B. Data in other recent matters.

26

64.     In addition, on August 8, 2022, the Summary Notice was published in *Investor's Business Daily* and over the *PR Newswire*. *See* Ex. D, ¶11.   Information regarding the Settlement, including copies of the Notice, Claim Form, and Settlement Agreement, was posted on the website established by A.B. Data specifically for this Settlement.  This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the [proposed judgment]."  Fed. R. Civ. P. 23(e)(1)(B).

65.     The Notice advises Settlement Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the Settlement Hearing.

66.     The Notice also contains information regarding the Fee Motion.[6]  As explained in the memorandum of law in support of the Settlement Approval Motion, the Notice fairly apprises Settlement Class Members of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, the PSLRA and due process.

## V.     THE PLAN OF ALLOCATION

67.     Lead Plaintiffs have proposed the Plan of Allocation to allocate the proceeds of the Net Settlement Fund among members of the Class who submit valid proofs of claim.

---

[6] Among other things, the Notice apprises the Settlement Class that "Court-appointed Lead Counsel Saxena White P.A. will apply to the Court for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed one-third (33⅓%) of the Settlement Fund," that "Saxena White will compensate [Lead Plaintiffs' fiduciary counsel] Klausner Kaufman for Klausner Kaufman's work in the Action from the attorneys' fees that the Court approves in an amount commensurate with Klausner Kaufman's efforts and contributions in the litigation and not to exceed 10% of the attorneys' fees awarded in this matter," and that "Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the institution, prosecution, and resolution of the claims against the Defendants, in an amount not to exceed $250,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class." ECF No. 91-4 at 3.

Pursuant the Court's Preliminary Approval Order, the full contents of the Plan are incorporated into the Notice that was disseminated to potential Settlement Class Members. *See* Ex. D at Ex. A (Notice) at ¶¶50-67. The objective of the Plan is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

68. Lead Plaintiffs engaged their damages and loss causation expert to prepare the Plan. In developing the Plan, Lead Plaintiffs' expert calculated the amount of estimated artificial inflation in the per share closing price of Covetrus common stock that was allegedly caused by Defendants' false and misleading statements and omissions. In so doing, Lead Plaintiffs' expert considered price changes in Covetrus common stock in reaction to the alleged corrective disclosure, adjusting for any price changes attributable to market or industry forces.

69. The Notice set forth and explained the proposed Plan to Settlement Class Members. It was prepared in consultation with Lead Plaintiffs' expert, tracks a theory of damages asserted by Lead Plaintiffs, accounts for the reduced likelihood of success on certain claims, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Class as a whole.

70. In response to the mailing of over 54,000 Notices, there have been no objections to the proposed Plan to date, further underscoring its fairness.

## VI. THE FEE AND EXPENSE APPLICATION

71. In addition to seeking final approval of the Settlement and Plan, Plaintiffs also request approval of Lead Counsel's application to the Court for an award of attorneys' fees and reimbursement of Litigation Expenses.

72. As detailed above, the recovery obtained for the Settlement Class was the result of thorough and diligent prosecutorial and investigative efforts, motion practice, extensive discovery efforts, and hard-fought settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or a significantly lower recovery) in the absence of a settlement.

73. The prosecution of the Action was significantly labor-intensive, and as is often the case with complex securities class actions, the attorneys involved would routinely have to spend significant stretches of their time focusing exclusively or near-exclusively on litigating this Action. As with all contingency fee cases, Lead Counsel ran a substantial risk that they would obtain no fee whatsoever. As aptly stated by Chief Judge McMahon of the Southern District of New York, "Lead Counsel understood from the outset that they were embarking on a complex, and potentially expensive and lengthy litigation, which would require the investment of thousands of hours of attorney time, with no guarantee of ever being compensated for their investment of such time and money." *Guevoura Fund Ltd. v. Sillerman, et. al.*, 2019 WL 6889901, at *19 (S.D.N.Y. Dec. 18, 2019) (McMahon, J.). Had Lead Counsel not willingly and vigorously undertaken the responsibility of representing the Settlement Class's interests here, the Settlement Class could well have recovered nothing for their claims.

74. Thus, with no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Securities class actions require substantial up-front costs. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like

29

this requires. Lead Counsel not only had to pay for their standard overhead expenses during the entirety of the litigation—including the time of numerous highly qualified and experienced attorneys—but had to advance all costs and expenses, including substantial electronic discovery costs, all without a guarantee of any recovery. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, which heavily supports the requested fee.

75.     Additionally, the risks undertaken, and difficulties presented in a complex securities class action such as this one favor approval of the requested fee award. As detailed above, and in the memoranda of law supporting the Settlement Approval Motion and the Fee Motion, the Action—asserting violations of §§10(b) and 20(a) of the Exchange Act—involved challenging issues of law and fact that presented considerable risk to Plaintiffs' case. Thus, when Lead Counsel undertook this engagement, there was no assurance that Lead Counsel would recover any payment for their services. Notably, by the end of 2021, 48% of securities class actions filed in 2019 (like this one) had been dismissed—twice the number of cases that had settled to that point.[7] *See also In re: Genworth Financial Sec. Litig.*, 210 F. Supp. 3d 837, 844 (E.D. Va. 2016) ("Even before trial, [] 54% of securities class actions cases are dismissed"). Indeed, as discussed above, the Court dismissed a significant portion of Plaintiffs' case at the pleading stage, and warned that the remaining claims had only "narrowly" survived, implying that these claims might not be sufficient to survive summary judgment.

76.     In addition, the quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the named

---

[7]   Cornerstone Research, Securities Class Action Filings 2021 Year in Review, at 18, available at https://www.cornerstone.com/wp-content/uploads/2022/02/Securities-Class-Action-Filings-2021-Year-in-Review.pdf

defendants were represented by a trio of renowned and experienced national defense firms. Indeed, Latham & Watkins LLP, a 3,200-attorney international law firm that was recently ranked fifth in the Vault Law 100, and whose efforts in this Action were directed by the former Global Chair of its Litigation & Trial department, serves as Defendants' Counsel.[8]  Additionally, Lead Counsel faced Morgan, Lewis & Bockius LLP, an international law firm founded with 2,200 lawyers and legal professionals ranked 34th in the Vault Law 100,[9] and Paul, Weiss, Rifkind, Wharton & Garrison LLP, a 1,000-attorney international law firm ranked 11th in the Vault Law 100.[10]  Despite this opposition, Lead Counsel was able to attain this outstanding Settlement.

77.     Furthermore, Courts in this Circuit and District frequently award attorneys' fees of one-third or even more of a common fund in class actions.  Indeed, as this Court has stated, a "request for one-third of the fund is reasonable and consistent with the norms of class litigation in this circuit."  *Amerigroup,* 2012 WL 3240461, at *5.  Here, Lead Counsel's request for an award of one-third of the Settlement Fund is inherently reasonable given that it is well in line with fees recently awarded in similar securities and other complex actions in this Circuit and around the country. *See, e.g., J.P. Morgan Stable Value Fund*, 2019 WL 4734396, at *6 (awarding one-third of $75 million recovery); *Chicago Bridge & Iron*, 2022 WL 3220783, at *1 (awarding one-third of $44 million recovery); *Perrigo*, 2022 WL 500913, at *1 (S.D.N.Y Feb. 18, 2022) (awarding one-third of $31.9 million recovery); *Cnova*, 2018 WL 11447878, at *3 (awarding one-third fee of $28.5 million recovery in action that settled prior to discovery);

---

[8] *See*:   https://www.lw.com/en/about-us;  https://legacy.vault.com/best-companies-to-work-for/law/top-100-law-firms-rankings

[9] *See*:  https://www.morganlewis.com/our-firm;  https://legacy.vault.com/best-companies-to-work-for/law/top-100-law-firms-rankings

[10] *See*:  https://www.paulweiss.com/about-the-firm; https://legacy.vault.com/best-companies-to-work-for/law/top-100-law-firms-rankings

*Landmen Partners*, 2013 WL 11330936, at *3 (one-third fee awarded on $85 million recovery); *see also* Lead Plaintiffs' memorandum of law in support of the Fee Motion, filed herewith ("Fee Memorandum") at 14-16 and cases cited therein.

78.     Furthermore, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request.  As set forth in Exhibits E and F, Plaintiffs' Counsel expended a total of 10,896.70 hours in the investigation, prosecution, and resolution of this Action from inception up through September 19, 2022.  The resulting lodestar is $5,790,092.50.  In light of this, the requested fee of one-third of the Settlement Fund yields a multiplier of 2.0—at the lower end of the range of multipliers awarded in this Circuit and around the country in comparable contingent securities and other complex class actions.  *See* Fee Memorandum at 16-17 and cases cited therein.  A fee equivalent to this modest multiplier of Lead Counsel's lodestar would appropriately compensate Lead Counsel for the risk it assumed in devoting significant attorney and staff time and resources to effectively prosecuting this Action against much larger and better-resourced, compensated defense counsel, all without any guarantee of ever receiving any payment.  *See, e.g., Guevoura Fund*, 2019 WL 6889901, at *18 ("counsel may be entitled to a 'multiplier' of their lodestar rate to compensate them for the risk assumed by them").[11]

79.     Furthermore, Lead Counsel's hourly rates are the same as, or comparable to, the rates submitted by comparable firms for lodestar cross-checks in other securities and other complex class action fee applications that have been granted in this District, Circuit, and others.  *See* Fee Memorandum at 17-18 and cases cited therein.  Indeed, Plaintiffs' Counsel's blended

---

[11] Such a result is also consistent with the public policy aims of the PSLRA, which recognizes that vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors.  If this important public policy is to be carried out, Lead Counsel should be "adequately compensated" taking into account the substantial risks undertaken in prosecuting securities class actions. *Amerigroup*, 2012 WL 3240461, at *5 ("Attorneys who fill the private attorney general role must be adequately compensated for their efforts").

32

hourly rate of approximately $531 underscores the reasonableness of the fee request and is well in-line with, and even below, blended hourly rates approved in this Circuit. *See* Fee Memorandum at 17 and cases cited therein (approving one-third fees for firms with blended rates of $618 to $769 per hour).

80.    Each attorney that prosecuted this Action performed substantive work that directly benefited the Settlement Class. The time spent by each attorney was reasonable and beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

81.    Additionally, aside from drafting the final settlement approval papers, Lead Counsel will continue to work towards effectuating the Settlement in the event that the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.

82.    In sum, based on the excellent results achieved for the Settlement Class, the quality of the work performed, and the risks of prosecuting the Action against Defendants, Lead Counsel submit that their request for a one-third fee award is fair, reasonable, and consistent with other similar fee awards in this Circuit.

83.    Lead Counsel also seek reimbursement of $159,480.05 in litigation expenses, well below the $250,000 upper limit set forth in the Notice mailed to the Class. *See* Exs. E and F. Lead Counsel respectfully submit that these expenses were reasonable and necessary in light of

33

the complexity and length of this litigation, and that reimbursement of these expenses would be appropriate and fair to the Settlement Class.

84.    Lead Counsel incurred these expenses at substantial risk to themselves and with no guarantee of receiving any reimbursement, or, indeed, any remuneration whatsoever.  Lead Counsel could not have effectively prosecuted this Action without incurring these expenses.  For example, Lead Counsel engaged the services of a specialized third-party vendor to host their database of electronically stored information produced in this Action, and could not have managed electronic discovery of this volume without the services of such a vendor.

85.    Additionally, the effective prosecution of the Action required the services of a qualified expert on market efficiency, loss causation, and damages.  Lead Counsel consulted with Mr. Chad Coffman, CFA and his team at Global Economics Group LLC to provide detailed damages analyses, a draft market efficiency report, and the proposed Plan of Allocation, among other things.  Each of these were critical to the resolution of the Action and/or the negotiation of the Settlement Agreement.

86.    In accordance with the PSLRA, Lead Plaintiffs City of Hollywood Police Officers' Retirement System and Pembroke Pines Pension Fund for Firefighters and Police Officers also seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class, in the amounts of $10,200 and $3,284.25 respectively.  The amount of time and effort devoted to this Action by the representatives of Lead Plaintiffs—who collectively expended considerable time and effort in initiating and actively supervising the litigation over a multi-year period, including by reviewing pleadings, collecting, and producing numerous documents, and actively participating in ongoing settlement discussions—is detailed in the accompanying Lead Plaintiff Declarations.  *See* Exs. A & B.

87.    Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type. As set forth in Lead Plaintiffs' declarations, each of the Lead Plaintiffs has, throughout the litigation of the Action, been fully committed to pursuing the interests of the Class. Lead Plaintiffs have actively and effectively complied with all of the many demands that arose during the litigation and the Settlement of this Action. Lead Plaintiffs' effort is precisely the type that courts have found to support reimbursement to class representatives, and fully supports Lead Plaintiffs' request for reimbursement.

## VII.    THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND LEAD PLAINTIFFS' APPROVAL

88.    As mentioned above, consistent with the Preliminary Approval Order, a total of 54,467 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed one-third of the Settlement Fund and payment of expenses in an amount not greater than $250,000, and that this amount might include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class. *See* Ex. D, Notice at ¶5. Additionally, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See* Ex. D, ¶11. The Notice has also been available on the settlement website maintained by the Claims Administrator (Ex. D, ¶12).

89.    Significantly, to date, not a single member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or motion for an award of attorneys' fees and reimbursement of Litigation Expenses. *See Guevoura Fund*, 2019 WL 6889901, at *22 (a "lack of objections" to a fee request, "in this day and age, is not only remarkable, but militates in favor

35

of approval of the Fees as requested"); *Vaccaro v. New Source Energy Partners L.P.*, 2017 WL6398636, at *8 (S.D.N.Y. Dec. 14, 2017) (Wood, J.) (the "fact that no class members have explicitly objected to these attorneys' fees supports their award"). This is particularly noteworthy given that the vast majority of the Class is comprised of sophisticated institutional investors who have the resources, professional staff, and financial motivation to object to the requested fee, if such an objection was warranted.

90.     Moreover, Lead Plaintiffs are themselves each sophisticated institutional investors that closely supervised and monitored the prosecution and the settlement of the Action.  As discussed in their declarations, Lead Plaintiffs have evaluated Lead Counsel's fee and expense application and believe that Lead Counsel's requested fee is fair and reasonable in light of the work counsel performed, the risks of the litigation, and the results achieved.[12]  The support and approval of court-appointed Lead Plaintiffs weighs heavily in favor of approval of a fee request. *See, e.g.*, *In re Genworth Fin. Sec. Litig.*, 2016 WL 7187290, at *2 (E.D. Va. Sep. 26, 2016) ("Lead Plaintiffs are sophisticated institutional investors that have been directly and extensively involved in the prosecution and resolution of the Action and have a substantial interest in ensuring that any fees paid to the Plaintiffs' Counsel are duly earned and not excessive"); *In re Veeco Instruments Inc. Sec. Litig.,* 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff . . . a large public pension fund—conscientiously supervised the work of lead counsel and has approved the fee request.").

---

[12] Lead Plaintiffs' retainer agreements provided that Lead Counsel could seek a one-third fee.  After the agreement to settle the Action was reached, Lead Plaintiffs again evaluated and approved Plaintiffs' Counsel's proposed one-third fee request.  *See* Exs. A and B at ¶¶13-14.

## VIII.  CONCLUSION

91.    For all the reasons discussed above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submit that the requested fee in the amount of one-third of the Settlement Fund should be approved as fair and reasonable, the request for reimbursement of total litigation costs and expenses in the total amount of $159,480.05 should be approved, and Lead Plaintiffs' reimbursement requests in the total amount of $13,484.25 should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed September 20, 2022.

/s/ Lester R. Hooker
Lester R. Hooker

37